UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ORIGINAL

- - - - - - - - - - - - - - - - - - - -x
                                       :
UNITED STATES OF AMERICA               :    SEALED
                                       :    INDICTMENT
         - v. -                        :
                                       :    15 Cr. ___
JASON GALANIS,                         :
JOHN GALANIS,                          :    **15 CRIM 643**
   a/k/a "Yanni,"                      :
JARED GALANIS,                         :
GARY HIRST,                            :
DEREK GALANIS,                         :
YMER SHAHINI, and                      :
GAVIN HAMELS,                          :
                                       :
         Defendants.                   :
                                       :
- - - - - - - - - - - - - - - - - - - -x

## COUNT ONE
### (Conspiracy to Commit Securities Fraud)

The Grand Jury charges:

### Relevant Individuals and Entities

1.   At all times relevant to this Indictment, Gerova Financial Group, Ltd. ("Gerova"), formerly known as Asia Special Situation Acquisition Corporation ("ASSAC"), purported to be an international reinsurance company incorporated in the Cayman Islands in March 2007 and later redomiciled in Bermuda. Gerova's officers and employees worked out of offices located in, among other places, New York, New York.  Until in or about 2011, Gerova, a foreign private issuer, traded publicly in the

United States on the New York Stock Exchange's ("NYSE") Amex
Equities exchange (the "Amex Exchange"), and later on the NYSE,
under the ticker symbol "GFC."  At certain times relevant to
this Indictment, trades on the Amex Exchange and the NYSE were
executed in New York, New York.  In or about July 2012, Gerova
commenced liquidation proceedings and filed for bankruptcy
protection.

<u>The GALANIS Family</u>

    2.   At all times relevant to this Indictment, JASON
GALANIS, the defendant, was an investment banker, venture
investor and consultant to a variety of publicly-traded and
privately held companies, including Gerova.  JASON GALANIS owned
equity, either directly or indirectly, in many of these
companies, including Gerova.  At certain points relevant to the
Indictment, JASON GALANIS owned or controlled, directly or
indirectly, approximately 50% of Gerova's free trading shares.
In or about April 2007, as a result of an action commenced by
the U.S. Securities and Exchange Commission (the "SEC"), JASON
GALANIS was judicially barred from serving as an officer or
director of a publicly-traded company for a period of five
years.

    3.   At all times relevant to this Indictment, JOHN
GALANIS, a/k/a "Yanni," the defendant, was a venture investor
who owned or invested in, directly or indirectly, a number of

publicly-traded and privately held companies.   JOHN GALANIS is
the father to, among others, JASON GALANIS, JARED GALANIS, and
DEREK GALANIS, the defendants.   Due to prior convictions and
regulatory proceedings involving securities fraud, JOHN GALANIS
often conducted his business through his sons, associates and/or
nominees.   In addition, as a result of an SEC action, JOHN
GALANIS was permanently barred from, among other things, trading
securities through any brokerage account other than in his own
name or the names of his wife or children.

    4.   At all times relevant to this Indictment, JARED
GALANIS, the defendant, a lawyer by training, participated in
transactions at the direction of JASON GALANIS, the defendant,
and others, in connection with, among others, the public and
private companies controlled by his brother, JASON GALANIS, and
his father, JOHN GALANIS, a/k/a "Yanni," the defendant.

    5.   At all times relevant to this Indictment, DEREK
GALANIS, the defendant, assisted JASON GALANIS, JOHN GALANIS,
a/k/a "Yanni," and JARED GALANIS, the defendants, in engaging in
certain transactions related to, among other companies, Gerova.

GALANIS Family Co-Conspirators

    6.   At certain times relevant to this Indictment, GARY
HIRST, the defendant, was the President of Gerova and the
Chairman of Gerova's Board of Directors.   As well, HIRST served

3

as an adviser to other companies affiliated with JASON GALANIS, the defendant.

7.   At all times relevant to this Indictment, YMER SHAHINI, the defendant, was a national of both Kosovo and Canada, and had an additional residence in the Czech Republic. SHAHINI and DEREK GALANIS, the defendant, were long-time friends; SHAHINI had prior business dealings with members of the GALANIS family.

<u>Investment Advisory Firms and Their Principals</u>

8.   At all times relevant to this Indictment, GAVIN HAMELS, the defendant, provided investment advisory services to clients through an investment advisory firm ("Investment Firm-1"), which was acquired by a bank ("Bank-1") in or about January 2010.  HAMELS served as the portfolio manager for Investment Firm-1 clients, while his partner, a co-conspirator not named as a defendant herein ("CC-1"), managed the client accounts.  At all times relevant to this Indictment, Investment Firm-1 (and Bank-1) was a registered investment adviser with the SEC.

9.   At all times relevant to this Indictment, a co-conspirator not named as a defendant herein ("CC-2") provided investment advisory services to clients through an investment advisory firm based in the U.S. Virgin Islands ("Investment Firm-2").  At all times relevant to this Indictment, CC-2 was

the President of Investment Firm-2, which was a registered investment adviser with the SEC.

10.  At all times relevant to this Indictment, a co-conspirator not named as a defendant herein ("CC-3"), provided investment advisory services to clients through an investment advisory firm ("Investment Firm-3"), which was registered with the SEC and based in Colorado Springs, Colorado.  At all relevant times, CC-3 was one of two principals of Investment Firm-3.

11.  At all times relevant to this Indictment, Weston Capital Asset Management ("Weston Capital") was a registered investment adviser with the SEC and had places of business in, among other places, New York, New York.  Weston Capital managed over a dozen funds, including a fund it called the Wimbledon Financing Fund ("WFF"), which focused on asset-backed lending investments.

12.  At all times relevant to this Indictment, Stillwater Capital Partners ("Stillwater") was a registered investment adviser that managed funds of other hedge funds, asset-backed funds, and real estate funds (collectively the "Stillwater Funds") for its clients.  At all times relevant to this Indictment, Stillwater's place of business was New York, New York.

## Overview of the Scheme to Defraud

13.   From in or about 2009 up to and including in or about 2011, JASON GALANIS, JOHN GALANIS, a/k/a "Yanni," JARED GALANIS, GARY HIRST, DEREK GALANIS, YMER SHAHINI, and GAVIN HAMELS, the defendants, conspired to engage in a scheme to defraud Gerova shareholders and the investing public by effecting securities transactions in Gerova stock for the purpose of conferring millions of dollars of undisclosed remuneration on JASON GALANIS and his co-conspirators, without adequate disclosure of JASON GALANIS's role in directing the transactions or the benefits received by JASON GALANIS and his co-conspirators.

14.   As a part of the scheme to defraud, JASON GALANIS, the defendant, with the complicity of, among others, GARY HIRST, the defendant, obtained sufficient control over Gerova so as to be able to cause Gerova to enter into transactions of his design, and for his benefit, including the issuance of Gerova stock, which often had no legitimate business purpose and which harmed other Gerova shareholders.  JASON GALANIS obtained this control without causing himself to be identified as an officer or director of Gerova so as to purport to abide by the SEC-imposed bar which forbade him from holding such positions at publicly traded companies.

