```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        15 Cr. 643 (PKC)

 5   JASON GALANIS, ET AL.,

 6              Defendants.
     ------------------------------x

 7                                       New York, N.Y.
                                         November 9, 2015
 8                                       2:10 p.m.

 9   Before:

10                    HON. P. KEVIN CASTEL,

11                                       District Judge

12
                           APPEARANCES
13
     PREET BHARARA
14        United States Attorney for the
          Southern District of New York
15   BRIAN R. BLAIS
     AMY HECTOR
16        Assistant United States Attorney

17   MURPHY PEARSON BRADLEY & FEENEY
          Attorneys for Defendant Jason Galanis
18   THOMAS P. MAZZUCCO
     AARON K. McCLELLAN
19
     MORVILLO ABRAMOWITZ GRAND IASON & ANELLO, P.C.
20        Attorneys for Defendant John Galanis
     PAUL R. GRAND
21   DANIEL F. WACHTELL

22   MURPHY PEARSON BRADLEY & FEENEY
          Attorneys for Defendant Jared Galanis
23   JAMES LASSART

24   ANTHONY J. BRASS
          Attorney for Defendant Derek Galanis
25
```

1          THE DEPUTY CLERK:  United States of America against

2     Jason Galanis, et al.

3          For the government, please.

4          MR. BLAIS:  Good afternoon, your Honor.  Brian Blais

5     and Amy Hector for the government.

6          MS. HECTOR:  Good afternoon.

7          THE COURT:  Good afternoon.

8          THE DEPUTY CLERK:  For the defendants.

9          MR. MAZZUCCO:  Good afternoon, your Honor.  Thomas

10     Mazzucco for Mr. Jason Galanis.

11          THE COURT:  Mr. Mazzucco, thank you.

12          MR. McCLELLAN:  Good afternoon, your Honor.  Aaron

13     McClellan for Jason Galanis.

14          THE COURT:  Thank you, Mr. McClellan.

15          MR. GRAND:  Paul Grand and Dan Wachtell for John

16     Galanis.

17          THE COURT:  Thank you, Mr. Grand.

18          Thank you, Mr. Wachtell.

19          MR. LASART:  Good afternoon, your Honor.  James

20     Lassart appearing on behalf of Jerod Galanis.

21          THE COURT:  Mr. Lassart, thank you.

22          MR. BRASS:  Good afternoon, your Honor.  Anthony Brass

23     for Derek Galanis.

24          THE COURT:  Afternoon, Mr. Brass.

25          I don't know any way to do this other than jumping

1    into the fray, so let me first inquire.

2            Mr. Mazzucco, you are with what law firm?

3            MR. MAZZUCCO:  With the law firm of Murphy Pearson

4    Bradley & Feeney in San Francisco, California, your Honor.

5            THE COURT:  Mr. Lassart, who are you with?

6            MR. LASART:  Murphy Pearson Bradley & Feeney also,

7    your Honor.

8            THE COURT:  San Francisco?

9            MR. LASART:  Yes, your Honor.

10            THE COURT:  Perhaps you can discuss with me what

11    happens if, in the course of the representation of your client,

12    Jason, it becomes in your client's best interest to take a deal

13    from the government which has a cooperation or substantial

14    assistance provision in it that would require your client to

15    cooperate against others in the case?  How could you advise

16    your client in that situation if such a deal would include

17    testifying against another client of your law firm?

18            MR. MAZZUCCO:  Your Honor, as you're well aware, this

19    is a case that involves several family members.  At this point

20    in time, I don't think we ever foresee that that will be an

21    option where a Galanis family member will cooperate, meaning my

22    client, against another family member.

23            THE COURT:  But how do you advise him?

24            MR. MAZZUCCO:  What we'd do is if that becomes an

25    issue -- maybe a little bit of history.  Mr. Lassart came on

1    and began representing Jerod Galanis when he was with another

2    firm, and then he joined our firm.  We have kept, and we can

3    continue to keep, and will keep if this Court wants to, a wall

4    between us.  There is other cases --

5              THE COURT:  What do you mean?  I have to decide

6    whether you should have a wall?

7              MR. MAZZUCCO:  No.  We will have an ethical wall, your

8    Honor.  We promise that to the Court that we'll have a wall

9    where there will be no discussion.  I can tell you myself, Mr.

10   Lassart, being both former --

11             THE COURT:  When did Mr. Lassart join your firm?

12             MR. LASART:  I joined the firm at the end of the year,

13   2013.  I had been representing Jerod Galanis since 2011.

14             THE COURT:  When did you begin representing Jason

15   Galanis?

16             MR. MAZZUCCO:  2009, your Honor.

17             THE COURT:  When did you begin representing him with

18   regard to the instant criminal investigation, or the

19   investigation that led to this prosecution?

20             MR. MAZZUCCO:  2012, your Honor.

21             THE COURT:  How about you, Mr. Lassart?

22             MR. LASART:  At the same time I began representation

23   of him.

24             THE COURT:  That was before you went to the firm?

25             MR. LASART:  Yes, your Honor.

```
 1              THE COURT:  You're talking about prospectively, from

 2   this day forth, having an ethical screen?  Is that what you're

 3   talking about?

 4              MR. MAZZUCCO:  Yes, your Honor.  We can set that up.

 5   There has been a screen.

 6              THE COURT:  That's why I asked the question.  Setting

 7   up a screen today is perhaps of no moment.  The question is

 8   whether there was a screen in place from day one.  That's the

 9   question.

10              MR. MAZZUCCO:  There was not, your Honor.  There was

11   not a screen in place from day one.  However, again, getting

12   back to the circumstances here, if this did turn to an

13   opportunity where one brother would cooperate against the next,

14   we would respect that, and it would not be any concern about

15   whether or not a brother was going to do that.  It's their

16   choice.  They each have their own counsel.

17              THE COURT:  What do you mean they each have their own

18   counsel?  Who?

19              MR. MAZZUCCO:  Mr. Lassart represents Mr. Jerod

20   Galanis and I represent Mr. Jason Galanis.

21              THE COURT:  No.  But your law firm represents both of

22   them.

23              MR. MAZZUCCO:  That is correct at this point.

24              THE COURT:  You both owe a duty of loyalty to the

25   other's client, to both clients, correct?
```

```
 1              MR. MAZZUCCO:  That's correct.

 2              THE COURT:  Presently, yes?

 3              MR. MAZZUCCO:  Yes.

 4              THE COURT:  Yes?

 5              MR. LASART:  Yes, your Honor, we do.

 6              Your Honor, so the Court knows that early on, when I

 7    moved from one firm to the other, I made my client aware of the

 8    potential, and he signed a written waiver at the time.

 9              I'm aware of the potential of a conflict.  It's not

10    actual, and it's not per se, it's a potential conflict.

11    Potentially.  I don't see that as a true conflict that is not

12    waivable, and it has been waived and will continue to be

13    waived.

14              THE COURT:  I understand.

15              Let me turn back to Mr. Mazzucco, because I'm still

16    not quite understanding.  I understand if your client says he

17    wants to cooperate, you will honor that.  That's not my

18    question.  It's not my question.

19              My question is, what do you do if the government

20    offers to you a cooperation agreement for your client?  How do

21    you advise your client?  That's the question I'm asking.  Not

22    if your client picks up the phone and says, "See whether you

23    can get me a cooperation agreement."  That's not my concern.

24              MR. MAZZUCCO:  If the government offers me a

25    cooperation agreement for my client, I will relay that offer to
```

1   my client.  I'll explain to him the pros and cons of such

2   offer, and at that point in time, again, there will be a wall

3   already in place.  I will advise him that he needs to do what's

4   best for him, and that I would walk him through the cooperation

5   if that were the case, and there would be no contact with

6   Mr. Lassart and his side of the shop with reference to

7   Mr. Jerod Galanis if, in fact, he was cooperating against Jerod

8   Galanis.

9           For the record, we, too, have had our client sign a

10  waiver when Mr. Lassart joined the firm to waive the conflict.

11          THE COURT:  If you get an offer from the government, I

12  would assume that it would be your practice as a lawyer, as an

13  adviser to your client, that you would review it and make a

14  recommendation.  "This offer stinks.  You can accept it if you

15  want, you're the client.  I would recommend you reject it."