15.   As a further part of the scheme to defraud, after causing Gerova to, among other things, issue shares of Gerova

stock at the time and in the manner and the quantity of his choosing, JASON GALANIS, the defendant, with the assistance of JOHN GALANIS, a/k/a "Yanni," JARED GALANIS, DEREK GALANIS, GARY HIRST, and YMER SHAHINI, the defendants, then gained and maintained control over a significant percentage of the free-trading shares of Gerova without publicly disclosing JASON GALANIS's control over those shares.  Among other means and methods, JASON GALANIS caused Gerova stock, which was intended for his ultimate benefit, to be issued to and held in the name of YMER SHAHINI, who knowingly served as a foreign nominee for JASON GALANIS.  JASON GALANIS, JOHN GALANIS, JARED GALANIS, DEREK GALANIS, HIRST, and SHAHINI understood that the purpose of the stock grant to SHAHINI was to disguise JASON GALANIS's ownership interest in the stock, and to evade the SEC's regulations for issuing unregistered shares of stock.

16.  At the same time, and as a further part of the scheme to defraud, JOHN GALANIS, a/k/a "Yanni," JARED GALANIS and DEREK GALANIS, the defendants, among others, with the knowledge and approval of JASON GALANIS, the defendant, opened and managed brokerage accounts in the name of YMER SHAHINI, the defendant (the "SHAHINI Accounts"), effected the sale of Gerova stock from the SHAHINI Accounts, and received and concealed the proceeds derived therefrom, knowing that this activity was designed to

conceal from the investing public JASON GALANIS's ownership of and control over the Gerova stock.

17.   As a further part of the scheme to defraud, JASON GALANIS, the defendant, with the assistance of JARED GALANIS, the defendant, among others, induced investment advisers, including GAVIN HAMELS, the defendant, CC-1, CC-2 and CC-3, to purchase shares of Gerova stock in the investment advisers' client accounts by offering compensation and/or other benefits to the respective investment adviser.  By causing the purchase of Gerova stock at the time, quantity and/or price of their choosing, JASON GALANIS and JARED GALANIS were able to, among other things, effectuate the sale of large quantities of Gerova stock from the SHAHINI Accounts that JASON GALANIS controlled while artificially maintaining the price of Gerova stock through the coordinated match trading described herein.  Such coordinated trading served to manipulate the market for Gerova stock and deceive the investing public, as HAMELS well knew.  As a result, JASON GALANIS and his co-conspirators reaped tens of millions of dollars in profits while defrauding the investing public.

## Deception To Ensure Gerova Maintained Its Listing On NYSE

18.   On or about January 19, 2010, Gerova was formed when ASSAC, its predecessor company, announced that it was changing its name to Gerova and that its shareholders had approved

several acquisitions.  At that time, ASSAC, which traded on the Amex Exchange, acquired, among other assets, (i) certain illiquid assets held by the Stillwater Funds and (ii) all of the assets of Weston Capital's Wimbledon Financing Fund.  ASSAC funded these acquisitions with the issuance of stock.

19.  In connection with Gerova's acquisition of certain assets held by the Stillwater Funds, CC-3, the investment adviser, played a role in introducing Stillwater to JASON GALANIS, the defendant, and Gerova.  Likewise, in connection with Gerova's acquisition of Weston Capital's Wimbledon Financing Fund, one of Gerova's officers caused Weston Capital to be introduced to JASON GALANIS and Gerova.

20.  In or about January 2010, JASON GALANIS, the defendant, learned that ASSAC had been asked by the NYSE, which owned and operated the Amex Exchange, to demonstrate that the company had, among other requirements, at least 400 "round-lot" shareholders, defined as shareholders who owned at least 100 shares, in order to demonstrate a sufficient investor base and trading interest to justify its public listing.

21.  In response to the Amex Exchange's request, JASON GALANIS, the defendant, directed CC-3, in a January 12, 2010 email, to "give [CC-3's] guy instructions to buy 100 shares in 200 accounts" belonging to the clients of CC-3's investment advisory firm (Investment Firm-3).

22.   On or about January 29, 2010, CC-3 declined to buy
Gerova stock for his clients unless and until JASON GALANIS, the
defendant, finalized an agreement on behalf of Gerova that
offered CC-3 compensation for his prior introduction of
Stillwater.   CC-3 emailed GALANIS:   "I am planning to help.
Need to get my consulting agreement done and shares received."
The next day, JASON GALANIS forwarded to CC-3 a proposed
consulting agreement between CC-3 and Gerova, and confirmed that
CC-3's promised shares, comprised of restricted stock worth
approximately $1 million, were being issued.   JASON GALANIS
engaged in this quid pro quo with CC-3 knowing that CC-3's
solicited purchases of Gerova stock, at JASON GALANIS's behest
and in exchange for remuneration, would not constitute the
genuine investor base and trading interest that the Amex
Exchange desired.

23.   Although he was not formally denominated an officer
nor director of Gerova, JASON GALANIS, the defendant, caused the
issuance of the approximately $1 million of restricted Gerova
stock for CC-3 with the assistance of GARY HIRST, the defendant,
who executed the consulting agreement on behalf of Gerova.

24.   The following week, beginning on or about February 3,
2010, upon receipt of the consulting agreement and in exchange
for the approximately $1 million of restricted Gerova stock, CC-
3 caused his firm to purchase approximately 17,700 Gerova shares

in approximately 80 separate client accounts.  Accordingly, at least partly as a result of the assistance of CC-3 procured by JASON GALANIS, the defendant, Gerova deceptively maintained its listing on the NYSE, thereby permitting its shares to continue to be publicly traded and to be used for other purposes, including for purposes of effecting transactions and as compensation.  The deception in connection with Gerova's public listing was never disclosed to Gerova's shareholders or the investing public.

### The Fraudulent Issuance and Sale of Gerova Stock for the Benefit of the Co-Conspirators

### The Fraudulent Consulting Agreement

25.  Sometime after Gerova secured its Amex Exchange listing, in or about 2010, JASON GALANIS, JOHN GALANIS, a/k/a "Yanni," JARED GALANIS, GARY HIRST, DEREK GALANIS, and YMER SHAHINI, the defendants, further schemed to cause Gerova to issue millions of free-trading shares of stock, for no legitimate business purpose, to benefit JASON GALANIS and his co-conspirators.

26.  Because Gerova had not complied with SEC regulations regarding the issuance of new shares of stock, its stock could not be issued to U.S. persons without restriction from resale for a period of at least six months, unless an exemption applied, as JASON GALANIS well knew.

27.   To effectuate the issuance of shares that could be
sold in the short term, which suited the scheme's purposes,
JASON GALANIS, JOHN GALANIS, a/k/a "Yanni," JARED GALANIS, GARY
HIRST, and DEREK GALANIS, the defendants, conspired to cause
Gerova to issue stock to a foreign individual who, as these
defendants well knew, could receive unrestricted shares of
Gerova stock under relevant SEC rules, so long as the foreign
national obliged himself, among other things, not to resell the
shares in the U.S.

28.   Accordingly, in furtherance of the scheme, in or about
May 2010, DEREK GALANIS, the defendant, at the direction of and
with the knowledge and approval of JASON GALANIS, JOHN GALANIS,
a/k/a "Yanni," and JARED GALANIS, the defendants, recruited his
friend, YMER SHAHINI, the defendant, a citizen of Kosovo and
Canada who was living in the Czech Republic at the time, to
participate in the co-conspirators' scheme by receiving Gerova
stock in SHAHINI's name, which stock was in fact controlled by
and for the benefit of JASON GALANIS and his co-conspirators, in
exchange for a portion of the scheme's proceeds.  As DEREK
GALANIS explained to SHAHINI in a May 22, 2010 email, "All we
need is a foreign national we trust which is where you come in
my friend.  Call me ASAP . . . Anytime day or night."