16  You do that for a living.

17          MR. MAZZUCCO:  Correct.

18          THE COURT:  Conversely, there are offers that you

19  review with your client and you say, "Given the risks involved,

20  this is a favorable offer, but it's up to you to decide whether

21  you can live with this and you want to accept this offer."

22  Correct?

23          MR. MAZZUCCO:  Correct.

24          THE COURT:  But you're telling me that, if it's an

25  offer from the government that includes substantial

1    cooperation, you're not going to advise your client, you're

2    going to say, "I will tell you about it, I will tell you what I

3    see as pros and cons, but in this instance, because my firm is

4    involved on both sides, I will not make a recommendation one

5    way or the other." Is that what you're telling me?

6            MR. MAZZUCCO: No. I would make a recommendation, but

7    what I would do as a remedy is I would invite in third-party

8    counsel, new counsel to meet with Mr. Galanis to go over the

9    offer so that he gets another counsel to tell him whether or

10   not they think this is a good offer and whether he should go

11   forward, and that's shouldn't be a problem. We'd bring in

12   other counsel.

13           THE COURT: You would bring in other counsel for him.

14           MR. MAZZUCCO: Yes.

15           THE COURT: As distinguished from Mr. Galanis getting

16   counsel.

17           MR. MAZZUCCO: Either way, your Honor. Obviously,

18   Mr. Galanis would know another attorney. He has a lot of

19   experience working with attorneys in the business world, some

20   of the biggest firms, and if he would like to bring in other

21   counsel, that would be, obviously, acceptable and be the right

22   thing to do.

23           THE COURT: Let me hear from you, Mr. Lassart. What

24   would you do if you got a plea offer from the government that

25   included substantial cooperation from your client?

1        MR. LASART:  Let me indicate to the Court that I have

2   another overlay of privilege in this matter that makes it a

3   little more difficult.  My client was Jason Galanis' attorney.

4        THE COURT:  I'm sorry?

5        MR. LASART:  My client, Jerod Galanis, is Jason

6   Galanis' attorney.  So that is another layer, just to let the

7   Court know, of privilege which is hooked into this entire

8   matter.

9        What I would do if I got an offer, obviously, I'd tell

10  my client, who is a lawyer, that he's got an offer, and I'd

11  make a recommendation.  I'd give him some names of some lawyers

12  that I know are white collar, and I'd have him go talk to them.

13       THE COURT:  How does the fact that your client has an

14  attorney/client privilege with the other client of your law

15  firm impact this?

16       MR. LASART:  Well, the client obviously owns a

17  privilege.

18       THE COURT:  In this case, it would be Jason or Jerod?

19       MR. LASART:  Jerod is my client.  He's the attorney.

20  Jason is the client.

21       THE COURT:  He's the attorney, so Jason --

22       MR. LASART:  Jason holds the privilege.

23       THE COURT:  Jason holds the privilege.

24       MR. LASART:  Absolutely.

25       THE COURT:  Therefore, you are not entitled to know

1   privileged information that arose within the context of

2   confidential communications between Jerod and Jason.  Is that

3   correct or not?

4              MR. LASART:  Let me think about that.

5              THE COURT:  Yes.

6              MR. LASART:  That is correct in the sense of oral

7   communications.  If there are emails, for instance, or those

8   kinds of documents that are out there to third parties,

9   obviously, I can see all of those.  If Jason waives the

10  privilege, I can learn anything he told Jerod.

11             THE COURT:  No.  But at present, are you privy to

12  email communications between Jerod and Jason --

13             MR. LASART:  Of course.

14             THE COURT:  -- on matters of legal advice?

15             MR. LASART:  I'm privileged to emails between Jerod

16  and Jason that I have had access to because Jason has

17  authorized them through his attorney.

18             THE COURT:  Your partner.

19             MR. LASART:  No, his attorney, Jerod.  If Jason

20  authorizes Jerod to give me information, I'm entitled to see

21  it.

22             THE COURT:  So it's an ongoing attorney/client

23  relationship between the two clients of your firm; is that what

24  you're telling me?

25             MR. LASART:  That is --

1          THE COURT:  Your client continues to represent Jason.

2          MR. LASART:  It is not ongoing, but it was ongoing

3     through these events and has ceased.  But, of course, it

4     doesn't diminish the privilege during the course of time that

5     he was working for him as a lawyer.

6          THE COURT:  Yes.  But the point is, are you contending

7     that Jerod today has the authority to waive the attorney/client

8     privilege for Jason?  Jerod, the attorney, can waive it for

9     Jason?

10          MR. LASART:  Jerod has never had the right to waive

11     the privilege, it always has been reposed in the client.  So as

12     the client instructs him or authorizes him to waive, he can

13     communicate.

14          THE COURT:  During the course of the agency, which you

15     tell me has ended.

16          MR. LASART:  Yes.

17          THE COURT:  When did it end?

18          MR. LASART:  I couldn't give you a date.  I can't give

19     you a date.  I can't do that.  I just am not prepared to give

20     you that.

21          THE COURT:  Did it exist at any time after the

22     indictment was unsealed?

23          MR. LASART:  No.

24          THE COURT:  You have not been privy to any emails

25     between Jason or Jerod that you didn't have before there was an

1     indictment in this case.

2              MR. LASART:  I think that's correct.  That's assuming

3     they exist.  If they exist, I don't know about them.

4              THE COURT:  I will say this, that I'm inclined to view

5     this as a potential conflict at this stage of the game, but let

6     me hear from the government.

7              MR. BLAIS:  Thank you, your Honor.  Yes.  I think the

8     case law regarding situations like this where there are

9     codefendants represented by the same law firm generally

10    provides that in that circumstance, the conflict is a potential

11    one that is generally waivable.

12             Of course, there is an independent duty of the Court

13    to inquire under the Curcio matter, and there's a separate

14    independent duty under the Wheat decision to ensure that all

15    criminal trials are conducted in a manner that is fair to all

16    involved, and we don't weigh in on the Court's inquiry with

17    respect to that matter.  But generally, the case law analyzing

18    these situations says that the conflict in this matter is a

19    waivable conflict, and we don't disagree with that general

20    conclusion in the case law.

21             THE COURT:  Let me find out from Mr. Mazzucco, what do

22    you mean in this context by "an ethical screen"?

23             MR. MAZZUCCO:  Your Honor, what that means is we've

24    done this before in our office with other matters that

25    Mr. Lassart has that I cannot be exposed to.  Essentially, I

1    have no access, nor would I ethically as an attorney access any

2    matter that I should not have information regarding.

3         THE COURT:  Well, you're not helping me out.  That's

4    kind of circular and begging the question.  "I won't have

5    access to anything I shouldn't have access to."  That doesn't

6    help me.  Define for me what the ethical screen includes.

7         MR. MAZZUCCO:  That would include, unless it was

8    authorized by Mr. Jerod Galanis, to share information with us

9    and his brother, Jason Galanis, we would not have access to any

10   information, we would have a closed file system in our office.

11        THE COURT:  What do you mean you wouldn't have access

12   to any information?  I assume you have access to information.

13   Can you tell me what information you would not have access to?

14        MR. MAZZUCCO:  We have a closed file system in our

15   office.  I would not go in and look into Jerod Galanis' file.

16   We can make it where I wouldn't have access to that.  There

17   would be a separate login that only Mr. Lassart and his

18   paralegal and his team can look at.

19        But the most important part is we give you, the Court,

20   the assurances that, unless we were authorized to look at

21   something, hear something, or see something, we would not do so

22   unless Mr. Jerod Galanis authorized it through his counsel,

23   Mr. Lassart.

24        THE COURT:  What if he turns around and says, "You can

25   tell him anything."  Just right now, blanket, "I want to tell

1    you right up front everything, anything, any little secret.  My

2    brother and I have no secrets between each other.  Whatever you

3    know, you can tell Mr. Lassart, and whatever Mr. Lassart knows,

4    he can tell you."

5              MR. MAZZUCCO:  Then if that's his wishes, then they

6    can share it with us.

7              THE COURT:  Is that his wish?

8              MR. MAZZUCCO:  If that is his wish --

9              THE COURT:  Is that his wish?

10             MR. MAZZUCCO:  If it his wish then --

11             THE COURT:  Is that his wish?

12             MR. MAZZUCCO:  If he tells his counsel it's his wish,

13   it's his wish.

14             THE COURT:  You haven't talked to your client about

15   this.

16             MR. MAZZUCCO:  We have to talk to our client because

17   he has the privilege.