29.   In order to make the issuance of the Gerova shares
appear legitimate, JASON GALANIS, JOHN GALANIS, a/k/a "Yanni,"

JARED GALANIS, GARY HIRST, DEREK GALANIS, and YMER SHAHINI, the defendants, then caused Gerova to enter into a fraudulent consulting agreement with SHAHINI that falsely claimed that SHAHINI was owed compensation for introducing Weston Capital to Gerova in connection with Gerova's acquisition of certain of Weston Capital's assets in January 2010 (the "SHAHINI Consulting Agreement"). The purported execution date of the SHAHINI Consulting Agreement was January 22, 2010. In truth and in fact, and as the co-conspirators well knew, SHAHINI played no role in introducing Weston Capital to JASON GALANIS and/or Gerova and was not entitled to any compensation related thereto.

<u>The Fraudulent Warrant Agreement and Opinion Letter</u>

30. In addition to causing the issuance of the fraudulent SHAHINI Consulting Agreement, JASON GALANIS, JOHN GALANIS, a/k/a "Yanni," JARED GALANIS, GARY HIRST, DEREK GALANIS, and YMER SHAHINI, the defendants, caused Gerova to enter into a warrant agreement with SHAHINI, with a purported execution date of March 29, 2010 (the "SHAHINI Warrant Agreement"), which provided for the issuance of 11,000,000 warrants to SHAHINI in lieu of any cash payment called for by the SHAHINI Consulting Agreement, thereby enabling SHAHINI to acquire ordinary shares of Gerova at $7.50 per share.

31. In or about May 2010, JASON GALANIS, JOHN GALANIS, a/k/a "Yanni," JARED GALANIS, GARY HIRST, DEREK GALANIS, and

YMER SHAHINI, the defendants, fraudulently obtained an attorney opinion letter, transmitted to and from Westchester County, New York, which authorized the removal of restrictions on the Gerova shares to be issued to SHAHINI following his exercise of certain warrants pursuant to the SHAHINI Warrant Agreement.  The co-conspirators, including GARY HIRST, DEREK GALANIS, and YMER SHAHINI, procured the opinion letter based on the misrepresentation, among others, that SHAHINI intended to dispose of his securities to persons outside the United States, thereby complying with applicable SEC regulations, when in truth and in fact, the co-conspirators planned to sell the securities to persons in the United States and to personally profit therefrom.

32.  Having secured this opinion letter through fraudulent means, GARY HIRST, the defendant, with the knowledge of his co-conspirators, authorized the issuance of approximately 5.3 million ordinary shares of Gerova stock to YMER SHAHINI, the defendant, with the knowledge and understanding that the granting of stock to SHAHINI served to obscure the true ownership and control of the stock by JASON GALANIS, the defendant, and the other co-conspirators.  HIRST effected this stock grant despite language in Gerova's by-laws, of which HIRST was aware, that Gerova securities, including options and

14

warrants, could only be issued or conferred by the full Board of Directors or a designated committee thereof.

33. On or about May 27, 2010, the date of SHAHINI's receipt of the shares, the stock price of Gerova closed at $13.56 per share, rendering the 5.3 million shares worth approximately $72 million. Because there were approximately 5.6 million unrestricted public shares in the marketplace prior to May 27, 2010, the issuance of these 5.3 million shares almost doubled the public float of Gerova, thereby diluting the value of the shares owned by Gerova investors.

34. The issuance of approximately 5.3 million shares to YMER SHAHINI, the defendant, had no legitimate business purpose, as JASON GALANIS, JOHN GALANIS, a/k/a "Yanni," JARED GALANIS, GARY HIRST, DEREK GALANIS, and YMER SHAHINI, the defendants, well knew. For example, on May 27, 2010, the date the shares were transferred to SHAHINI, SHAHINI sent an e-mail to DEREK GALANIS acknowledging as much: "I forgot to mention accorting [sic] to this I'm rich!" DEREK GALANIS replied: "If we do this just right, my friend, we all may be!"

35. Just days later, on June 8, 2010, JOHN GALANIS, a/k/a "Yanni," the defendant, displayed his knowledge of the fact that YMER SHAHINI, the defendant, had done no work in connection with the Gerova/Weston Capital deal when JOHN GALANIS emailed SHAHINI certain basic information about Weston Capital -- information

SHAHINI surely would have known had he actually introduced Weston to Gerova and deserved the equivalent of $72 million in connection with the deal.

<u>The Intentional Non-Disclosure of the</u>
<u>Fraudulent Documents and the Stock Issuance</u>

36.  As a further part of the fraudulent scheme, JASON GALANIS, JOHN GALANIS, a/k/a "Yanni," JARED GALANIS, GARY HIRST, DEREK GALANIS, and YMER SHAHINI, the defendants, deliberately failed to disclose the existence of either the SHAHINI Consulting Agreement or the SHAHINI Warrant Agreement to Gerova's Board of Directors, Gerova's shareholders, the NYSE, or to the investing public.

37.  For example, an April 23, 2010 document submitted by GARY HIRST, the defendant, to the Amex Exchange, which purported to disclose, among other things, all consulting agreements entered into by Gerova as of that date, omitted any mention of the SHAHINI Consulting Agreement, despite the fact that the Agreement had purportedly been executed in January 2010 and clearly fell within the Amex Exchange's request.

38.  In addition, in or about June 2010, when specifically asked by Gerova's Chief Financial Officer (the "CFO") about the SHAHINI Consulting Agreement in connection with the CFO's preparation of the company's annual financial disclosures, GARY HIRST, the defendant, deliberately misled the CFO about the

fraudulent nature of the SHAHINI Consulting Agreement and
omitted entirely any mention of the SHAHINI Warrant Agreement or
the issuance of 5.3 million shares of Gerova stock, despite the
obvious relevance and connection of the two Agreements to each
other and to the company's financial disclosures.  By his false
and misleading statements and omissions, HIRST, with the
knowledge and approval of JASON GALANIS, the defendant, caused
certain of Gerova's publicly reported results to be false and
misleading, including the company's reported stock grants
related to the costs of its business combinations.

39.  Moreover, while the SHAHINI Warrant Agreement was
signed by GARY HIRST, the defendant, on behalf of Gerova, it was
not approved by Gerova's Board of Directors at the time of its
purported execution in or about March 2010, or otherwise made
known to any other officer or director of Gerova, until
September 2010, when Gerova's CFO discovered the shares granted
to YMER SHAHINI, the defendant, only while reviewing a
shareholder list provided by a third party.  Only upon the
insistence of Gerova's CFO did HIRST present the Warrant
Agreement to Gerova's Board of Directors in or about October
2010, for after-the-fact ratification.

40.  As a further example, in or about January 2011, GARY
HIRST, the defendant, with the knowledge and approval of JASON
GALANIS, the defendant, caused Gerova to issue a letter to the

17

NYSE containing material misrepresentations concerning, among
other things, the true ownership and control of the 5.3 million
shares of Gerova stock issued pursuant to the SHAHINI Warrant
Agreement.