18             THE COURT:  Have you talked to your client about this?

19   Is that his wish?

20             MR. MAZZUCCO:  Yes.  Yes.

21             THE COURT:  Okay.

22             MR. MAZZUCCO:  We've had --

23             THE COURT:  Don't play games with me about the ethical

24   screen.  You're telling me that you've spoken to your client

25   and your client wants you and Mr. Lassart to share every little

1    secret with one another.

2         MR. MAZZUCCO:  At this point in time, yes, your Honor.

3         THE COURT:  So please don't stand up here and tell me

4    about the ethical screen.  The ethical screen in fact amounts

5    to nothing, right?

6         MR. MAZZUCCO:  Unless Mr. Jerod Galanis decides at

7    this point that he doesn't want us to learn anything, then we'd

8    be fine with it.

9         THE COURT:  Let me hear from Mr. Lassart.  What do you

10   understand the ethical screen to be, and what is your client's

11   desire?

12        MR. LASART:  My client wishes that everything that we

13   have is shared with his brother.

14        THE COURT:  Pardon me?

15        MR. LASART:  My client wishes that everything we have

16   is shared with his brother, simply.

17        The other thing is, with regard to an ethical screen,

18   my independent work product is not put on the company server,

19   so to speak.  If it's specific, I can talk to my client, or I

20   think it's specific.  I have a go-ahead from my client to share

21   everything.

22        I can tell you that I have seen things in the docket

23   that indicate, for instance, certain things under protective

24   order.  I know of that.  I don't know the information because,

25   if there's a protective order issued by the Court or agreed to

1    by Jason versus my client, I don't have that information,

2    unless I am told about it and it's authorized by law or by

3    Jason to my client.

4           My client, on the other hand, is prepared to share

5    everything with his brother/former client.

6           THE COURT:  Bottom line, taking it at face value,

7    ethical screen is not an issue in this case, and it's not

8    really a factor here.

9           MR. LASART:  It's not an issue at all, really, because

10   there's an agreement to share.

11          However, we're all going to be careful, because if

12   there's a change in heart at any time, we're going to have to

13   put it up and deal with that.

14          THE COURT:  You mean if your clients tell you, "I

15   don't want to cooperate anymore."

16          MR. LASART:  Exactly.

17          THE COURT:  What about the prospect of your saying,

18   "You shouldn't be sharing this with Jason.  You're crazy if you

19   share it."  Is that advice you would give, or wouldn't you be

20   ethically precluded because that's adverse to your other

21   client?

22          MR. LASART:  Based upon that hypothetical, if my

23   client tells me that, "I want to no longer cooperate," then I

24   have an obligation to deal with that issue and advise him, and

25   also, I would probably reach out and get him a lawyer and

```
 1    independently advise him of that.  I don't have a choice.

 2              THE COURT:  What about if you conclude it's a bad

 3    idea?  Your client is all enthused about sharing with his

 4    brother, but you conclude that it's really not in his best

 5    interest.

 6              MR. LASART:  Your Honor, at the end of the day, I can

 7    only advise a client -- I've had clients who have made some bad

 8    choices before, but they're entitled to them.  It's their life

 9    on the line, it's their 6th Amendment right.

10              THE COURT:  No.  But the question is whether or not

11    you would so advise your client, which is giving advice to your

12    client, which is contrary to the interest of your firm's other

13    client.

14              MR. LASART:  The answer is, I have a duty to him to

15    give him the direct advice, and then if I think it's

16    appropriate or we disagree, then we get him outside counsel to

17    advise him.

18              THE COURT:  Mr. Blais, do you think this is a waivable

19    conflict?

20              MR. BLAIS:  Yes, we continue to believe this is a

21    waivable conflict, your Honor.

22              THE COURT:  Where is Jason Galanis?

23              DEFENDANT JASON GALANIS:  Your Honor.

24              THE COURT:  Where is Jerod Galanis?

25              DEFENDANT JEROD GALANIS:  Here, your Honor.
```

 1          THE COURT:  Please be seated.  In a moment, I'm going

 2     to have you both placed under oath.  I'm going to ask you

 3     certain questions and advise you of certain rights.  If I ask

 4     you something or I tell you something and you don't quite

 5     understand, please let me know and I'll put it into different

 6     words.

 7          Jason Galanis, if at any time you wish to speak in

 8     private with Mr. Mazzucco or Mr. McClellan, I'll give you an

 9     opportunity to do that.

10          Mr. Jerod Galanis, if you want to speak in private at

11     any point with Mr. Lassart, I'll give you the opportunity to do

12     that.

13          Do you understand that, sir?

14          DEFENDANT JASON GALANIS:  Yes, your Honor.

15          DEFENDANT JEROD GALANIS:  Yes, your Honor.

16          THE COURT:  Please stand and the clerk will administer

17     the oath.

18          (Jason Galanis and Jerod Galanis are sworn)

19          THE COURT:  You're now both under oath, and your

20     answers to my questions are subject to the penalties of perjury

21     or of making a false statement if you do not answer truthfully.

22          Also, any statement you make today may be used in any

23     such prosecution.

24          Let me begin.  Jason Galanis, how old are you?

25          DEFENDANT JASON GALANIS:  45, your Honor.

```
 1              THE COURT:  How far did you go in school?

 2              DEFENDANT JASON GALANIS:  Four years of university and

 3    some post-graduate work.

 4              THE COURT:  Are you now or have you recently been

 5    under the care of a medical doctor?

 6              DEFENDANT JASON GALANIS:  No, your Honor.

 7              THE COURT:  Have you ever been addicted to any

 8    substance?

 9              DEFENDANT JASON GALANIS:  No, your Honor.

10              THE COURT:  Have you ever been treated for a mental

11    illness?

12              DEFENDANT JASON GALANIS:  No, your Honor.

13              THE COURT:  Is your mind clear today?

14              DEFENDANT JASON GALANIS:  Yes.

15              THE COURT:  Do you understand what's happening?

16              DEFENDANT JASON GALANIS:  Yes, your Honor.

17              THE COURT:  Jerod Galanis, how old are you?

18              DEFENDANT JEROD GALANIS:  36, your Honor.

19              THE COURT:  How far did you go in school?

20              DEFENDANT JEROD GALANIS:  Graduate school, your Honor.

21              THE COURT:  What do you mean by graduate school?

22              DEFENDANT JEROD GALANIS:  I went to law school.

23              THE COURT:  You have a law degree.

24              DEFENDANT JEROD GALANIS:  I do have a law degree.

25              THE COURT:  You're a licensed practitioner.
```

1          DEFENDANT JEROD GALANIS:  I am, your Honor.

2          THE COURT:  Are you now or have you recently been

3    under the care of a medical doctor?

4          DEFENDANT JEROD GALANIS:  No, your Honor.

5          THE COURT:  Have you ever been addicted to any

6    substance?

7          DEFENDANT JEROD GALANIS:  No, your Honor.

8          THE COURT:  Ever treated for a mental illness?

9          DEFENDANT JEROD GALANIS:  No, your Honor.

10         THE COURT:  Is your mind clear today?

11         DEFENDANT JEROD GALANIS:  It is, your Honor.

12         THE COURT:  Where are you admitted to practice?

13         DEFENDANT JEROD GALANIS:  In the State of California,

14   your Honor, the State of New York, and the District of

15   Columbia.

16         THE COURT:  I conclude that both defendants are fully

17   competent in this matter.

18         Jason Galanis, have you been following the discussion

19   here this afternoon?

20         DEFENDANT JASON GALANIS:  I have, your Honor.

21         THE COURT:  Have you read the correspondence that

22   preceded this hearing today?

23         DEFENDANT JASON GALANIS:  Yes, I have.

24         THE COURT:  Did you read the government's letter?

25         DEFENDANT JASON GALANIS:  Yes.

1          THE COURT:  Tell me in your own words what your

2     understanding of the conflict that exists or the potential

3     conflict that exists in this case.

4          DEFENDANT JASON GALANIS:  I can imagine a bunch of

5     scenarios, but the most simple answer to it, I suppose, is when

6     my interest might be adverse to my brother's interest, however

7     that may play out in the future, the possibility of that.

8          THE COURT:  Do you realize that in that situation, you

9     would have a lawyer who has divided loyalties?  Your brother is

10    a client of the same law firm that represents you in this

11    matter.  Do you understand that?