### Deception in Connection With the SHAHINI Accounts

41.  In furtherance of the conspiracy and the scheme to
defraud, JASON GALANIS, JOHN GALANIS, a/k/a "Yanni," JARED
GALANIS, DEREK GALANIS, and YMER SHAHINI, the defendants, caused
the 5.3 million shares of Gerova stock issued in May 2010 to be
deposited into the SHAHINI Accounts, which were held at three
different U.S. brokerages, and then later to be sold in the U.S.
for the benefit of the co-conspirators.

42.  In order to facilitate this aspect of the scheme,
DEREK GALANIS, JARED GALANIS and JOHN GALANIS, a/k/a "Yanni,"
the defendants, directed YMER SHAHINI, the defendant, to open
each of the SHAHINI Accounts, and, in correspondence with
SHAHINI, provided him with instructions for communicating with
representatives of the respective brokerage firms.  In certain
of these communications, SHAHINI made materially false
statements to the brokerage firms where the SHAHINI Accounts
were held, including on or about June 21, 2010, when SHAHINI
represented to one firm that he had received five million shares
of Gerova as a "fee" for helping to facilitate the
Gerova/Stillwater transaction, when in truth and in fact, and as

18

set forth above in paragraphs 19, 22 and 23, CC-3 had previously received compensation for making that same introduction and SHAHINI had played no role in it, as he knew.

43.   In addition, YMER SHAHINI, the defendant, gave JARED GALANIS and DEREK GALANIS, the defendants, as well as an employee ("Associate-1") of an entity associated with JOHN GALANIS, a/k/a "Yanni," the defendant, power to execute trades and disburse proceeds from the SHAHINI Accounts on his behalf. When SHAHINI did engage in transactions in the SHAHINI Accounts, he did so at the direction of JASON GALANIS, the defendant, JOHN GALANIS, JARED GALANIS, and DEREK GALANIS.

44.   For example, on or about November 15, 2010, JOHN GALANIS, a/k/a "Yanni," the defendant, emailed Associate-1 copying JARED GALANIS, the defendant, with the subject "tasks for the 16th as I will be traveling."  In the email, JOHN GALANIS instructed Associate-1 to, among other things, transfer almost three million shares of Gerova among the SHAHINI Accounts and to "sell 40,000 shares of [Gerova] from the [SHAHINI] [A]ccount." Regarding the Gerova sales, JOHN GALANIS wrote: "Most important you put orders 10,000 shares at a time every hour on the [hour] starting at 10:00PST with the last one 10 minutes before the close."

45.   In engaging in this aspect of the scheme, JOHN GALANIS, a/k/a "Yanni," the defendant, acted in direct violation

of his judicially-imposed lifetime bar on executing securities trades in brokerages accounts in the names of those other than his own or his family members'.  In order to conceal his role in directing the stock trading in the SHAHINI Accounts, JOHN GALANIS took steps to disguise his communications by, for example, using an email account in the name of an attorney who worked for the GALANIS family, rather than in his own name.

46.  YMER SHAHINI, the defendant, well understood his role in the scheme, describing himself in an April 2012 letter to JOHN GALANIS, a/k/a "Yanni," the defendant, as a "foreign nominee" who had allowed the GALANIS family to "maintain [a] grip upon [his] identity for [its] own fraudulent use" including "operating bank accounts under [SHAHINI's] name" "as well as sending fraudulent emails."

Manipulating the Market for Gerova Stock
With Investment Firm-1

47.  On or about June 14, 2010, JASON GALANIS, JOHN GALANIS, a/k/a "Yanni," JARED GALANIS, DEREK GALANIS, and YMER SHAHINI, the defendants, began to cause the sale of Gerova stock from the SHAHINI Accounts.  From their trading in the last two weeks of June 2010, the defendants realized a net profit of approximately $6.4 million.  During many of those trading days, sales from the SHAHINI Accounts constituted a significant portion of the daily volume of Gerova shares traded.

48.  By the end of June 2010, however, Gerova's stock price
had declined dramatically from its closing price on June 14,
2010, which was $17.25 per share, to $5.41 per share -- a nearly
69 percent decline.  The drop in Gerova's stock price hurt the
conspirators' ability to profit from their scheme.

49.  In order to artificially stabilize Gerova's stock
price in the face of the selling pressure from the SHAHINI
Accounts, and to maximize the profits for the illicit scheme,
JASON GALANIS, the defendant, sought out investment advisers who
would be willing to corruptly coordinate purchases of Gerova
stock in client accounts with sales from the SHAHINI Accounts,
thereby propping up the stock price and manipulating the market,
in exchange for compensation or some other benefit.

50.  On or about June 23, 2010, JASON GALANIS, the
defendant, attended a meeting at a hotel in Los Angeles,
California with GAVIN HAMELS, the defendant, and CC-1 from
Investment Firm-1.  At the time of the meeting, Investment Firm-
1 was suffering from significant trading losses incurred in
certain client accounts, as JASON GALANIS knew.  At the meeting,
JASON GALANIS proposed that HAMELS and CC-1 buy $10 million
worth of Gerova stock in their clients' accounts in exchange for
stock and cash for the benefit of Investment Firm-1.
Specifically, JASON GALANIS offered to compensate HAMELS and CC-
1 for purchasing Gerova stock by transferring to Investment

21

Firm-1 clients, at no cost, shares of two companies that traded on the Over-The-Counter Bulletin Board and which JASON GALANIS controlled (the "OTC Stocks") as well as up to $2 million for Investment Firm-1 clients who had suffered losses.  Further, JASON GALANIS requested that HAMELS and CC-1 commit to holding GEROVA stock in their client accounts for at least one year.

51.  GAVIN HAMELS, the defendant, and CC-1 agreed to participate in the fraudulent scheme, with the knowledge and understanding that their purchases would be used to manipulate the market for Gerova stock, although they determined that they could not purchase more than approximately $5 million of stock in client accounts.  On or about June 30, 2010, JASON GALANIS, the defendant, emailed JARED GALANIS, the defendant, and told him that he had reached a deal with HAMELS and CC-1, and instructed JARED GALANIS to make one of what was to be several wire transfers of money to Investment Firm-1 clients.

52.  Between approximately July 6, 2010 and September 10, 2010, GAVIN HAMELS, the defendant, with CC-1's knowledge, purchased approximately 900,000 shares of Gerova for approximately 60 Investment Firm-1 clients, at a total cost of approximately $5.3 million in clients' funds.

53.  At or about the same time, JASON GALANIS and JARED GALANIS, the defendants, caused Investment Firm-1 clients to receive cash and hundreds of thousands of shares of the OTC

Stocks which appeared to have some value on their face but because both were thinly traded could not readily be sold by Investment Firm-1 clients.

54. In executing the purchases of Gerova stock, GAVIN HAMELS, the defendant, followed explicit instructions from JARED GALANIS, the defendant, which JASON GALANIS, the defendant, understood, as to the time, price and quantity of Gerova stock to be bought. In so doing, JASON GALANIS and JARED GALANIS ensured that sales from the SHAHINI Accounts were matched by purchases from Investment Firm-1's clients at prices they set.