12         DEFENDANT JASON GALANIS:  I have, and I've thought

13    about it quite a bit and taken advice --

14         THE COURT:  And?

15         DEFENDANT JASON GALANIS:  -- and taken advice on the

16    matter.  I believe I understand.

17         THE COURT:  What is your view on this?

18         DEFENDANT JASON GALANIS:  I believe that for my

19    purposes, I'm comfortable waiving it.  And I believe that it's

20    unlikely to arise that there would be a situation where it

21    would be adverse.  And in the unlikely event that it would, I

22    think that I have enough relationship resources with other

23    firms that I could access that advice as an independent, if it

24    were deemed to be conflicted in some manner.

25         THE COURT:  Tell me what you mean when you say you

1    have relationship access.

2              DEFENDANT JASON GALANIS:  I presently employ other law

3    firms, and I would seek to ask their advice on this matter.

4              THE COURT:  These are law firms with expertise in what

5    area of law?

6              DEFENDANT JASON GALANIS:  White collar criminal

7    matters.

8              THE COURT:  You understand that under the

9    constitution, and specifically the 6th Amendment, you are

10   entitled to a conflict-free lawyer?  Do you understand that?

11             DEFENDANT JASON GALANIS:  Yes, your Honor.

12             THE COURT:  If you waive the conflict in this case,

13   you have a lawyer who has a potential conflict.  Do you

14   understand that?

15             DEFENDANT JASON GALANIS:  Yes, I do, your Honor.

16             THE COURT:  You're prepared to waive that conflict?

17             DEFENDANT JASON GALANIS:  I am.

18             THE COURT:  Would you like me to give you time to

19   consult with one of the other lawyers to whom you have access

20   or with whom you have access to get their views on whether you

21   should be waiving this conflict?  I could put this hearing off

22   and give you a chance to have that consultation.

23             DEFENDANT JASON GALANIS:  I would say I've taken

24   enough consult on the matter.  I'm informed enough to be able

25   to say to the Court that I would be prepared to waive conflict.

1       THE COURT:  Are you telling me that you've consulted

2  with lawyers other than the lawyers representing you in this

3  criminal matter?

4       DEFENDANT JASON GALANIS:  I have talked to others,

5  your Honor.

6       THE COURT:  Would you like me to give you more time on

7  this?

8       DEFENDANT JASON GALANIS:  I don't think I need it,

9  your Honor.  I think I understand the issue.

10      THE COURT:  Jerod Galanis.  Tell me what your

11  understanding of the potential conflict is in this situation.

12      DEFENDANT JEROD GALANIS:  Your Honor, I also

13  understand that it's a possibility that my interest would

14  become adverse to my brother and codefendant's interest in that

15  our lawyers are both working at the same law firm, and there is

16  a potential conflict with them being able to give unconflicted

17  advice.

18      THE COURT:  You understand that, in law, they each owe

19  a duty of loyalty to each of you.  Do you understand that?

20      DEFENDANT JEROD GALANIS:  I do, your Honor.

21      THE COURT:  Do you understand that, Jason?

22      DEFENDANT JASON GALANIS:  I do, your Honor.

23      THE COURT:  What advantage do you see to yourself in

24  waiving the conflict?

25      DEFENDANT JEROD GALANIS:  Your Honor, I've been

1    satisfied with the representation of Mr. Lassart thus far.  I

2    think I've established a relationship with him.  I entrust in

3    his abilities to represent me, and I would like for him to

4    continue to represent me.

5              THE COURT:  Do you see any disadvantage?

6              DEFENDANT JEROD GALANIS:  No, your Honor.  I think the

7    conflict, if it were to arise, would be something that we would

8    have to talk about, but I don't envision that being a problem.

9              THE COURT:  Jason, tell me what you understand are the

10   advantages of you being represented by the same law firm as

11   your brother.

12             DEFENDANT JASON GALANIS:  Well, your Honor,

13   advantages, I would just say, being represented by Mr. Mazzucco

14   and Mr. McClellan, there is long-standing relationship with

15   them, and they understand the facts better than anybody, would

16   be in a better position -- probably the only position to

17   understand as many facts as there are and as much evidence is

18   anticipated to be coming into this case.  So my advantage is

19   this institutional knowledge about what I view is a hugely

20   complex case, so almost a practical necessity for me to remain

21   represented by Murphy Pearson.

22             THE COURT:  I can give you time to retain another

23   firm, if that's your concern.  If it's a question of the time

24   necessary for another law firm to get up to speed, I have the

25   power to grant you an adjournment to make that happen, if you

1    wish.

2          DEFENDANT JASON GALANIS:  Thank you for letting me

3    know that, your Honor.  I would feel uncomfortable trying to

4    establish another relationship at the depth of knowledge that

5    has to happen in this case, and I have a firm view that

6    Mr. Mazzucco has an understanding of the rules.  He was an

7    Assistant U.S. Attorney for many years, and I think he

8    understands both the fact pattern with this and how to conduct

9    himself that would protect me, and all this is giving

10   independent, clear advice.

11         THE COURT:  Do you see any disadvantages from this

12   arrangement?

13         DEFENDANT JASON GALANIS:  I don't, your Honor.

14         THE COURT:  What happens if the government comes along

15   and says, "We're really interested in one of your codefendants,

16   and if you agree to substantial assistance, we will make your

17   cooperation known to the sentencing judge at the time of

18   sentencing."  That might involve your cooperating against the

19   codefendant.  How would that work if your codefendant were

20   represented by the same law firm?

21         DEFENDANT JASON GALANIS:  I think, your Honor, I'm

22   sophisticated enough to have a view of when I would think I

23   would need independent advice, and I have access and resources

24   to it, enough knowledge to be able to do that.

25              I also would rely on the ethical conduct of

1    Mr. Mazzucco, which I think is -- I hold him in the highest

2    regard.

3            And independent of that, I do have my own views of

4    what my risk might be, and I think I could make my own judgment

5    whether or not I need to seek advice of counsel, third-party

6    counsel, other than Mr. Mazzucco and the firm.

7            THE COURT:  Mr. Jerod Galanis, what happens in your

8    case if an offer is made that if you render substantial

9    assistance, that assistance will be made known to the

10   sentencing judge, but that assistance would include cooperation

11   against your codefendants, including Jason Galanis?  How could

12   you possibly be dispassionately and advised by counsel,

13   conflict-free counsel, if your counsel is the same firm as your

14   brother's firm?

15           DEFENDANT JEROD GALANIS:  Your Honor, I think

16   Mr. Lassart would do his best to give me unconflicted advice in

17   that instance.  But if the situation did arise that it was

18   impossible for him to do so, I would be fine seeking

19   independent counsel.

20           THE COURT:  Mr. Blais, does the government have any

21   other inquiry that it wishes me to make?

22           MR. BLAIS:  Just one question, your Honor.  If you

23   could ask the defendants if they understand that if they waive

24   the right to conflict-free counsel, in the eventuality that

25   they are convicted, they will not be able to appeal their

1   conviction or collaterally attack their conviction on the basis

2   that they were represented by conflicted counsel at their

3   trial.

4            THE COURT:  Mr. Jerod Galanis, did you hear the

5   question asked by the Assistant United States Attorney?

6            DEFENDANT JEROD GALANIS:  I did, your Honor.

7            THE COURT:  Did you understand the question?

8            DEFENDANT JEROD GALANIS:  I understand the question.

9            THE COURT:  What is your answer to that question?

10            DEFENDANT JEROD GALANIS:  I understand and that will

11   not be a problem.

12            THE COURT:  You waive that right?

13            DEFENDANT JEROD GALANIS:  Yes.

14            THE COURT:  And you waive any right to conflict-free

15   counsel that you have in this case?

16            DEFENDANT JEROD GALANIS:  I do, your Honor.

17            THE COURT:  You understand that waiver is binding on

18   you and cannot be revisited on appeal or at any subsequent

19   proceeding?

20            DEFENDANT JEROD GALANIS:  Yes, your Honor.

21            THE COURT:  Mr. Jason Galanis, did you hear the

22   question asked by the prosecutor?

23            DEFENDANT JASON GALANIS:  I did, and I understand it,

24   your Honor.

25            THE COURT:  What is your answer?

1          DEFENDANT JASON GALANIS:  In that case, I would waive

2     any right to any defense on appeal in connection with conflict

3     of counsel.