55. To match their trades, GAVIN HAMELS, the defendant, and JARED GALANIS, the defendant, spoke on the phone throughout the relevant trading day. For example, on or about August 10, 2010 and August 11, 2010, HAMELS and JARED GALANIS knowingly coordinated their trades as follows:

| Date/Time | Event |
|---|---|
| 8/10/2010<br>11:03am PDT | **PHONE CALL:** JARED GALANIS to HAMELS |
| 8/10/2010<br>11:13am PDT | **SELL ORDER:** sell order executed from a SHAHINI Account for 7,000 shares of Gerova at $6.22/share<br>**BUY ORDER:** Investment Firm-1 executes buy order for 7,000 shares of Gerova at $6.22/share |
| 8/10/2010<br>12:17pm PDT | **PHONE CALL:** JARED GALANIS to HAMELS |
| 8/10/2010<br>12:17pm PDT | **SELL ORDER:** sell order executed from a SHAHINI Account for 9,000 shares of Gerova at $6.20/share<br>**BUY ORDER:** Investment Firm-1 executes buy order for 9,000 shares of Gerova at $6.20/share |
| 8/11/2010<br>9:43am PDT | **PHONE CALL:** JARED GALANIS to HAMELS |
| 8/11/2010<br>9:49am PDT | **SELL ORDER:** sell order executed from a SHAHINI Account for 10,000 shares of Gerova at $5.94/share |

| | BUY ORDER: Investment Firm-1 executes buy order for 10,000 shares of Gerova at $5.94/share |
|---|---|

56.   As another example, on or about September 9, 2010, GAVIN HAMELS, the defendant, and JARED GALANIS, the defendant, knowingly coordinated the following trades:

| Date/Time | Event |
|---|---|
| 9/9/2010<br>9:21am PDT | PHONE CALL: JARED GALANIS to HAMELS |
| 9/9/2010<br>9:49am PDT | SELL ORDER: sell order executed from a SHAHINI Account for 900 shares of Gerova at $5.55/share |
| 9/9/2010<br>9:53am PDT | SELL ORDER: sell order executed from a SHAHINI Account order for 19,100 shares of Gerova at $5.50/share |
| 9/9/2010<br>10:00am PDT | BUY ORDER: Investment Firm-1 executes a series of buy orders for 16,800 shares of Gerova at $5.50/share |
| 9/9/2010<br>10:00am PDT | SELL ORDER: sell order executed from a SHAHINI Account for 5,000 shares of Gerova at $5.50/share |
| 9/9/2010<br>10:04am PDT | SELL ORDER: sell order executed from a SHAHINI Account for 8,600 shares of Gerova at $5.50/share<br>BUY ORDER: Investment Firm-1 executes buy order for 6,000 shares of Gerova at $5.50/share |
| 9/9/2010<br>10:09am PDT | BUY ORDER: Investment Firm-1 executes buy order for 2,200 shares of Gerova at $5.50/share |
| 9/9/2010<br>10:15am PDT | PHONE CALL: JARED GALANIS to HAMELS |
| 9/9/2010<br>10:18am PDT | BUY ORDER: Investment Firm-1 executes buy order for 2,000 shares of Gerova at $5.49/share |
| 9/9/2010<br>10:57am PDT | PHONE CALL: HAMELS to JARED GALANIS |
| 9/9/2010<br>11:04am PDT | BUY ORDER: Investment Firm-1 executes a series of buy orders for a total of 27,200 shares of Gerova at an average of $5.35/share |
| 9/9/2010<br>11:07am PDT | BUY ORDER: Investment Firm-1 executes a series of buy orders for a total of 2,800 shares of Gerova at an average of $5.35/share |
| 9/9/2010<br>2:05pm PDT | PHONE CALL: HAMELS to JARED GALANIS |
| 9/9/2010<br>2:06pm PDT | PHONE CALL: HAMELS to JARED GALANIS |

57.   GAVIN HAMELS, the defendant, and CC-1 intentionally failed to disclose to either their clients, or their employer, Bank-1, that their receipt of the shares of the OTC Stocks and cash was in exchange for their agreement to cause their clients to purchase Gerova stock.

58.   On or about September 24, 2010, GAVIN HAMELS, the defendant, and CC-1 were fired by Bank-1 after Bank-1 discovered the corrupt arrangement that HAMELS and CC-1 had entered into with JASON GALANIS, the defendant.  Bank-1 then reimbursed the clients for whom HAMELS had purchased Gerova shares, and liquidated the firm's Gerova holdings.

### Manipulating the Market for Gerova Stock With Investment Firm-2

59.   Shortly after GAVIN HAMELS, the defendant, and CC-1 were fired by Bank-1, JASON GALANIS and JARED GALANIS, the defendants, sought a new investment adviser who would be willing to purchase the Gerova shares they were selling from the SHAHINI Accounts in order to continue the scheme to manipulate the market.  In or about September 2010, CC-2 agreed to begin purchasing Gerova shares for his clients at Investment Firm-2, in close coordination with sales of Gerova stock from the SHAHINI Accounts.

60.   From on or about September 28, 2010 through on or about February 22, 2011, CC-2 purchased, on a net basis, over

1.5 million shares of Gerova for his clients' accounts for a total of $24 million.  During that same time period, over 900,000 shares of Gerova were sold from the SHAHINI Accounts.

61.  Many of the purchases of Gerova by CC-2 in his clients' accounts closely matched sales of Gerova from the SHAHINI accounts.  The following chart shows the approximate quantities of Gerova shares purchased by CC-2, on behalf of his clients, and sold from the SHAHINI Accounts on selected dates:

| Date | Shares of Gerova Purchased by CC-2 | Shares of Gerova Sold from the SHAHINI Accounts |
|---|---|---|
| 10/11/2010 | 25,000 | 32,600 |
| 10/12/2010 | 25,000 | 50,000 |
| 10/13/2010 | 41,600 | 49,000 |
| 10/14/2010 | 10,000 | 12,183 |
| 10/15/2010 | 16,000 | 28,638 |
| 10/18/2010 | 27,000 | 24,900 |
| 10/20/2010 | 40,000 | 39,000 |
| 10/21/2010 | 36,200 | 32,305 |
| 10/28/2010 | 48,000 | 48,806 |
| 10/29/2010 | 42,600 | 36,000 |
| 11/3/2010 | 27,400 | 25,800 |
| 11/16/2010 | 10,000 | 10,000 |

62.  Correspondence between JARED GALANIS, the defendant, and CC-2 further demonstrates that the trades were coordinated.  For example:

a.  On or about October 19, 2010, JARED GALANIS, the defendant, asked CC-2 to do "5k in here," and told CC-2 that he needed the bid "above $5, very important."  On that same day, CC-2 purchased 24,000 shares of Gerova at $5.01 per share.

b.    In a December 13, 2010 e-mail, JARED GALANIS, the defendant, asked CC-2 to put in a "bid pre-opening for 3500 shares at 26," and on the following day, CC-2 confirmed that he complied with the request.

c.    Also on or about December 13, 2010, JARED GALANIS, the defendant, sent an email to CC-2.  In the email, JARED GALANIS quoted the text of an email that JASON GALANIS, the defendant, sent to GARY HIRST, the defendant.  Specifically, JARED GALANIS quoted JASON GALANIS as stating the following in his email to HIRST regarding CC-2's purchases of Gerova shares: "it is worth noting that [CC-2] has acquired 975,000 POST SPLIT shares in the market thus far.  he is the sole reason [Gerova] isn't in the toilet."