4          THE COURT:  Is it your desire to waive any conflict of

5     interest arising from the dual representation of yourself and

6     your brother, and waive it for all time in this case, including

7     your right to attack a conviction or appeal a conviction?

8          DEFENDANT JASON GALANIS:  That's correct, your Honor.

9          THE COURT:  Mr. Blais, anything further?

10          MR. BLAIS:  Nothing further, your Honor.

11          THE COURT:  Anything I should ask, Mr. Mazzucco?

12          MR. MAZZUCCO:  No, your Honor.

13          THE COURT:  Anything I should ask, Mr. Lassart?

14          MR. LASART:  No, your Honor.

15          THE COURT:  Based upon the responses to my questions

16     and my observation of their demeanor, I find that Jason Galanis

17     and Jerod Galanis know their rights, know the consequences of

18     waiving the conflict of interest, and their waiver is knowing

19     and voluntary and it is accepted.

20          Let me hear from the government with regard to the

21     circumstances relating to Derek Galanis and the previous

22     representation of Ms. McEnroe.

23          MR. BLAIS:  Yes.  Thank you, your Honor.

24          So Mr. Brass, who is here today, represents Derek

25     Galanis in connection with this matter.  Mr. Brass previously

1    represented an individual by the name of Megan McEnroe.

2    Ms. McEnroe testified previously at a trial in this district.

3    The trial was against an individual named James Tagliaferri,

4    and she presented testimony at that trial regarding certain of

5    the defendants in this matter, Mr. Brass.

6              THE COURT:  Let me pause right here.  What is the

7    relationship between the Tagliaferri matter and this case, if

8    any?

9              MR. BLAIS:  There is some relationship, your Honor.

10   Mr. Tagliaferri was an investment adviser.  He is referenced in

11   the indictment in this matter as the individual referencing CC

12   TO, and there are acts in relation to Mr. Tagliaferri that

13   constitute, allegedly, criminal conduct in this matter.  So

14   there is some overlap, but there is not identity of matters,

15   there were other matters at issue in the trial of

16   Mr. Tagliaferri that have nothing to do with any of the

17   criminal matters alleged in this case.

18             THE COURT:  What was Ms. McEnroe's relationship to

19   Tagliaferri in this regard?

20             MR. BLAIS:  There were certain investments that were

21   made by Mr. Tagliaferri on behalf of clients whose money that

22   he managed.  Mr. Tagliaferri, as I mentioned, was an investment

23   advisor, and he ran an investment advisory firm called Tag

24   Virgin Islands, or Tag VI.

25             THE COURT:  I had the civil case against

1    Mr. Tagliaferri, and I may also have had an SEC case, I think,

2    also, so I have some passing familiarity.

3            Go ahead.

4            MR. BLAIS:  Right.  Certain of the investments that

5    Mr. Tagliaferri made on behalf of his clients were associated

6    with some of the defendants in this matter.  They were notes

7    that were issued by entities in which certain of these

8    defendants were affiliated.

9            Ms. McEnroe at the trial of Mr. Tagliaferri -- and

10   Ms. McEnroe, to be clear, and I think we mentioned this in our

11   letter, served a period of time as the personal assistant of

12   Jason Galanis, and she testified at the trial about certain

13   matters, including the identity of certain of the entities and

14   who was associated with them.  She identified pictures.  They

15   were specifically of a home that Jason Galanis lives in.  The

16   reason that was relevant is that there were notes associated

17   with the limited liability company that paid expenses

18   associated with that home, and those notes were some of the

19   investments that Mr. Tagliaferri put his client in.

20           So Ms. McEnroe's testimony was about some of those

21   entities in whose notes Mr. Tagliaferri's clients were

22   invested, as well as information about, for example,

23   identifying pictures of a home.  That was the nature of her

24   testimony.

25           The government expects that Ms. McEnroe would be a

1      witness again at this trial.

2                THE COURT:  Who is she represented by now?

3                MR. BLAIS:  It is my understanding that she is no

4      longer represented by Mr. Brass.  We did not reach out to

5      Ms. McEnroe in connection with this Curcio matter for various

6      reasons.  We are not aware of new counsel who represents her at

7      this point.  We obviously will reengage with her as trial gets

8      closer.  So we are unaware presently of --

9                THE COURT:  Did she enter any kind of a plea?

10               MR. BLAIS:  She did not.

11               THE COURT:  She was not charged with anything?

12               MR. BLAIS:  She did not, your Honor.  She testified as

13     a pure fact witness and not with any agreement with the

14     government.

15               THE COURT:  All right.

16               MR. BLAIS:  So the potential conflict here, obviously,

17     is we've got a lawyer who represents a defendant in this

18     matter, and has a former client who would testify as a witness

19     in this case.

20               Generally, I think the case law views that, again, as

21     a potential conflict, and one that is, after a Curcio,

22     waivable.  We understand, and I think we represented this in

23     our letter, as well, at least as represented to us by

24     Mr. Brass, that Ms. McEnroe is prepared to waive any conflict

25     in this matter, although we did indicate in our letter, the

1    Court will, I believe, if necessary, appoint unconflicted

2    Curcio counsel for Ms. McEnroe to advise her with respect to

3    the suitability or desirability of any waiver of the conflict.

4         But at least as represented to us at this time,

5    Ms. McEnroe is prepared to waive the conflict, at least from

6    her perspective.

7         THE COURT:  Let me hear from Derek Galanis' lawyer,

8    Mr. Brass.  Mr. Brass, if you could review with me the period

9    of your representation of Ms. McEnroe and whether it included

10   her testifying in the Tagliaferri trial before Judge Abrams.

11        MR. BRASS:  Your Honor, when Ms. McEnroe testified

12   before Judge Abrams, that concluded my representation of

13   Ms. McEnroe.  That was the end.  I had represented Ms. McEnroe

14   for some meaningful period of time before that where there was,

15   I think, a period of a year or more between when I initially

16   consulted with her and when the government actually got in

17   touch with me to speak with Ms. McEnroe.

18        During that time, there was virtually no activity

19   whatsoever outside of her consulting with me and me having

20   extensive conversations and interviews with her regarding what

21   I imagined would be the case, but I had precious little

22   information about it.

23        I just know as the ending date it would be the day she

24   testified in the Tagliaferri matter, which the government might

25   be better informed as to an exact date, but it's some

1   meaningful period of time ago.

2          THE COURT:  What do you do at a trial in which

3   Ms. McEnroe is testifying on behalf of the government?  You are

4   possessed of information from your confidential communications

5   with her which would suggest potentially fruitful lines of

6   cross examination.  How do you resolve your ethical obligations

7   to your former client and your ethical obligations to your

8   present client?

9          MR. BRASS:  Your Honor, my duty of confidentiality and

10  loyalty to Ms. McEnroe remain.  Those obligations I have to

11  carry with me forever.  So based on the time that I represented

12  her, those obligations remain in place.

13          The easiest way to resolve this for purposes of this

14  hearing and going forward was for me to advise Mr. Derek

15  Galanis of the situation that I'm in.  There are a lot of gray

16  areas about what type of cross examination I could conduct of

17  Ms. McEnroe, but for purposes of clarity here, and given my

18  conversations with Mr. Derek Galanis, I can tell the Court that

19  I have advised Mr. Galanis in very simple terms that,

20  essentially, he is risking having a lawyer who cannot cross

21  examine Ms. McEnroe.  Although I believe I could, although I

22  believe there is ample information consistency among all of the

23  nonprivileged, nonconfidential statements she has given which I

24  could cross examine her on should she testify inconsistently

25  with those, for purposes of this hearing.

 1          And for Mr. Galanis moving forward with a very simple

 2     model, it's that he should know and understand that I may well

 3     have to turn to him and say, "I cannot cross examine

 4     Ms. McEnroe at all."  Based on that, I advised him about his

 5     right to have me as his counsel or to not have me as his

 6     counsel, that being his choice.

 7          THE COURT:  Let me hear from the government.  What I

 8     don't understand, and maybe you could shed some light on, is

 9     the extent to which Ms. McEnroe's testimony relates to Derek

10     Galanis as opposed to anyone else in the case.

11          MR. BLAIS:  I think we have not specifically discussed

12     Derek Galanis with Ms. McEnroe anytime recently.  It is our

13     understanding that her testimony against Derek Galanis is

14     likely to be relatively limited.  Her testimony is likely to be

15     more relevant to specifically counts 8 and 9 of the indictment,

16     in which only Jason and Jerod Galanis are named as defendants.