63.   JASON GALANIS, the defendant, provided CC-2 with benefits in exchange for CC-2's coordinated trading activity in Gerova stock.  For example, on or about August 28, 2010, an entity associated with the GALANIS family transferred approximately 1.6 million shares of Gerova to an account that JASON GALANIS maintained at Investment Firm-2.  These shares, which were in addition to the approximately 1.5 million shares that CC-2 purchased on the open market, were later distributed to Investment Firm-2 clients by CC-2 at no cost.  CC-2 described these shares to clients as a "2-for-1," a "buy one get one free," or a special dividend from Gerova.

<u>The GALANIS Family and their Co-Conspirators Profit</u>
<u>From the Sales of Gerova Stock</u>

64.  From in or about June 2010 through in or about May 2011, the SHAHINI Accounts realized approximately $20 million in profits from the sales of Gerova stock.  During that time period, JASON GALANIS, JOHN GALANIS, a/k/a "Yanni," JARED GALANIS, DEREK GALANIS, and YMER SHAHINI, the defendants, along with Associate-1, caused to be made numerous wire transfers from the SHAHINI Accounts, in order to distribute the proceeds of the sales of Gerova stock.  Virtually all of these transfers, which totaled approximately $19 million, were to entities and individuals affiliated, either directly or indirectly, with JASON GALANIS, JOHN GALANIS, JARED GALANIS, DEREK GALANIS, and GARY HIRST.

65.  For example, the following wire transfers occurred in furtherance of the scheme described above:

a.    On or about June 17, 2010, $450,000 of the proceeds from the sale of Gerova shares in one of the SHAHINI Accounts was transferred by wire to a bank account associated with the law firm of JARED GALANIS, the defendant.

b.    On or about June 18, 2010, $162,000 of the proceeds from the sale of Gerova shares in one of the SHAHINI Accounts was transferred by wire to a bank account associated

with an entity, 100 percent of the stock of which was owned by

JASON GALANIS, the defendant.

      c.      On or about June 22, 2010, $2,620,000 of the

proceeds from the sale of Gerova shares in one of the SHAHINI

Accounts was transferred by wire to a bank account associated

with an entity controlled by GARY HIRST, the defendant.

      d.      On or about July 28, 2010, $1,747,000 of the

proceeds from the sale of Gerova shares in one of the SHAHINI

Accounts was transferred by wire to a bank account ("Bank

Account-1") associated with the attorney who provided the

fraudulently procured opinion letter discussed above in

paragraph 31 of this Indictment.  Bank Account-1 was opened at a

bank branch located in New York, New York.  This wire transfer

occurred after JOHN GALANIS, a/k/a "Yanni," sent an email to

YMER SHAHINI, the defendant, on or about July 26, 2010, which

directed SHAHINI to wire $1,750,000 to "my [JOHN GALANIS's]

attorney."

      66.  On or about February 23, 2011, following the

publication of articles which questioned whether Gerova had

engaged in wrongdoing, the NYSE halted trading of Gerova's

stock.  In April 2011, Gerova asked the New York Stock Exchange

to delist its securities.  Gerova's stock price bottomed out at

$0.00 per share on or about November 2, 2011.

67. Many of the investors on whose behalf Gerova stock was purchased as a result of the match trading described herein lost substantial amounts of money following the decline in the price of Gerova stock. A single investor at Investment Firm-2, on whose behalf CC-2 had purchased Gerova stock as part of the scheme, for instance, lost over $11 million.

### Statutory Allegation

68. From at least in or about 2009 through in or about 2011, in the Southern District of New York and elsewhere, JASON GALANIS, JOHN GALANIS, a/k/a "Yanni," JARED GALANIS, GARY HIRST, DEREK GALANIS, YMER SHAHINI, and GAVIN HAMELS, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

69. It was a part and object of the conspiracy that JASON GALANIS, JOHN GALANIS, a/k/a "Yanni," JARED GALANIS, GARY HIRST, DEREK GALANIS, YMER SHAHINI, and GAVIN HAMELS, the defendants, and others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce and of the mails, and of the facilities of national securities exchanges, would and did use and employ

manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

Overt Acts

70.   In furtherance of the conspiracy and to effect its illegal object, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   In or about 2010, JASON GALANIS, the defendant, caused the fraudulent SHAHINI Consulting Agreement to be issued to YMER SHAHINI, the defendant.

b.   In or about May 2010, DEREK GALANIS, the defendant, recruited SHAHINI to receive Gerova shares in SHAHINI's name but which were to be controlled by the co-conspirators.

c.   On or about May 26, 2010, GARY HIRST, the defendant, procured an opinion letter from an attorney in Westchester County, New York.

31

d.    On or about June 23, 2010, JASON GALANIS, the
defendant, met with GAVIN HAMELS, the defendant, and CC-1 at a
hotel in Los Angeles, at which they agreed to a quid pro quo
arrangement concerning Gerova stock.

e.    On or about July 28, 2010, JOHN GALANIS, a/k/a
"Yanni," the defendant, caused $1,747,000 of the proceeds from the
sale of Gerova shares in one of the SHAHINI Accounts to be
transferred by wire to Bank Account-1, which was opened at a bank
branch located in New York, New York.

f.    On or about September 9, 2010, JARED GALANIS, the
defendant, engaged in manipulative trading of Gerova stock with
GAVIN HAMELS, the defendant.

g.    On or about November 15, 2010, JOHN GALANIS, a/k/a
"Yanni," the defendant, sent an email containing instructions for
the sale of Gerova stock from the SHAHINI Accounts.

h.    In or about January, 2011, GARY HIRST, the
defendant, sent a letter to the NYSE in New York, New York
containing false and misleading statements concerning the true
ownership and control of the approximately 5.3 million shares
issued pursuant to the SHAHINI Warrant Agreement.

(Title 18, United States Code, Section 371.)

## COUNT TWO
(Securities Fraud)

The Grand Jury further charges:

71.  The allegations contained in paragraphs 1 through 67 of this Indictment are repeated and realleged as if fully set forth herein.

72.  From at least in or about 2009 through in or about 2011, in the Southern District of New York and elsewhere, JASON GALANIS, JOHN GALANIS, a/k/a "Yanni," JARED GALANIS, GARY HIRST, DEREK GALANIS, YMER SHAHINI, and GAVIN HAMELS, the defendants, and others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce and of the mails, and of the facilities of national securities exchanges, used and employed manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, the defendants engaged in a scheme to defraud Gerova shareholders and the investing public by effecting

33

securities transactions in Gerova stock for the purpose of
conferring undisclosed remuneration on JASON GALANIS and his co-
conspirators, without adequate disclosure of JASON GALANIS's
role in the transactions or the benefits received by JASON
GALANIS and his co-conspirators.

> (Title 15, United States Code, Sections 78j(b) & 78ff;
> Title 17, Code of Federal Regulations, Section 240.10b-5;
> and Title 18, United States Code, Section 2.)

## COUNT THREE
(Conspiracy to Commit Wire Fraud)

The Grand Jury further charges:

73.  The allegations contained in paragraphs 1 through 67
of this Indictment are repeated and realleged as if fully set
forth herein.

74.  From at least in or about 2009 through in or about
2011 in the Southern District of New York and elsewhere, JASON
GALANIS, JOHN GALANIS, a/k/a "Yanni," JARED GALANIS, GARY HIRST,
DEREK GALANIS, and YMER SHAHINI, the defendants, and others
known and unknown, willfully and knowingly did combine,
conspire, confederate, and agree together and with each other to
commit an offense against the United States of America, to wit,
wire fraud, in violation of Title 18, United States Code,
Section 1343.