17     It is unlikely that any of her information will directly

18     implicate Derek.  Even unlike the case which we're about to

19     discuss with Mr. Hlavsa where there are conspiracy charges, we

20     think that's unlikely to be the case with respect to

21     Ms. McEnroe.

22          THE COURT:  Well, would Ms. McEnroe being testifying,

23     for example, in support of a theory of the existence of a

24     conspiracy in which Mr. Derek Galanis is alleged to be a

25     member, even if her testimony is not directly related to Derek

```
 1   Galanis?

 2              MR. BLAIS:  That was the distinction I was trying to

 3   draw.  I think it is unlikely that her testimony would go to

 4   even to the existence of a conspiracy of which Derek Galanis is

 5   alleged to be a member.  More likely to be directed to Jason

 6   and Jerod Galanis as charged in counts 8 or 9 of the

 7   indictment.  That, of course, is subject to amendment as we

 8   continue.

 9              THE COURT:  8 and 9 are not conspiracy counts?

10              MR. BLAIS:  One of them is, but Derek Galanis is not

11   named in either of those counts.

12              THE COURT:  Okay.

13              MR. BLAIS:  That is obviously subject to amendment as

14   we continue to speak further with Ms. McEnroe in preparation

15   for trial.  But sitting here today, we think it's unlikely that

16   her testimony would either directly implicate Derek Galanis or

17   any conspiracy of which he's charged as a member.

18              THE COURT:  Mr. Brass.

19              MR. BRASS:  I'm sorry, your Honor.  Mr. Galanis is

20   indicating to me that he needs to take a break.

21              DEFENDANT DEREK GALANIS:  Your Honor, I'm sorry.  I'm

22   in pretrial services and they have me on drug testing, so I

23   consume a lot of water.

24              THE COURT:  We'll take five minutes.

25              MR. BRASS:  Thank you very much.
```

```
 1              (Recess)

 2              THE COURT:  Is there anything further before I inquire

 3    of Mr. Derek Galanis?

 4              MR. BRASS:  No, your Honor.

 5              THE COURT:  Mr. Blais?

 6              MR. BLAIS:  No, your Honor.

 7              THE COURT:  Mr. Derek Galanis, I'm going to have the

 8    clerk administer the oath to you.  If I ask you something or

 9    tell you something and you don't quite understand, let me know.

10    Also, if at any point you wish to consult with Mr. Brass in

11    private, I'll give you an opportunity to do that.  Do you

12    understand that?

13              DEFENDANT DEREK GALANIS:  Yes, your Honor.

14              THE COURT:  Please stand.  The clerk will administer

15    the oath.

16              (Derek Galanis is sworn)

17              THE COURT:  You are now under oath and your answers to

18    my questions are subject to the penalties of perjury or of

19    making a false statement.  If you do not answer truthfully,

20    anything you say today may be used in such a prosecution.  Do

21    you understand all that?

22              DEFENDANT DEREK GALANIS:  I do, your Honor.

23              THE COURT:  How old are you, sir?

24              DEFENDANT DEREK GALANIS:  I'm 43.

25              THE COURT:  How far did you go in school?
```

1          DEFENDANT DEREK GALANIS:  I have a Bachelor's Degree

2     in history.

3          THE COURT:  Are you now or have you recently been

4     under the care of a medical doctor?

5          DEFENDANT DEREK GALANIS:  I am, your Honor.

6          THE COURT:  For what condition?

7          DEFENDANT DEREK GALANIS:  Bipolar disorder.

8          THE COURT:  Do you take medication for that?

9          DEFENDANT DEREK GALANIS:  I do not.

10          THE COURT:  Have you ever been hospitalized for that

11     condition?

12          DEFENDANT DEREK GALANIS:  I have not, your Honor.

13          THE COURT:  Have you ever been addicted to any

14     substance; alcohol, cocaine, marijuana?

15          DEFENDANT DEREK GALANIS:  I have, your Honor.

16          THE COURT:  Pardon me?

17          DEFENDANT DEREK GALANIS:  I have.

18          THE COURT:  To what substance?

19          DEFENDANT DEREK GALANIS:  Marijuana.

20          THE COURT:  When was the last time you used?

21          DEFENDANT DEREK GALANIS:  Years ago, your Honor.

22          THE COURT:  How do you feel today?

23          DEFENDANT DEREK GALANIS:  I feel great.

24          THE COURT:  Is your mind clear?

25          DEFENDANT DEREK GALANIS:  Yes, sir.

1      THE COURT:  Do you understand what's happening?

2      DEFENDANT DEREK GALANIS:  Yes, sir, I do.

3      THE COURT:  Do you understand that Mr. Brass

4  represented Ms. Megan McEnroe in connection with the

5  Tagliaferri matter?  Do you understand?

6      DEFENDANT DEREK GALANIS:  I do, your Honor.

7      THE COURT:  Are you familiar with the prosecution of

8  James Tagliaferri?

9      DEFENDANT DEREK GALANIS:  I am, your Honor.

10      THE COURT:  Are you familiar with Ms. McEnroe's

11  testimony in that case?

12      DEFENDANT DEREK GALANIS:  Not specifically, your

13  Honor, but I do know that she testified.

14      THE COURT:  Do you understand that Ms. McEnroe is

15  likely to be a witness in the trial against you?  Do you

16  understand?

17      DEFENDANT DEREK GALANIS:  I do, your Honor.

18      THE COURT:  While the prosecutor said that she may

19  offer testimony on counts 8 and 9, in which you're not named as

20  a defendant, I understood the prosecutor to leave open the

21  possibility that she may offer testimony on other counts.  Do

22  you understand that?

23      DEFENDANT DEREK GALANIS:  I do, your Honor.

24      THE COURT:  Mr. Brass has potentially a wealth of

25  information about Ms. McEnroe because he represented her.  Do

1    you understand that?

2    DEFENDANT DEREK GALANIS:  Yes, I do, your Honor.

3    THE COURT:  Do you understand that he can't use any of

4    that information to help you?

5    DEFENDANT DEREK GALANIS:  I do, your Honor.

6    THE COURT:  You understand that he would not be able

7    to cross examine his former client?  Do you understand that?

8    DEFENDANT DEREK GALANIS:  I do, your Honor.

9    THE COURT:  Do you understand that it would be a

10   serious ethical violation for him to, in words or through signs

11   or in any respect, telegraph to any of the counsel for any

12   codefendant fruitful areas of inquiry?  Do you understand that?

13   DEFENDANT DEREK GALANIS:  I do, your Honor.

14   THE COURT:  Say, potentially, he knew some fact that

15   would be useful to use in cross examination of Ms. McEnroe.

16   Not only can he not use it on your behalf, but he can't subtly

17   communicate it to any of the other counsel in the case or he

18   would be committing a disciplinary violation for which he could

19   be severely disciplined.  Do you understand that?

20   DEFENDANT DEREK GALANIS:  I do, your Honor.

21   THE COURT:  You, of course, understand that,

22   Mr. Brass, as well?

23   MR. BRASS:  Of course, your Honor.

24   THE COURT:  You are entitled to a conflict-free

25   representation by a lawyer who doesn't have divided loyalties.

1    Do you understand that?

2            DEFENDANT DEREK GALANIS:  I do, your Honor.

3            THE COURT:  That's part of the 6th Amendment's promise

4    of effective assistance of counsel.  Do you understand that?

5            DEFENDANT DEREK GALANIS:  I do.

6            THE COURT:  Do you want Mr. Brass to represent you,

7    despite this conflict?

8            DEFENDANT DEREK GALANIS:  Absolutely, your Honor.

9            THE COURT:  What do you see as the advantages of that?

10           DEFENDANT DEREK GALANIS:  It's very hard for me to

11   find a lawyer that I get along with and I trust completely.  I

12   trust Mr. Brass completely.

13           THE COURT:  Well, there are quite a few lawyers in the

14   State of New York.  I think the New York State Bar Association

15   touts a membership of about 74,000, so there are quite a few

16   lawyers running around the streets of New York.  That's just

17   the ones that belong to the Voluntary Bar Association.

18           I'm sure you could find another lawyer who could

19   represent you in this matter.  Why, Mr. Brass?