75.  It was a part and an object of the conspiracy that
JASON GALANIS, JOHN GALANIS, a/k/a "Yanni," JARED GALANIS, GARY

HIRST, DEREK GALANIS, and YMER SHAHINI, the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

### COUNT FOUR
(Wire Fraud)

The Grand Jury further charges:

76.   The allegations contained in paragraphs 1 through 67 of this Indictment are repeated and realleged as if fully set forth herein.

77.   From at least in or about 2009 through in or about 2011 in the Southern District of New York and elsewhere, JASON GALANIS, JOHN GALANIS, a/k/a "Yanni," JARED GALANIS, GARY HIRST, DEREK GALANIS, and YMER SHAHINI, the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and

promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, the defendants engaged in a scheme to defraud Gerova shareholders and the investing public, including through the use of e-mails and wire transfers, by effecting securities transactions in Gerova stock for the purpose of conferring undisclosed remuneration on JASON GALANIS and his co-conspirators, without adequate disclosure of JASON GALANIS's role in the transactions or the benefits received by JASON GALANIS and his co-conspirators.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNTS FIVE THROUGH SEVEN
(Investment Adviser Fraud)

The Grand Jury further charges:

78.  The allegations contained in paragraphs 1 through 67 of this Indictment are repeated and realleged as if fully set forth herein.

79.  From in or about 2007 through in or about 2011, in the Southern District of New York and elsewhere, as part of his scheme to enrich himself, his family members and his associates, JASON GALANIS, the defendant, with the assistance of JARED GALANIS, the defendant, induced investment advisers, including

GAVIN HAMELS, the defendant, CC-1, CC-2, and CC-3 to make investments on their clients' behalf in GALANIS-related entities by providing compensation or other benefits to those investment advisers that were not disclosed to the investment advisers' clients.  JASON GALANIS and JARED GALANIS arranged these quid pro quo transactions with the knowledge and understanding that the investment advisers, whose businesses were often in precarious financial situations, would not fully disclose the quid pro quo arrangements to their clients.

### Background on Registered Investment Advisory Firms

80.  Investment Firm-1, Investment Firm-2, and Investment Firm-3 (collectively, the "Investment Firms"), like most investment advisory firms registered with the SEC, managed portfolios of securities and provided advice on investments for clients.  Compensation took different forms but typically included a fee based on total assets under management and additional performance-based returns.  Pursuant to investment advisory agreements, clients empowered these Investment Firms and their principals to make investment decisions on their behalf, with the understanding that the investment advisers would make such decisions based on the best interests of their clients.

## The Schemes to Defraud

81.   As described herein, JASON GALANIS and JARED GALANIS,
the defendants, aided and abetted fraud on investment advisory
clients on at least three occasions.  GAVIN HAMELS, the
defendant, was a principal of the investment advisory firm in
one such instance and participated in the fraud.  In each case,
rather than making investment decisions based upon the best
interests of their clients, as they were legally obligated to
do, the principals of the investment advisory firms -- including
HAMELS -- instead made investment decisions for their clients
based on their own interests and those of their close
associates, including JASON GALANIS and JARED GALANIS.

82.   First, from in or about June 2010 through in or about
September 2010, JASON GALANIS and JARED GALANIS, the defendants,
provided free shares of the OTC Stocks, as well as a promise of
up to $2 million of liquidity for the investment advisory
clients, to GAVIN HAMELS, the defendant, and to CC-1, in
exchange for HAMELS and CC-1 committing to cause their clients
to buy approximately $5 million in Gerova stock, in
transactions, some of which were executed in New York, New York,
as described in paragraphs 50 through 58 above.  HAMELS and CC-1
concealed from their clients that the receipt of the shares of
the OTC stocks and the promise of millions of dollars in

liquidity was in exchange for HAMELS's and CC-1's agreement to cause their clients to purchase Gerova stock.

83.    Second, from in or about 2007 through in or about 2011, JASON GALANIS and JARED GALANIS, the defendants, caused millions of dollars in payments to be made to CC-2 in exchange for CC-2 investing over $100 million of Investment Firm-2's clients' funds in various entities associated with JASON GALANIS and JARED GALANIS, including by purchasing shares of Gerova. Some of the purchases of Gerova stock that CC-2 made on his clients' behalf were executed in New York, New York.  CC-2 concealed from his clients his receipt of compensation in exchange for the investment of his clients' funds in entities associated with JASON GALANIS and JARED GALANIS.

84.    Third, from in or about January 2010 through in or about February 2010, JASON GALANIS, the defendant, caused approximately $1 million of restricted Gerova shares to be issued to CC-3 in exchange for CC-3 purchasing Gerova stock on behalf of Investment Firm-3 clients so that Gerova could remain listed on the NYSE Amex Exchange, as described in paragraphs 19 through 24 above.  The restricted Gerova shares had previously been promised to CC-3 as compensation for introducing the Stillwater acquisition to Gerova, but JASON GALANIS did not cause the Gerova shares to be issued until CC-3 conditioned the purchase of Gerova stock for his clients on his receipt of such

payment.  The purchases of Gerova shares on behalf of Investment
Firm-3 clients were executed in New York, New York.  CC-3
concealed from his clients, among other things, that he had
received consideration, in the form of restricted Gerova stock
from JASON GALANIS, in return for causing Investment Firm-3
clients' purchases of Gerova stock.

### Statutory Allegation

85.  On or about the dates set forth below, in the Southern
District of New York and elsewhere, JASON GALANIS, JARED
GALANIS, and GAVIN HAMELS, the defendants, willfully and
knowingly used the mails and other means and instrumentalities
of interstate commerce, directly and indirectly, (a) to employ a
device, scheme, and artifice to defraud clients and prospective
clients; (b) to engage in a transaction, practice, and course of
business which operated as a fraud and deceit upon clients and
prospective clients; and (c) to engage in an act, practice, and
course of business which was fraudulent, deceptive, and
manipulative, to wit, JASON GALANIS and JARED GALANIS aided and
abetted fraud by a number of investment advisers, including
HAMELS, in which the advisers intentionally withheld material
information regarding transactions, including their receipt of
benefits in exchange for purchasing certain securities, from
their investment advisory clients, as listed below.

| COUNT | DATE(S) | DEFENDANTS | INVESTMENT ADVISERS |
|-------|---------|------------|---------------------|
| FIVE | June 2010 through September 2010 | JASON GALANIS<br>JARED GALANIS<br>GAVIN HAMELS | Investment Firm-1 (GAVIN HAMELS and CC-1) |
| SIX | 2007 through 2011 | JASON GALANIS<br>JARED GALANIS | Investment Firm-2 (CC-2) |
| SEVEN | January 2010 through February 2010 | JASON GALANIS | Investment Firm-3 (CC-3) |

(Title 15, United States Code, Sections 80b-6 and 80b-17; and Title 18, United States Code, Section 2.)

## COUNT EIGHT
(Conspiracy to Commit Securities Fraud)

The Grand Jury further charges:

### The Scheme to Defraud

86.  The allegations contained in paragraphs 1 through 67 and 79 through 84 of this Indictment are repeated and realleged as if fully set forth herein.