20           DEFENDANT DEREK GALANIS:  I know that, your Honor, and

21   I don't understand the law, and I believe it's my right to

22   waive that and keep Mr. Brass.  If so, I would like to.

23           THE COURT:  What do you see, if anything, as

24   disadvantages of keeping Mr. Brass on this case?

25           DEFENDANT DEREK GALANIS:  I don't see that there are

1    any, your Honor.

2         THE COURT:  How about his inability to cross examine

3    Ms. McEnroe, who may offer testimony against you?

4         DEFENDANT DEREK GALANIS:  I don't believe that will

5    affect me, your Honor, quite honestly.

6         THE COURT:  Do you understand that he would not be

7    able to cross examine her?

8         DEFENDANT DEREK GALANIS:  I do, your Honor.

9         THE COURT:  Do you understand, if I accept the waiver

10   from you of this potential conflict, that you would not be able

11   to withdraw that waiver, and that would be binding on you on

12   appeal and in any collateral proceeding attacking the

13   conviction?  Do you understand that?

14        DEFENDANT DEREK GALANIS:  I do, your Honor.

15        THE COURT:  Mr. Blais, any other area for inquiry?

16        MR. BLAIS:  No further questions, your Honor.

17        THE COURT:  Mr. Brass?

18        MR. BRASS:  No, thank you, your Honor.

19        THE COURT:  Mr. Derek Galanis, I find that you know

20   your rights, you know the consequences of the waiver, that it's

21   knowing and intelligent, and it's accepted.

22        Now there remains the issue of Ms. McEnroe, and it

23   seems to me that it is Mr. Brass who is the former lawyer for

24   Ms. McEnroe, and perhaps Mr. Brass is the one who should secure

25   the waiver and advise Ms. McEnroe of her right to counsel, and

 1   that the Court will authorize the appointment of counsel for

 2   her, assuming she does not have the resources to have counsel,

 3   and that Mr. Blais will arrange for her appearance in

 4   magistrate's court to have such counsel approved.

 5           Will you undertake to do that, Mr. Brass?

 6           MR. BRASS:  I will, your Honor.

 7           THE COURT:  Is that acceptable to you, Mr. Blais?

 8           MR. BLAIS:  That's acceptable, your Honor.

 9           THE COURT:  I'm going to direct you to report back to

10   me on the results of this within 14 days.  I will further

11   direct that you obtain a copy of the transcript of this

12   proceeding and provide it to Ms. McEnroe.

13           MR. BRASS:  It will be done, your Honor.

14           THE COURT:  Anything further in that regard,

15   Mr. Blais?

16           MR. BLAIS:  With respect to Derek Galanis or the

17   issues involving Ms. McEnroe, no.

18           MR. BRASS:  Your Honor, may I inquire, is it possible

19   to have the transcript done that quickly?

20           THE COURT:  You can take that up later.  Ms. Court

21   Reporter, I'm sure you can accommodate what's needed?

22           COURT REPORTER:  Yes.

23           THE COURT:  It doesn't have to be done overnight, but

24   you'll be able to do it with reasonable dispatch?

25           COURT REPORTER:  Yes.

1          THE COURT:  Yes.

2          MR. BRASS:  Thank you.

3          THE COURT:  Mr. Grand, you are among the most

4   respected members of the bar of the Southern District of

5   New York, a long-standing member, and one with a distinguished

6   record and excellent reputation.

7          The concern that I have here is unlike what we've

8   discussed in other instances.  My review of this would indicate

9   to me that this is not a potential conflict, but an actual

10  conflict.  That Mr. Hlavsa is a client in your firm, and

11  Mr. Hlavsa will be offering testimony against your client, John

12  Galanis.  This is not a theoretical possibility, as I

13  understand it, if I've read this correctly.

14         Maybe I'll be educated that I'm wrong in this regard,

15  but in that situation, I see an actual conflict.  I understand

16  that there is a basis in some instances to waive the conflict,

17  but one of the preconditions is that a reasonable attorney

18  would find it to be waivable.

19         Now, I don't accuse you of not being a reasonable

20  attorney, but it is an objective rather than a subjective

21  standard, and I am not at present convinced that it is a

22  waivable conflict, so I would like to hear from you further on

23  this.

24         I understand from the correspondence that it is not

25  your intention to try this case.  I appreciate that.  But it

1    would appear to me to be an actual conflict and a nonwaivable

2    conflict, and I invite you to help me think my way through it

3    or dissuade me of that.

4              MR. GRAND:  Thank you, your Honor.  My understanding

5    of the facts here are, number one, you are quite accurate that

6    I do not intend to be trial counsel.  I will be 82 years old

7    next month and think that it's time, and any potential client

8    would deserve to have me not try the case.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THE COURT:  Well, I think I think there would be a lot

2    of clients who would be well served having you try their case,

3    but that's not the issue for today.

4    MR. GRAND:  I understand.  Mr. Galanis, John Galanis,

5    is in the process of retaining trial counsel.  And I hope that

6    within the next week or two that will be accomplished.

7    As to the alleged conflict, I think it is

8    theoretically an actual conflict.  But in reality, I think it

9    is not.  What is argued by the government to make it an actual

10    conflict is that Mr. Hlavsa and Mr. Galanis are represented by

11    the same firm.  As I understand it, Mr. Hlavsa has never met

12    John Galanis.  He has never spoken to John Galanis.  The two of

13    them, if they ran across each other in a hallway, wouldn't know

14    who the other one was.

15    And so even the government has conceded that the

16    testimony Mr. Hlavsa will give will be testimony as to the

17    existence of a conspiracy that the government claims John

18    Galanis is a member of.  In other words, there is no part of

19    the potential future testimony by Mr. Hlavsa that actually can

20    mention John Galanis as somebody that he knows, has met to, has

21    talked to, anything like that.

22    And I think that stands in marked contrast to the kind

23    of factual pattern that Judge Pauley talked about in the

24    Daugerdas case where the two people in consideration were

25    partners in an accounting firm.  They were both members of the

1    board of directors.  They had daily contact, daily professional

2    contact with each other for five years out of the 11-year

3    conspiracy.  That's an entirely different set of circumstances.

4         And I think that, here, whatever this man can testify

5    about will be abstract as it relates to Mr. Galanis.  Maybe he

6    will testify about a conspiracy.  And maybe that conspiracy,

7    through other evidence from other people, will be said to

8    include John Galanis.  But he can't say that it is, because

9    he's never met him, spoken to him, and the two of them would

10   stumble over each other in a dark room and not know who each

11   other was.

12        So I think that as a practical matter, when you

13   consider that, number one, I'm not going to be in the case as

14   the trial counsel, and, number two, the facts are so different

15   from Daugerdas, my role is an extremely limited role here.  It

16   is one only of being an advisor to Mr. Galanis, and nothing

17   else as it has been for a very long time, and that that should

18   not conflict me, nor should it conflict my partner, Ben

19   Fischer, who represents Mr. Daugerdas and as to whom we do not

20   communicate substantively about this case.

21        THE COURT:  Let me ask you, Mr. Grand, is -- and I'll

22   ask the same question of the government -- is a smart idea here

23   for me to put this over for a couple of weeks in anticipation

24   of the appearance of new counsel, which may change the color

25   and dimension of all of this, and in essence suspend what we're

1    doing today in anticipation of the arrival of the new counsel?

2    Does that make sense from your standpoint?

3         MR. GRAND:  It certainly makes sense from my

4    standpoint because I think then it would eliminate any question

5    that you have may have.

6         THE COURT:  Mr. Blais, does that work from the

7    standpoint of the government?

8         MR. BLAIS:  Your Honor, not that we have an issue with

9    putting it off.  But I'm not sure that the appearance of new

10   counsel necessarily solves the issue.  It's my understanding

11   that Mr. Grand would intend to remain as counsel for Mr. John

12   Galanis, although not trial counsel; he would still nonetheless

13   be counsel.  And I believe that that may restrict his

14   co-counsel in terms of what that co-counsel could do in his

15   cross-examination or actions taken towards Mr. Hlavsa.

16        THE COURT:  Well, the good news is, because the new

17   counsel is not yet in place, no notice of appearance has been

18   filed, an ethical screen might be established right from the

19   get-go, so that this new counsel is absolutely screened from

20   any information emanating from Mr. Grand or anyone else at the

21   Morvillo firm of or pertaining to Mr. Hlavsa.  Assuming

22   everybody acts in a professional manner, as I would assume

23   here, that would preclude that from happening.  So Mr. Grand

24   would not be in a position to speak at all about Mr. Hlavsa as

25   a witness or lines of cross-examination or anything of the

1  like.  That would be an area where there would be an ethical

2  screen, set up right from the beginning, so it's not a question

3  of, oops, I had previously read the memos on this; he just

4  wouldn't have any access to it.