87.  From in or about November 2007 up to and including in or about April 2010, JASON GALANIS and JARED GALANIS, the defendants, along with CC-2, participated in a scheme to defraud the clients of Investment Firm-2.  As set forth above, oftentimes in exchange for compensation from JASON GALANIS and JARED GALANIS, CC-2 caused Investment Firm-2 clients to invest in notes issued by entities associated with JASON GALANIS and JARED GALANIS, i.e., to make loans to entities associated with JASON GALANIS and JARED GALANIS.

When these obligations to Investment Firm-2 clients became due, CC-2 directed a complex series of securities trades among and between client accounts that CC-2 controlled.  These trades allowed CC-2 to use funds in Investment Firm-2 client accounts for the benefit of JASON GALANIS and JARED GALANIS.

88.  When obligations owed by entities associated with JASON GALANIS and JARED GALANIS, the defendants, became due, CC-2 used client funds to either purchase notes issued by other entities associated with JASON GALANIS and JARED GALANIS, or publicly-traded shares held by such entities.  The funds generated were then used to pay the original obligations owed to other Investment Firm-2 clients.  Through these securities trades, funds in client accounts of one set of Investment Firm-2 investors were used to pay obligations owed to a different set of Investment Firm-2 investors by entities associated with JASON GALANIS and JARED GALANIS.

89.  At certain times relevant to this Indictment, the custodian of Investment Firm-2's client accounts was located in New York, New York, and communications regarding the placement and disposition of assets in Investment Firm-2 client accounts were directed to the custodian's office in New York, New York.

90.  JASON GALANIS and JARED GALANIS, the defendants, were made aware through emails that Investment Firm-2 client funds were being used to pay off obligations owed to other Investment Firm-2

42

clients by entities associated with JASON GALANIS and JARED GALANIS as part of the scheme.  For example, on or about April 3, 2010, in an email to JARED GALANIS, CC-2 wrote, "On my own, I'm trying to help you.  [Certain] shares you transferred are being sold to clients.  With those proceeds, you're buying back your own notes."  Similarly, on or about April 4, 2010, in an email to JASON GALANIS, CC-2 again stated that he had used Investment Firm-2 client funds generated by the sale of certain shares from an account held in the name of a company controlled by JASON GALANIS to make payments to other Investment Firm-2 clients who held notes in entities associated with JASON GALANIS and JARED GALANIS and who were demanding repayment.

91.   Through this scheme, the entities associated with JASON GALANIS and JARED GALANIS, the defendants, obtained assistance in paying off their debts to Investment Firm-2 clients.  In exchange, CC-2 was able to satisfy client redemption requests.  CC-2 indicated to JARED GALANIS in an email that he needed $5-10 million "to take away the urgency of those [clients] clamoring for their money" and then an additional $20-30 million to "clear up all your paper [referring to notes that Investment Firm-2 clients held in companies related to JASON GALANIS and JARED GALANIS]."

## Statutory Allegation

92.   From in or about November 2007 up to and including in or about April 2010, in the Southern District of New York and

43

elsewhere, JASON GALANIS and JARED GALANIS, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

93.   It was a part and object of the conspiracy that JASON GALANIS and JARED GALANIS, the defendants, and others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce and of the mails, and of the facilities of national securities exchanges, would and did use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

94.

Overt Acts

95.   In furtherance of the conspiracy and to effect its illegal object, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   On or about January 25, 2010, JASON GALANIS, the defendant, caused 9,000,000 shares of a company with which he was associated to be deposited into an account held in the name of a different company controlled by JASON GALANIS.

b.   On or about February 27, 2008, CC-2 caused $575,000 of Investment Firm-2 client funds to be wired to Bank Account-1, which had been opened at a bank branch in New York, New York, from which funds were later wired to an account associated with the law firm of JARED GALANIS, the defendant, and to an account associated with CC-2.

c.   On or about March 11, 2010, CC-2 caused several Investment Firm-2 clients to purchase shares of a company associated with JASON GALANIS for a total of over $700,000.

d.   On or about March 12, 2010, CC-2 used the proceeds from that sale to make payments to a number of clients pursuant to promissory notes issued by various companies controlled by JASON GALANIS, the defendant.

(Title 18, United States Code, Section 371.)

## COUNT NINE
(Securities Fraud)

The Grand Jury further charges:

96.  The allegations contained in paragraphs 1 through 67, 79 through 84, and 86 through 91 of this Indictment are repeated and realleged as if fully set forth herein.

97.  From at least in or about 2007 through and including in or about 2010, in the Southern District of New York and elsewhere, JASON GALANIS and JARED GALANIS, the defendants, willfully and knowingly, directly and indirectly, by the use of a means and instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, used and employed manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, to wit, JASON GALANIS and JARED GALANIS caused CC-2 to purchase securities for Investment Firm-2 clients not for legitimate investment reasons, but instead to generate proceeds to

46

be used by companies affiliated with JASON GALANIS and JARED

GALANIS to extinguish various debts owed to other Investment Firm-

2 clients.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17,
Code of Federal Regulations, Section 240.10b-5; and Title 18,
United States Code, Section 2.)

## FORFEITURE ALLEGATION AS TO COUNTS ONE THROUGH NINE

98.   As a result of committing one or more of the offenses

alleged in Counts One through Nine, JASON GALANIS, JOHN GALANIS,

a/k/a "Yanni," JARED GALANIS, GARY HIRST, DEREK GALANIS, YMER

SHAHINI, and GAVIN HAMELS, the defendants, shall forfeit to the

United States pursuant to Title 18, United States Code, Section

981(a)(1)(C) and Title 28, United States Code Section 2461, any

property, real or personal, that constitutes or is derived from

proceeds traceable to the commission of the offenses alleged in

Counts One through Nine of this Indictment.

### Substitute Assets Provision

99.   If any of the above-described forfeitable property, as

a result of any act or omission any of the defendants:

a.   cannot be located upon the exercise of due

diligence;

b.   has been transferred or sold to, or deposited

with, a third party;

c.   has been placed beyond the jurisdiction of the

court;

      d.    has been substantially diminished in value; or

      e.    has been commingled with other property which

cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21,

United States Code, Section 853(p), and Title 28, United States

Code Section 2461, to seek forfeiture of any other property of

the defendants up to the value of the forfeitable property

described above.

       (Title 18, United States Code, Section 981(a)(1)(C);
          Title 21, United States Code, Section 853(p);
          Title 28, United States Code, Section 2461.)

GRAND JURY FOREPERSON

PREET BHARARA
United States Attorney

48

Form No. USA-33s-274 (Ed. 9-25-58)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

JASON GALANIS,
JOHN GALANIS,
a/k/a "Yanni,"
JARED GALANIS,
GARY HIRST,
DEREK GALANIS,
YMER SHAHINI, and
GAVIN HAMELS,

Defendants.

INDICTMENT

15 Cr. ____

(Title 15, United States Code, Sections
78j(b), 78ff, 80b-6 and 80b-17; Title
17, Code of Federal Regulations, Section
240.10b-5;
Title 18, United States Code, Sections
371, 1343, 1349, and 2.)

_____          _____
Foreperson                               PREET BHARARA
                                         U.S. Attorney.

9/21/15 Filed Sealed Indictment
        Filed Arrest warrants
        Judge Netburn