5       MR. BLAIS:  Yes.  I think with that, with appropriate

6  ethical screens in place, that may address the issue.  And if

7  more time is necessary to allow that -- for new counsel to make

8  an appearance and to enter into the case and for those screens

9  to be put up, we certainly have no objection to the additional

10 time.

11      MR. GRAND:  Your Honor, for whatever value it has to

12 the Court's general knowledge, I can represent to the Court, A,

13 that there is an ethical screen at the firm; B, I have no

14 knowledge whatsoever about Mr. Hlavsa beyond the fact that he

15 was CFO of the company, not one iota more.

16      THE COURT:  Well, I appreciate that.  But if you look

17 at the literature these days on ethical screens, quite

18 appropriately, when it's within a law firm, they're looking for

19 protective devices that would preclude you from accessing a

20 file cabinet or the like.  And of course when we're talking

21 about someone who is not at your firm coming in, the wall

22 between you and this individual and of course Mr. Fischer and

23 this individual is more easily established at the get-go so

24 that it is, I will never talk to you about Mr. Hlavsa and

25 whether he's a good witness, a bad witness, or how he factors

1    into this, we'll talk about everything other than that, and

2    you're not going to have access to any of my memos that talk

3    about Mr. Hlavsa, because if your memos were tainted by your

4    discussions with Mr. Fischer, then it ends at the walls of the

5    Morvillo firm and does not extend over to the new lawyer.  That

6    would be the thought.

7              MR. GRAND:  As a theoretical matter I agree with that.

8    But as a factual matter I have no such information.

9              THE COURT:  I have it.  I have it.

10             So let's see.  There is the stub week before

11   Thanksgiving in which many lawyers don't have a lot on their

12   calendar.  I won't do it on Wednesday, but maybe on that Monday

13   we could find 20 minutes to get together.  Would that be

14   convenient, Mr. Blais?

15             MR. BLAIS:  That Monday, unfortunately, is actually

16   problematic for me.  I have an appearance in White Plains.

17             THE COURT:  Tuesday.  How about Tuesday?

18             MR. BLAIS:  Tuesday would be fine.  I do have a court

19   appearance at 11:30 that day.

20             THE COURT:  All right.  So let's see.  Tuesday the

21   24th at 2 o'clock.  Would that work for you?

22             MR. BLAIS:  That would be perfect.

23             THE COURT:  Mr. Grand, would that work for you?

24             MR. GRAND:  Yes, your Honor.

25             THE COURT:  All right.  And I would anticipate that

1   prior to that date and time, there would be a notice of

2   appearance filed by the incoming lawyer.

3          MR. GRAND:  It's my profound hope.

4          THE COURT:  All right.  And you will see to it that

5   you do not turn over wholesale files without first reviewing

6   them to make sure that they don't include information

7   pertaining to Mr. Hlavsa.

8          MR. GRAND:  Of course, your Honor.

9          THE COURT:  That sounds like a good discussion.  And

10   then we will continue the dialogue on that, Mr. John Galanis.

11          DEFENDANT JOHN GALANIS:  Your Honor, if I may?  My

12   name is John Galanis.

13          THE COURT:  Yes.

14          DEFENDANT JOHN GALANIS:  The issue of retention of new

15   counsel, I'm not certain I will be able to complete that

16   retention probably before the first week in December.

17          THE COURT:  That's a problem.

18          DEFENDANT JOHN GALANIS:  I simply -- OK.  I -- I --

19          THE COURT:  Who will you have represent you if it's

20   not Mr. Grand?  Mr. Grand is not going to represent you at

21   trial.  Your trial is on for -- do I have a trial date yet,

22   Mr. Blais?

23          MR. BLAIS:  It's April 11, your Honor.

24          THE COURT:  April 11.

25          DEFENDANT JOHN GALANIS:  Mr. Grand has represented me

1    for 45 years, your Honor.  And during that -- and he

2    represented me prior to Mr. Hlavsa's -- I'm sure you are

3    probably aware of this from the moving papers -- but prior to

4    Mr. Hlavsa retaining his firm, he asked me if I would safe

5    since I had informed him of some of the issues that are law of

6    this case.  This is well before the actual bringing of the

7    indictment.  And I agreed to waive based upon representations

8    from Mr. Hlavsa to Mr. Grand's partner that in fact we had

9    never met, he doesn't know anything about me and just all of

10   the things that Mr. Grand has reiterated to you.

11            THE COURT:  That may have satisfied you, but it

12   doesn't satisfy me.

13            DEFENDANT JOHN GALANIS:  I understand, your Honor.

14            THE COURT:  The question is this.  Why can't you

15   retain counsel prior to November 23?

16            DEFENDANT JOHN GALANIS:  I have to get the funds in

17   order to do that, your Honor.

18            THE COURT:  And what happens between November 23 and

19   December 1 with regard to the funds?

20            DEFENDANT JOHN GALANIS:  I'm looking -- family members

21   are getting at the -- as you can imagine because of the

22   complexity of this trial and the volume of discovery, it's

23   rather an extensive process for any lawyer to undertake.  And

24   so the retainers are -- that are being asked are really quite

25   high.  So it's going to take me some time to raise that money.

1          THE COURT:  But it doesn't sound to me, if it's a

2     problem on November 23, why wouldn't it be a problem on

3     December 1?

4          DEFENDANT JOHN GALANIS:  Because during that first

5     week in December I think that I'll basically have it raised by

6     then.

7          THE COURT:  Well that's not the -- December 1 is a

8     Tuesday.  So then you're talking about December 4, is really

9     what you're talking about.

10         DEFENDANT JOHN GALANIS:  I was hoping for -- during

11    the first week of December, I thought.  I'm sorry I didn't make

12    that clear, your Honor.

13         THE COURT:  So you will not be in a position to retain

14    counsel until December 4.  Is that what you're saying?

15         DEFENDANT JOHN GALANIS:  Yes, your Honor.

16         THE COURT:  So when would your counsel be in a

17    position to appear?

18         DEFENDANT JOHN GALANIS:  Well, I presume on that date,

19    your Honor.  I've already had discussions with counsel, with

20    competent counsel and counsel that I'm satisfied could

21    adequately represent me, and he has given me --

22         THE COURT:  Well, what I'm concerned about, sir, is,

23    not hearing from you or your new counsel, I couldn't possibly

24    be prepared to try this case on April 11.  I'm only coming in

25    now on December 11, Judge.  This is terribly unfair to my

1    client.

2              DEFENDANT JOHN GALANIS:  I would not have him make

3    that.  And I'm, I would warrant to you, your Honor, that I

4    would not make such a motion.

5              THE COURT:  I'm going to set this for Tuesday,

6    December 8, at 2:30 p.m.

7              DEFENDANT JOHN GALANIS:  Thank you, your Honor.

8    That's very generous.

9              THE COURT:  All right.  You understand I'm not going

10   to adjourn that.

11             DEFENDANT JOHN GALANIS:  I do understand, your Honor.

12             THE COURT:  And you may be in a situation where

13   Mr. Grand is disqualified and you will either be representing

14   yourself or, if you can make out a truthful affidavit that you

15   are without resources, I will appoint counsel for you.  Do you

16   understand that?

17             DEFENDANT JOHN GALANIS:  I do understand, your Honor.

18             THE COURT:  All right.

19             Mr. Grand, does that work for you?

20             MR. GRAND:  Yes, your Honor.

21             THE COURT:  All right.  Mr. Blais?

22             MR. BLAIS:  That's fine, your Honor.

23             THE COURT:  OK.  What else can we usefully accomplish

24   today?

25             MR. BLAIS:  I don't think -- nothing from the

1   government.

2           MR. LASSART:  Your Honor, just to be sure that the

3   record is clear for us, that December 8 date, does it require

4   other counsel to be here?

5           THE COURT:  No, it doesn't.

6           MR. LASSART:  I just wanted to make sure we didn't --

7           THE COURT:  No.  That's fine.

8           Anything else?

9           Thank you all very much.

10                                 o0o

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25