UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------- x

UNITED STATES OF AMERICA                    :

                                            :          15 Cr. 643 (PKC)

            - v. -                          :

                                            :

JASON GALANIS,
JOHN GALANIS,                               :
   a/k/a "Yanni"
DEREK GALANIS, and                          :
GARY HIRST
                                            :

            Defendants.                     :
---------------------------------------------------------------- x


**APPLICATION OF WIMBLEDON FINANCING MASTER FUND, LTD.
(IN OFFICIAL LIQUIDATION) PURSUANT TO THE MANDATORY VICTIMS
RESTITUTION ACT TO BE TREATED AS A VICTIM OF THE CRIMES
COMMITTED BY GALANIS AND HIRST**

Howard J. Kaplan
Michelle A. Rice
Joseph A. Matteo
KAPLAN RICE LLP
142 West 57th Street, Suite 4A
New York, New York 10019
Telephone: (212) 235-0300
Fax:  (212) 235-0301

*Attorneys for Wimbledon Financing Master
Fund, Ltd. (In Official Liquidation)*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS .................................................................................................... 4

    A.    Formation of Gerova ................................................................................... 4

    B.    The Fund.com Ponzi Scheme ...................................................................... 5

    C.    Manipulation of the SPAC Vote .................................................................. 8

    D.    The Phony Reinsurance Business ................................................................ 8

    E.    Lies to Investors and the NYSE Concerning the Number of Gerova Shareholders ..... 9

    F.    While Lying to Wimbledon's Investors, Galanis and Hirst Engage in a Pump and Dump Scheme ...................................................................................... 10

    G.    The Sale of Wimbledon's HM Ruby Asset and Misappropriation of $4.7 Million ... 12

    H.    The Public Exposure of Gerova as a Fraud ................................................. 12

    I.    The Supposed "Unwind" of the Wimbledon Transaction and the Theft of an Additional $5 Million ............................................................................. 13

ARGUMENT ................................................................................................................ 14

CONCLUSION .............................................................................................................. 20

# TABLE OF AUTHORITIES

## Cases

*Levy v. U.S.*,
   626 F.App'x 319 (2d Cir 2015) .................................................................................. 18

*U.S. v. Boyd*,
   222 F.3d 47 (2d Cir. 2000) ................................................................................. 14, 17

*U.S. v Marsh*,
   2011 WL 5325410 (E.D.N.Y. 2011) ...................................................................... 18

*U.S. v. Schwamborn*,
   542 F.App'x 87 (2d Cir. 2013) ................................................................................ 18

*U.S. v. Skowron,*
   839 F. Supp.2d 740 (S.D.N.Y. 2012) .............................................................. 14, 15

## Statutes

18 U.S.C. §3663A(a)(2)............................................................................................. 14

Wimbledon Financing Master Fund, Ltd. (In Official Liquidation) ("Wimbledon"), a Cayman Island company in official liquidation, by and through its Joint Official Liquidators and its counsel, Kaplan Rice LLP, respectfully submits this application pursuant to the Mandatory Victims Restitution Act ("MVRA") to be treated as a victim of the crimes committed by Jason Galanis ("Galanis") and Gary Hirst ("Hirst").

## PRELIMINARY STATEMENT

Wimbledon and Weston Capital Partners Master Fund II, Ltd. ("Partners II") are both direct victims of the criminal schemes perpetrated by Galanis and Hirst and their co-conspirators, including Wimbledon's and Partners II's investment advisor, Albert Hallac ("Hallac") of Weston Capital Asset Management LLC ("WCAM"). Wimbledon and Partners II investors lost at least $50 million, including the theft of approximately $9.5 million in cash. We respectfully submit that the government's position that it is too hard to calculate the losses suffered by investors in Wimbledon and Partners II, or that their damages result from a contractual dispute, is incorrect and unfair.

The Government's unduly narrow description of the conspiracy is also inconsistent with its initial sentencing memorandum, the indictment in this case, the criminal complaint filed against Hallac (to which he pleaded guilty), and the indictment charging David Bergstein ("Bergstein") and Keith Wellner ("Wellner"), all co-conspirators with Galanis and Hirst. The government's position is also inconsistent with the MVRA, which defines the term "victim" to include persons who were "*directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy or pattern*." Indeed, the law in this Circuit is that even victims of uncharged counts that are harmed in the course of the conspiracy are entitled to restitution.

As set forth below, Galanis and Hirst perpetrated a series of schemes pursuant to which they misappropriated funds and assets from Wimbledon and Partners II.  They bribed WCAM's principal, Albert Hallac, and secretly took control of WCAM through Fund.com, Inc. ("Fund.com"), another company that the government has charged was a Ponzi scheme.  The *quid pro quo* for the bribe was Hallac's agreement to cause Wimbledon to transfer its hedge fund assets to Gerova Financial Group, Ltd. ("Gerova").[1]  Through Hallac and Keith Wellner (WCAM's general counsel), Galanis and Hirst  made misrepresentations to and concealed material facts from Wimbledon's investors and its board of directors regarding the business of Gerova (it had none), Gerova's financial condition, and its prospects for success.  Based on this false picture of financial health and success, Wimbledon's board of directors agreed to transfer Wimbledon's hedge fund assets, valued at approximately $114 million, to Gerova in exchange for an equivalent amount of Gerova stock, which turned out to be worthless.  The Wimbledon transaction was critical to the criminal schemes charged in the indictment; the schemes could not have succeeded without this transaction and a similar transaction with Stillwater Capital Partners, which allowed Galanis and Hirst to avoid the dissolution of Gerova and to give a veneer of legitimacy to what in fact was another Ponzi-like scheme.

Gerova was a fraud from day one.  Wimbledon investors were promised stock in a successful reinsurance company with adequate capital to grow, and were further promised that such stock would be unrestricted and freely tradeable in six months.  Galanis and Hirst (through WCAM and in public filings) represented that the illiquid assets of Wimbledon (investments in hedge funds) would be used as "regulatory capital" for this reinsurance business.  However, after the Wimbledon and Stillwater transactions, there was only approximately $2.6 million in

---

[1]    At the time, Gerova was known as Asia Special Situation Acquisition Corp. ("ASSAC").  It changed its name to Gerova in January 2010.  For purposes of this Application, all references to Gerova are intended to include ASSAC.

Gerova's bank account, obviously insufficient to acquire (let alone operate) a reinsurance business. The six months came and went without release of the unrestricted stock. It is plain that the conspiracy was to fraudulently induce Wimbledon to contribute its assets to a shell company with no business, pretend that Gerova was a reinsurance company, steal all the money, and engage in a market manipulation scheme to misappropriate even more.

Galanis, Hirst and Hallac perpetrated this scheme for 12 months. While Galanis and Hirst were engaged in a stock manipulation trading scheme, their co-conspirator Albert Hallac was continuing to misrepresent Gerova's financial condition and prospects to Wimbledon investors, and to conceal critical and material facts from them. Wimbledon and its investors were misled by these misrepresentations, and by the fact that the stock price was relatively stable during the summer and fall of 2010. During this time, Hallac was also receiving his share of profits from the conspiracy. In 2010, Hallac received millions of dollars from Galanis and Hirst. Indeed, they together misappropriated $4.3 million from Wimbledon in October 2010, shortly after they sold one of Wimbledon's assets.

The government's indictments and convictions of the key perpetrators of this criminal conspiracy leave no doubt that Gerova was in fact a fraud, that this conspiracy was much broader than the market manipulation scheme described by the government, and that Wimbledon was a victim of that conspiracy within the meaning of the MVRA.

# STATEMENT OF FACTS[2]

### A.      Formation of Gerova

In or about March 2007, Jason Galanis and Gary Hirst (among others) formed a Special

Purpose Acquisition Company ("SPAC") called ASSAC (subsequently renamed Gerova).   A

SPAC is a collective investment structure that allows public stock market investors to invest in

private equity-type transactions.    SPACs are shell or "blank check" companies with no

operations of their own, but which offer shares to the public with the intention of using the

money from the sale of the shares to acquire or merge with another company.   In or about

January 2008, Gerova issued stock in an initial public offering ("IPO"), raising approximately

$115 million.  Gerova was required to use the IPO proceeds to acquire an acceptable business in

Asia by January 23, 2010.   As 2009 drew to a close, Galanis and Hirst were running out of time

to find an acceptable acquisition target.  If they did not do so, they would be forced to return the

IPO proceeds to the original SPAC investors, and the $5 million in insider warrants (some of

which were owed by a Hirst company) would expire worthless.  *See* Sentencing Memorandum of

the United States of America in *United States v. Jason Galanis*, No. 1:15-cr-643 (PKC), Dkt. No.

376 ("Sentencing Mem.") at 2-3; Wimbledon Am. Complt. ¶¶ 67-68; Plenary Action Dkt. Nos.

494 (¶¶ 24-26), 505, 506.

---

[2]        The facts set forth in this memorandum are taken from the government's sentencing memorandum, the
indictments and guilty pleas of Galanis and his co-conspirators, and evidence adduced in the civil proceedings
commenced by Wimbledon arising out of this conspiracy, captioned *Wimbledon Financing Master Fund, Ltd. v.
Weston Capital Management LLC, et al.*, N.Y. Index No. 653468/2015 (the "Plenary Action").   Wimbledon's
Amended Complaint is at Docket Number 258 in the Plenary Action, and its evidentiary submissions in response to
motions to dismiss filed by Galanis, Hallac and other members of the conspiracy are at Docket Numbers 494-550.
In addition, Wimbledon has commenced a turnover proceeding against David Bergstein and others, captioned
*Wimbledon Financing Master Fund., Ltd. v. David Bergstein, et al.*, N.Y. Index No. 150584/2016 (the "Bergstein
Turnover Proceeding").   Wimbledon submitted extensive evidence in support of the Bergstein Turnover Proceeding,
which can be found at Docket Numbers 1-35 and 175-243 in that special proceeding.   These documents are
voluminous, and we have not included them with this submission.  We will submit this material to the Court if the
Court believes it would be helpful.

Gerova was controlled by Galanis and Hirst. Hirst was a sponsor of the SPAC and then served as its President and Chairman of the Board of Directors until February 2011. *See* Plenary Action Dkt. No. 981 at 52; Sentencing Mem. at 3.

**B.      The Fund.com Ponzi Scheme**

During this  time, Galanis was running a Ponzi scheme through a company called Fund.com. Galanis' co-conspirators in this part of the fraudulent scheme included various individuals who participated in yet another Ponzi scheme involving Westmoore Capital. *See* Sentencing Memorandum at 6-7. Galanis bribed investment advisors such as James Tagliaferri, who then invested their clients' funds in shares of Fund.com. *See id*. These monies were then used to pay off notes that Galanis-controlled entities owed to shareholders. In some cases, the note-holders were paid with proceeds of their investment in Fund.com. *See* Sentencing Memorandum at 8-9. Fund.com also had no operating business, and appears to have been a sham company.

The government's evidence shows that Albert Hallac and Wimbledon were integral to the Tagliaferri conspiracy and the Gerova fraud. Indeed, as reflected in an email chain attached to the Government's Sentencing Memorandum between Galanis and Tagliaferri, Galanis had promised to pay Tagliaferri investors "$125MM" upon the "Weston closing," and that Tagliaferri "provided money in December [2009] to effect that closing." Sentencing Mem., Exh. A.

The closing to which Tagliaferri refers was a $9.6 million bribe promised to Hallac, structured as a buyout of his company Weston Capital Management ("Weston"), the parent of WCAM. The *quid pro quo* for this payment was Hallac's agreement to transfer Wimbledon's assets to Gerova. Specifically, in October or November 2009, Galanis and Joseph Bianco, who

would later serve as CEO of Gerova, proposed a "buyout" of Weston by Fund.com.[3]  Plenary Action Dkt. No. 973 ¶ 7.  As part of this transaction, Hirst became a board member of Weston.  *Id.*  Bianco, who was a government witness at the Hirst trial, has admitted in an affidavit that the Wimbledon sale transaction was part of an "overall arrangement."  *See* Plenary Action Dkt. No. 984 ¶ 10 (Affidavit of Joseph Bianco in Support of Motion to Dismiss).

Galanis clearly viewed Gerova, which turned out to be yet another Ponzi-like scheme, as part of the Tagliaferri conspiracy.  Indeed, when Tagliaferri complained to Galanis in April 2010 that he had not received his "$125MM" in connection with the "closing" of the Weston transaction, Galanis assured him:  "[I]t is important for you to realize we continue to make progress on businesses that will resolve our mutual issues.  [T]he businesses are viable and have significant net assets."  Sentencing Mem., Exh A.  Galanis concluded:  "[I] am performing great feats to accumulate usable assets to fix our problems."  *Id.*[4]

 In order to accomplish this "accumulation of usable assets" in Gerova, Galanis, Hirst and Hallac had to mislead Wimbledon's investors and directors. The $9.6 million promised payment to Hallac from Fund.com was concealed from them.[5]  The fact that this was a *quid pro quo* agreement to transfer control of Wimbledon's assets to Gerova in exchange for restricted shares in Gerova was also concealed.[6]  Nor did Hallac disclose that Weston was controlled by Galanis

---

[3]      Joseph Bianco was also an officer of Fund.com.

[4]      While Gerova is not mentioned in this email, it seems plain that Galanis is referring to the illiquid hedge fund assets of Wimbledon and Stillwater.  This email was sent just two months before Galanis began his pump and dump scheme.

[5]      Galanis and Hirst also promised Hallac millions of dollars in management fees to be paid by Gerova, even though Hallac had agreed with Wimbledon investors that he would not charge any fees in connection with the liquidation of Wimbledon.  *See* Plenary Action Dkt. Nos. 475-481; 551 at 58-59.

[6]      In his plea allocution, Hallac admitted that he had entered into "an agreement among two or more people to commit the offenses of" investment advisor fraud, securities fraud and wire fraud, and that he entered into the conspiracy with knowledge of its "illegal object."  *See* Plenary Action Dkt. No. 977 at 14:5-15; 18:9-17; 24:8-10.  Specifically, among other things, Hallac admitted that he failed to disclose to Wimbledon and other investors

and Hirst at the time that Weston signed the Gerova agreement on behalf of Wimbledon, and that Galanis and Hirst also controlled Gerova. *See* Plenary Action Dkt. No. 977.

Hallac has pleaded guilty to this aspect of the conspiracy. Hallac admits in his guilty plea allocution that he did not disclose that Galanis controlled both Fund.com and Gerova. Hallac, Hirst, and their co-conspirators kept Galanis in the shadows because otherwise, as Hallac explained in his plea allocution, "Galanis' involvement in the deals, and the fact of his SEC bar, would upset . . . investors and cause them to oppose or aggressively question the deals." *Id.* at 26:10-14. Hallac "intentionally withheld this information about Galanis from the investors." *See id.*

Similarly, there was no disclosure to Wimbledon's investors or its board that Hirst was deeply conflicted and was on all sides of the Gerova transactions insofar as he, together with Galanis, secretly controlled (i) Weston, the parent of Wimbledon's investment advisor, (ii) Gerova, and (iii) Rineon Group, which allegedly contributed significant assets to Gerova at an inflated price, and became one of Gerova's largest shareholders. *See* Plenary Action Dkt. No. 973 ¶ 12.

In addition to concealing these material facts, Galanis and Hirst, through Hallac, among others, transmitted false information to Wimbledon's board of directors and investors. Among other things, they falsely represented that Gerova would have $115 million as its "core asset," that Gerova's reinsurance business was well positioned to grow, and that Gerova's stock price would increase such that Wimbledon shareholders would recover their capital. *See* Plenary Action Dkt. No. 503. They stated that Gerova's cash was held in trust and suggested that the

---

"material information about financial transactions involving their moneys." *Id.* at 25:4-6. In his plea allocution, Hallac also identified by name or by description a number of the conspirators in the scheme, including Galanis and Wellner. *See id.* at 25:16-27:24; 28:19-25.

cash would be available to the business if a deal was consummated. They also represented that Wimbledon would be receiving shares priced at $7.50 per share; Gerova's stock was then trading at $9.50. Under the Asset Purchase Agreement, Wimbledon received a minimum of 11,333,333 shares, which were held in escrow and were to be delivered to investors when the restrictions on trading were lifted. *See* Asset Purchase Agreement dated as of December 31, 2009, a true and correct copy of which is attached hereto as Exhibit A.

C.    **Manipulation of the SPAC Vote**

Another scheme in furtherance of the conspiracy was to manipulate the Gerova shareholder vote to ensure that the SPAC survived. Galanis knew that Gerova's original shareholders intended to vote against the acquisitions of the assets of Wimbledon and Stillwater, and he thus implemented a market manipulation scheme to secure the affirmative vote for the transaction. Galanis and Hirst engaged a firm called Victory Park Capital Advisors, LLC ("Victory Park"), which agreed to purchase a majority of shares from Gerova's original investors, and vote them in favor of the transactions. In return, Gerova agreed to repurchase all such shares immediately after the vote (using most of its $115 million in cash), and to pay a 1% fee on the repurchase. *See* Plenary Action Dkt. Nos. 505, 506; Wimbledon Am. Complt. ¶¶ 89-90.

D.    **The Phony Reinsurance Business**

The Victory Park transaction left Gerova with virtually no money to acquire or operate a business. Galanis and Hirst (and other members of the conspiracy) did not disclose to Wimbledon's investors and directors that the $115 million core asset did not in fact exist, that Gerova lacked sufficient funds to acquire, let alone operate, a reinsurance business, and that the stated purpose of the acquisition of Wimbledon's assets – to use them as regulatory capital in a reinsurance business – was impossible since there never was a reinsurance business. Indeed, in

light of the debt and future obligations that Gerova was assuming in connection with the acquisition of Wimbledon and Stillwater, Gerova was functionally insolvent. Wimbledon Am. Cmplt. ¶¶ 7, 96, 183(b).

Hirst and Galanis also used another of their companies to control Gerova and give the false impression that Gerova was actually acquiring a reinsurance business. More specifically, Galanis and Hirst had their company Rineon Group, Inc. ("Rineon Group") "sell" its subsidiary, Amalphis Group, Inc., to Gerova for a vastly inflated price. *See* Plenary Action Dkt. No. 982 ¶ 29 (Complaint in *Securities and Exchange Commission v. Galanis, et al.*, 15-cv-07547 (S.D.N.Y.)); *see also* Wimbledon Am. Cmplt. ¶ 98. Amalphis owned an interest in the reinsurance company that Gerova represented it would acquire. The acquisition never happened, and it does not appear that Rineon or Amalphis ever contributed any assets or cash to Gerova. Rineon nonetheless became a significant shareholder in Gerova. Some of Rineon Group's shares were provided to investment advisor Gavin Hamels' clients as a *quid pro quo* for Hamels' agreement to have his clients purchase $10 million of Gerova stock from Galanis and his family. *See* Plenary Action Dkt. Nos. 502 & 982 ¶¶ 63-65; Wimbledon Am. Cmplt. ¶ 98; Plenary Action Dkt. Nos. 507 & 986 at 339:11-25. Hamels has pleaded guilty to this part of the scheme.

Not only were these facts never disclosed to Wimbledon and its investors, Hallac continued to represent that Gerova was on track and was a healthy company.

### E.    Lies to Investors and the NYSE Concerning the Number of Gerova Shareholders

As a result of the Victory Park repurchase agreement Gerova did not have a sufficient number of shareholders to comply with stock exchange listing requirements. Gerova thus received a notice from the NYSE Amex Exchange (the "Amex Exchange") in late January 2010 requiring the company to demonstrate, among other things, that it had at least 400 shareholders

who owned at least 100 shares each to justify Gerova's public listing.  *See* Plenary Action Dkt. Nos. 494 ¶ 29; 502; Wimbledon Am. Complt. ¶ 90.

As charged in the indictment, in response to the Amex Exchange's notice, Galanis bribed an investment advisor to have 200 of his managed accounts buy 100 shares each of Gerova.  As a *quid pro quo*, Galanis agreed to pay the financial advisor approximately $1 million worth of restricted Gerova stock, and falsely structured this payment as compensation for the introduction of Stillwater to Gerova.  Plenary Action Dkt. No. 502 at ¶ 22.  Hirst, as Gerova's president, executed the fraudulent consulting agreement, and caused $1 million of restricted Gerova stock to be issued to the advisor.  On February 3, 2010, that advisor caused his firm to purchase nearly 18,000 shares of Gerova across 80 client accounts.  *See id.* ¶ 23.

A Gerova representative told Wimbledon investors that Gerova did in fact have a sufficient number of shareholders to meet the listing requirements, but did not disclose that Galanis had to bribe a financial advisor to buy Gerova stock to satisfy the shareholder requirement.

### F.    While Lying to Wimbledon's Investors, Galanis and Hirst Engage in a Pump and Dump Scheme

Galanis, Hirst and Hallac then engaged in a series of deceptions to avoid any investigation into Gerova's financial condition, and to further the false image that Gerova was a productive reinsurance business.  These deceptions directly facilitated the pump and dump scheme with which Galanis and Hirst were charged and allowed them and co-conspirator Hallac to steal millions of dollars from Wimbledon investors.

With Wimbledon's investment advisor and its hedge fund assets firmly in hand, and Wimbledon's stock in escrow, Galanis and Hirst embarked on their market manipulation scheme. With the vast majority of public shares under his control, Galanis and his confederates engaged

in a scheme that involved bribing financial advisors to have their clients purchase Galanis' Gerova shares at inflated prices, thereby creating an artificial and fraudulent market for the stock. *See* Plenary Action Dkt. No. 502; Wimbledon Am. Cmplt. ¶¶ 97-103.

Among other things, Gerova entered into a second fraudulent consulting agreement, this time with a foreign national named Ymer Shahini ("Shahini"), also charged in this case. The agreement with Shahini purported to compensate Shahini for introducing Weston to Gerova. This agreement was also fraudulent; Shahini had nothing to do with introducing Wimbledon to Gerova. Hirst signed a letter instructing Gerova's stock transfer agent to issue 5,333,333 shares of Gerova to Shahini without Gerova's CFO's knowledge, and signed the warrants for these shares. Plenary Action Dkt. No. 986 at 325:20-326:20; 417:7-418:7. These 5,333,333 shares of Gerova were not registered, as they were issued to a foreign national.

Shahini, at Hirst and Galanis' insistence, deposited his shares in American banks and signed powers of attorney to Hirst and Galanis' co-conspirators. Galanis and Hirst then bribed investment advisors to induce them to have their clients purchase shares of Gerova stock at certain prices, and timed these trades to match sales from the Shahini accounts. This part of the scheme is described in detail in the Sentencing Memorandum at 5-7.

The Government has proven that more than $19 million of proceeds were generated from the matched trading market manipulation scheme. *Id.* at 8. Hirst received $2.6 million of these proceeds, which he paid to Hallac. According to the Government, this payment was for "a debt that an investment fund he ran owed to Weston," but these funds were never paid to Wimbledon investors, and were not likely paid to any other Hallac investors. *See United States v. Hirst*, No.

1:15-cr- 643-PKC, Dkt. No. 389 at 12. Rather it appears that these funds were taken by Hallac himself.[7]

Throughout 2010, Hallac, while receiving millions of dollars from the conspiracy, continued to misrepresent Gerova's financial condition and its prospects. He told investors and the Wimbledon board that Gerova continued to represent the best option for short term liquidity, and that unrestricted stock would be delivered to investors in the near future, even though Gerova had never issued a quarterly SEC report or financial statement, had not acquired a reinsurance business, and had no cash other than the distributions from the Wimbledon and Stillwater hedge fund assets (which apparently were stolen upon receipt). *See* Plenary Action Dkt. No. 494 ¶¶ 20, 27. Wimbledon's board and its investors, were again lulled into inaction by these misrepresentations and the artificially inflated stock price. *Id.* ¶ 22.

## G. The Sale of Wimbledon's HM Ruby Asset and Misappropriation of $4.7 Million

Hallac sold one of Wimbledon's assets, an investment in HM Ruby, in October 2010. On October 27, 2010, Wimbledon received approximately $4.7 million as a result of this sale, and also received a distribution of approximately $1.9 million from another asset. Beginning on October 29, 2010, these funds were distributed to Hallac ($1.9 million) and an account at Vensure Federal Credit Union that Wimbledon believes was controlled by Galanis and Hirst ($2.3 million). *See* Plenary Action Dkt. No. 993.

## H. The Public Exposure of Gerova as a Fraud

In January 2011, articles and reports were published exposing Gerova's scheme "to pump up share prices and dump them on unsuspecting investors . . . ." Plenary Action Dkt. No. 494 ¶

---

[7]    Wimbledon does not have any records relating to this payment, and we respectfully request that the Government produce all records in its possession relating to payments from Gerova, Galanis or Hirst to Hallac or any of his entities.

34.    One such report revealed that Gerova had all the hallmarks of a classic fraud, and detailed the lack of financial disclosure, impaired or overvalued assets, undisclosed related-party transactions, and strong ties to individuals and entities who have been in trouble with regulators in the past, including Galanis and others connected to the Westmoore Ponzi scheme. *See* Plenary Action Dkt. No. 994.  This information caused Gerova's stock price to plummet.  On February 23, 2011, the NYSE halted trading of Gerova securities.  Plenary Action Dkt. No. 494 ¶ 36. On April 21, 2011, Gerova asked the NYSE to delist its securities. *Id.* On May 9, 2011, Gerova deregistered its securities. *Id.*

Wimbledon thus had contributed assets worth $114 million to Gerova, and was left with Gerova stock that had no value and could not be sold.

I.      **The Supposed "Unwind" of the Wimbledon Transaction and the Theft of an Additional $5 Million**

Even at this point, Galanis, Hirst and Hallac were not done stealing from Hallac's investors.  Together with David Bergstein, who appears to have joined the Gerova conspiracy in the fall of 2010, they put together a scheme whereby the original Wimbledon transaction would be "unwound" in exchange for payments of approximately $5 million to themselves. *See* Plenary Action Dkt. No. 516.  Because Wimbledon's bank account had already been looted, they schemed to transfer the remaining Wimbledon assets to a sham company created by Bergstein called Arius Libra,[8] and then to pledge those assets for a $9 million loan from another Weston managed fund, Partners II.  The proceeds were used to pay the Gerova insiders, and otherwise misappropriated by Hallac and Bergstein. *See* Plenary Action Dkt. No. 494 at ¶¶ 45-46, 49-50; Bergstein Turnover Proceeding Dkt. Nos. 1 (¶¶ 24-29); 11-27; 189-215.  Galanis received at

---

[8]      Bergstein, Hallac and Wellner created a second unwind agreement in September 2011 that removed any reference to the payments made to Gerova's insiders.  This version was backdated and given to Wimbledon's directors and auditors. *See* Plenary Action Dkt. No. 976 at 57:3-17. *See also* Plenary Action Dkt. No. 494 at ¶ 51. Hirst signed this second unwind agreement. *See* Plenary Action Dkt. No. 527.

least $700,000 of these misappropriated funds. *See* Bergstein Turnover Proceeding Dkt. Nos. 1 (¶ 27(b)), 189; *see also* Plenary Action Dkt. Nos. 517, 976 (Testimony of David Bergstein in the matter of Weston Capital Asset Management before the United States Securities and Exchange Commission, . at 57:3-17; 65:7-66:9).

## ARGUMENT

The MVRA provides for an award of restitution to victims of an offense of conviction. "Victim" is "broadly" defined as:

> [A] person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered *including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy or pattern.*

18 U.S.C. §3663A(a)(2) (emphasis added); *See U.S. v. Boyd*, 222 F.3d 47, 50 (2d Cir. 2000).

As Judge Cote held in *U.S. v. Skowron*:

> "The necessary 'causal nexus' unquestionably exists" when the loss is "a significant part of the greater fraud" for which the defendant was convicted.

839 F. Supp.2d 740, 744 (S.D.N.Y. 2012) (citation omitted).

Under this "broad" definition of "victim," a participant in a conspiracy must pay restitution "even on uncharged or acquitted counts," and even where the loss is caused by a co-conspirator. *Boyd*, 222 F.3d at 50-51 ("It was not plain error for the district court to . . . impose a restitution order making [defendant] liable for the reasonably foreseeable acts of all co-conspirators".)

In *Skowron*, the defendant pleaded guilty to one count of conspiracy to commit securities fraud through insider trading and one count of obstruction of justice for covering up the scheme. 839 F. Supp.2d at 742. *Skowron* was the portfolio manager for FrontPoint, a

14

hedge fund owned by Morgan Stanley. *Id.* at 745. He bribed a consultant to provide non-public information concerning clinical trials of a drug being tested by Human Genome Sciences, Inc. ("HGSI"). Upon receipt of negative test results, he caused FrontPoint to sell its significant holdings in HGSI stock, avoiding millions of dollars in losses. *Id.* The defendant then lied to the SEC and provided false information to Morgan Stanley's lawyers who were conducting an investigation. *Id.* The Court held that Morgan Stanley was a victim of the scheme. "Deceiving his employer, Morgan Stanley, was an integral part of Skowron's scheme. Without that deceit, the scheme would not have been undertaken nor could it have succeeded for any period of time." *Id.* at 746. The Court held that Morgan Stanley was "a victim because it was directly and proximately harmed by Skowron's scheme in a variety of ways." *Id.* at 748. The Court awarded Morgan Stanley restitution for its costs and legal fees related to the investigation, as well as 20% of Skowron's total compensation from 2007-2010. *See id.* at 752.

Wimbledon is plainly a victim of the criminal conspiracy perpetrated by Galanis, Hirst and Hallac. The government's charging document against each of these defendants identifies a conspiracy involving Fund.com and Gerova. *See, e.g.*, Plenary Action Dkt. No. 502 ¶¶ 13-15, 19, 32 (Indictment of Jason Galanis, Gary Hirst and Gavin Hamels); *United States v. Albert Hallac*, No. 1:15-cr-512-RMB Dkt. No. 5. This conspiracy could not have occurred but for the purchase of Wimbledon's assets. The SPAC that became Gerova was scheduled to expire on or about January 23, 2010. Without the acquisition of some business (no matter how phony) the SPAC would simply expire. And the existence of the SPAC was obviously necessary to have a market for Gerova stock. The acquisition of the Wimbledon and Stillwater assets was a front for this fraudulent scheme and effectively served as Galanis' platform for his fraudulent trading activity.

Wimbledon's directors and investors were misled by the perpetrators of the conspiracy. All public disclosures and representations to Wimbledon's investors and its board described in detail Gerova's reinsurance business and its high likelihood of success, but there never was one. Gerova could not close on the only reinsurance deal contemplated (with a company called Northstar Group) because it had no money. Accordingly Wimbledon's assets were not used as "regulatory capital" in furtherance of any purported reinsurance business, as represented. The only purpose of the Wimbledon and Stillwater acquisitions was to further the conspiracy. Indeed, it appears from the government's evidence that the Gerova conspiracy was borne out of the Fund.com Ponzi scheme. Galanis and Tagliaferri (among others) orchestrated the Weston bribe, and Galanis obviously had planned to us Gerova in part to "fix" the problems caused by the Fund.com Ponzi scheme.

Wimbledon also had its funds misappropriated as part of the conspiracy. Not having an operating business, Galanis and Hirst simply siphoned funds for their own purposes. In 2010 and 2011, $4.3 million was transferred from Wimbledon's account to Hallac ($1.9 million) and to a Gerova account at Vensure Capital ($2.3 million), which Wimbledon believes is controlled by Hirst. *See* Plenary Action Dkt. No. 993.

Moreover, the bleeding of Wimbledon did not stop upon the delisting of Gerova's stock. In April 2011, Galanis, Hallac, and another member of the conspiracy, David Bergstein, cooked up another scheme to further misappropriate Wimbledon's assets. They caused Wimbledon to enter into a so called "unwind" of the Wimbledon-Gerova transaction, purported to transfer those assets to a sham company called Arius Libra, pledged those assets for a "loan" from Partners II, and stole the proceeds, including approximately $5 million to pay the Gerova insiders under the "Unwind Agreement." The government has charged this conspiracy in an indictment against

Bergstein and Wellner, and Hallac has pleaded guilty to this crime.  *See* Plenary Action Dkt. Nos. 977, 980. The fact that the government did not charge Galanis specifically with this crime in this case does not preclude Wimbledon from seeking restitution, because this is a continuation (indeed the conclusion) of the Gerova conspiracy.  The harm to Wimbledon need only be caused by the conspiracy, whether or not this aspect of it was charged.  *See Boyd*, 222 F.3d at 51 (affirming trial court's imposition of liability under the MVRA for uncharged crimes, but which were committed in the course of the conspiracy).

Finally, Wimbledon, like other shareholders, lost the entire value of their Gerova shareholdings.  The Government's Sentencing Memorandum appears to acknowledge that Wimbledon, as a Gerova shareholder, was a victim of the crimes charged.  *See* Sentencing Memorandum at 19.  The Government, however, then sought to exclude Wimbledon and Stillwater in its Supplemental Sentencing Memorandum, stating in a footnote:  "Stillwater and Wimbledon, like every shareholder of Gerova at the time of the initial issuance to Shahini, are victims of the fraudulent issuance in that such issuance diluted the value of their shares. However, because this category of putative victims is so large – literally every shareholder at the time of the Shahini issuance – and because of the difficulty in ascertaining exact monetary losses based on this dilution, this category of victims should not be included in the restitution order." *See United States v. Galanis*, No. 1:15-cr-643-PKC Dkt. No. 397 at 4 n.2.

The Government's suggestion that it can calculate damages for some shareholders but not others (particularly Wimbledon) is, we respectfully submit, unreasonable.  The fraud on Wimbledon was central to the scheme.  Wimbledon did not buy stock on the open market, its investment advisor was bribed to contribute Wimbledon assets to Gerova.  The stock was worthless from day one, because it was impossible for Gerova to acquire a reinsurance business

(showing that Galanis and Hirst never had any real intention of doing so). *U.S. v. Schwamborn*, 542 F.App'x 87 (2d Cir. 2013); *U.S. v Marsh*, 2011 WL 5325410, at *14 (E.D.N.Y. 2011) ("In securities fraud cases, the Court of Appeals for the Second Circuit has found that there is a sufficient causal nexus between the fraud and the losses where the victims would not have transacted with the defendant but for the defendants' fraudulent misrepresentations."); *Levy v. U.S.*, 626 F.App'x 319, 323 (2d Cir 2015) ("We have observed however that the entire amount of investor losses may be attributed to a defendant who 'promoted worthless stock in worthless companies").

Moreover, Gerova stock was delisted not just because of the pump and dump scheme, but because Gerova was a Ponzi-like scheme that had no operating business, could not issue financial statements, and was controlled by or affiliated with individuals who had perpetrated Ponzi schemes in the past. Indeed, as calculated by the government, the Tagliaferri holders' damages flow from the fraudulent nature of Gerova, not just the illegal trading.[9] The government's loss calculation is based on the failure of Gerova and the delisting of its stock, not just a decreased market price. Wimbledon and Stillwater are the principal victims of this broader fraud, and just because their losses are large is no reason to exclude them.

In its Supplemental Sentencing Memorandum, the Government seeks to characterize the schemes "alleged and proven" as limited to the matched trading market manipulation. We respectfully submit that this characterization is unduly narrow. This scheme was much broader and could not have succeeded without the Wimbledon transaction, the survival of the SPAC, and the continued deception of Wimbledon to avoid discovery. Wimbledon's investors lost

---

[9]     The government calculates damages for the Tagliaferri clients based on the difference between the purchase price and the stock price "at the time when trading in Gerova was halted." In the alternative, the government proposed using an average of the stock price during the period of the fraud ($7.03) and the stock price on the date that trading was halted ($3.65), times the number of shares held. *See* Sentencing Mem. at 11.

everything in this scheme. Their $100 million plus in investments went up in smoke. They had to spend hundreds of thousands of dollars just to determine what happened to their investments, and now are embroiled in extensive civil litigation to recover something from the perpetrators of these frauds. It is simply not accurate to characterize Wimbledon's situation as a contract dispute – Wimbledon was the victim of the securities fraud just like the Tagliaferri clients, except that Wimbledon's corrupt investment advisor contributed more than $100 million in assets to the scheme rather than cash.

Wimbledon respectfully requests that the court deem it a victim of the Galanis and Hirst conspiracy, entitled to restitution under the MVRA. Wimbledon's losses are comprised of the following:

1.  The misappropriation of $4.3 million from Wimbledon's account in 2010 and 2011.

2.  The $5 million "unwind" payments to Galanis and his co-conspirators in 2011.

3.  The loss in value of Wimbledon's stock. Using the Government's calculation, the value of Wimbledon's loss equals $43,633,332 (using the price at which Wimbledon acquired the shares) or $38,306,665.50 using the average stock price during the period of the fraud).[10]

4.  Wimbledon's costs and attorneys' fees to investigate the frauds.

---

[10]     Under the Asset Purchase Agreement, Wimbledon purchased Gerova shares at $7.50 per share. *See* Exhbit A hereto. After the unwind, Hallac represented to investors that the assets were worth approximately $12 million, but had been double pledged for two different loans. Wimbledon subsequently through litigation recovered what remains of the original assets, but the distributions to Wimbledon have not even covered the cost of litigation and investigation.

## **CONCLUSION**

For the foregoing reasons, Wimbledon requests that it and Partners II be treated as Victims of the Galanis and Hirst crimes, and that the sentencing order include restitution for these entities totaling at least $47 million.

Dated: April 12, 2017
New York, New York

KAPLAN RICE LLP


By:    */s/ Howard J. Kaplan*_____
        Howard J. Kaplan
        Michelle A. Rice
        Joseph A. Matteo
142 West 57th Street, Suite 4A
New York, New York 10019
Tel: (212) 235-0300

*Attorneys for Wimbledon*
*Financing Master Fund, Ltd.*
*(In Official Liquidation)*

20

# Exhibit A

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** ("Agreement") is made and entered into as of the 31ˢᵗ day of December 2009, by and among **Asia Special Situation Acquisition Corp.**, a Cayman Islands corporation ("ASSAC"); **Amalphis Group Inc.**, a British Virgin Islands corporation ("Amalphis"); **Allied Provident Insurance Company Ltd.**, a Barbados exempted insurance company ("Allied Provident"); **WFM Holdings Ltd.**, a Cayman Island exempted company (the "Buyer"); **Weston Capital Asset Management LLC,** a Delaware limited liability company ("Weston" or the "Portfolio Manager"); and **Wimbledon Financing Master Fund Ltd.**, a Cayman Island exempted company ("Wimbledon" or the "Fund"). Amalphis, Allied Provident and the Buyer are hereinafter sometimes collectively referred to as the "Amalphis Parties." The Fund and Weston are hereinafter sometimes collectively referred to as the "Wimbledon Parties". ASSAC, the Amalphis Parties and the Wimbledon Parties are hereinafter sometimes collectively referred to individually as a "Party" and collectively as the "Parties").

## RECITALS

**WHEREAS**, Amalphis owns 100% of the issued and outstanding share capital of Allied Provident; and

**WHEREAS**, the Buyer is a 100% owned Subsidiary of Allied Provident that has been formed for the sole purpose of acquiring the Acquired Assets and Liabilities of the Fund pursuant to this Agreement; and

**WHEREAS**, Weston is the Portfolio Manager of the Fund; and

**WHEREAS**, Weston and the board of directors of the Fund desire to sell, transfer, convey and assign (collectively "Transfer") all of the Acquired Assets (as hereinafter defined) of the Fund, subject to the Buyer's assumption of all of the Liabilities (as hereinafter defined) of the Fund, solely in exchange for 106,000 Amalphis Series A Preferred Shares (the "Subject Shares"), and

**WHEREAS**, Amalphis desires that the Buyer acquire all of the Acquired Assets of the Fund, subject to their Liabilities, all upon the terms and subject to the conditions set forth in this Agreement; and

**WHEREAS**, prior to the Closing of the transactions contemplated by this Agreement, the Fund desires to enter into the Amalphis Exchange Agreement pursuant to which, on the Exchange Agreement Closing Date, the Fund shall exchange all of the Subject Shares issued to it pursuant to this Agreement for a like number of ASSAC Series A Preferred Shares, and ASSAC desires to acquire all, and not less than all, of the Subject Shares from the Fund; and

**WHEREAS**, the Board of Directors of each of ASSAC, the Buyer, Amalphis, Allied Provident and the Portfolio Manager, in its capacity as Portfolio Manager of the Fund, and the board of directors of the Fund each believe that this Agreement, the Amalphis Exchange Agreement and related transactions contemplated hereby and thereby are in the best interests of the respective Parties and the Fund Shareholders, and have each approved and adopted the form, terms and provisions of this Agreement; and

**WHEREAS**, ASSAC and its Subsidiaries are consolidating certain insurance company and hedge funds assets, as a result of which ASSAC shall acquire certain securities and assets of the Stillwater Funds, the Acquired Assets (subject to assumption of the Liabilities) of Wimbledon and the securities of other Persons, all in accordance with the this Agreement, the Share Exchange Agreement and the Additional Acquisition Agreements, as a result of which ASSAC and its consolidated direct and indirect

NewYork01 1335920v3 043086.000010
84422196_18

Subsidiaries shall own an aggregate of approximately $500.0 million or more of "Net Asset Value" (as that term is defined in this Agreement and in the Additional Acquisition Agreements).

**NOW, THEREFORE**, in consideration of the mutual representations, warranties and agreements contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I. DEFINITIONS

"Acquired Assets" means the Acquired Percentage of (i) all of the securities and other investments of the Fund, (ii) all participating interests (if any) in such securities or investments, and (iii) all other assets and properties, real and personal, both tangible and intangible, of every kind and description, that is owned, leased or otherwise used by the Fund, as the same shall exist as at the Closing Date; a general description of which Acquired Assets are set forth on **Exhibit C-1** annexed hereto and made a part hereof (the "**Asset Schedule**"), but in no event shall it include the name "Wimbledon". For the avoidance of doubt, if the Acquired Percentage is less than 100%, then Acquired Assets shall mean the Acquired Percentage of each investment and other asset owned by the Fund.

"Acquired Percentage" means 100%; provided, however, if any investor in any of the feeder funds investing in the Fund objects to the transactions contemplated by this Agreement prior to January 19, 2010 and such investor's investment balance in one or both of such feeder funds aggregates an amount that exceeds 10% of the total shareholder's equity of the Fund (each such investor an "Objecting Investor" and each Objecting Investor's indirect percentage ownership interest in the shareholder's equity of the Fund, the "Objecting Investor's Percentage"), then the term "Acquired Percentage" shall mean (i) 100% _less_ (b) the sum of the Objecting Investor's Percentage of each Objecting Investor.

"Additional Acquisition Agreements" means the various agreements and plan of merger, asset purchase agreement and other agreements and instruments, all in form and content satisfactory to Stillwater, ASSAC and the other Persons who are parties thereto, pursuant to which, **inter alia**, ASSAC or a Subsidiary of ASSAC shall acquire, in addition to its acquisition of the Fund pursuant to this Agreement, any or all of: (a) the Amalphis Exchange Shares pursuant to the Amalphis Exchange Agreement, (b) all or substantially all of the equity and assets (subject to assumption of liabilities) of all or certain of the Stillwater Funds pursuant to the Stillwater Acquisition Agreements, (c) all or substantially all of the assets (subject to assumption of liabilities) of the Wimbledon Real Estate Fund pursuant to the Wimbledon Real Estate Fund Acquisition Agreement, and (d) all or substantially all of the equity of Northstar pursuant to the Northstar Merger Agreement.

"Adjusted Purchase Value" means 100% of the Appraised NAV of the Fund; provided, however, in no event shall the Adjusted Purchase Value be less than $85,000,000.

"Affiliate" means any one or more Person controlling, controlled by or under common control with any other Person.

"Agreement" has the meaning set forth in the first paragraph of this Agreement.

"Allied Provident" shall mean Allied Provident Insurance Company, Ltd., a Barbados exempted insurance company, and a wholly-owned subsidiary of Amalphis.

"Amalphis" shall mean Amalphis Group, Inc., a British Virgin Islands corporation.

"Amalphis Exchange Agreement" means the share exchange agreement, dated as December 31,

2

Confidential Treatment Requested    WMAC0020459

2009 among Amalphis, Rineon Group, Inc., a Nevada corporation ("Rineon"), NatProv Holdings, Inc., a British Virgin Islands corporation ("NatProv"), ASSAC, Wimbledon and the other parties signatory thereto, pursuant to which, *inter alia*, in exchange for additional ASSAC Series A Preferred Shares, ASSAC shall acquire, through its receipt of the Amalphis Exchange Shares, a controlling interest in Amalphis and its consolidated Subsidiaries, including without limitation, Allied Provident and the Buyer.

"Amalphis Exchange Shares" shall mean the collective reference to all of the issued and outstanding shares of Amalphis Series A preferred stock that are issued pursuant to (a) this Agreement, and (b) the Amalphis Exchange Agreement.

"Ancillary Agreements" means the Amalphis Series A Preferred Share Certificate of Designations, the ASSAC Series A Preferred Share Certificate of Designations, the ASSAC Restated Articles, the Asset Schedule, the Asset Transfer Instruments, the Liabilities Schedule, the Liabilities Assumption Instruments, the Management Agreement and the Registration Rights Agreement.

"Appraised NAV" means the Net Asset Value of the Fund as at December 31, 2009, as appraised pursuant to the NAV Appraisal or such other evaluation method as shall be reasonably satisfactory to the Fund and ASSAC.

"ASSAC Articles" means the Memorandum and Articles of Association of ASSAC, as at the date of this Agreement.

"ASSAC Executive Shares" shall mean the 10,746,667 restricted ASSAC Ordinary Shares issued to Marshall Manley ("Manley") and his Affiliates or associates (collectively, the "Manley Group") in consideration for the services performed for ASSAC prior to the Closing Date and to be performed for the ASSAC Group following the Closing Date.

"ASSAC Ordinary Shares" means the collective reference to (a) the 50,000,000 ordinary shares of ASSAC, $0.0001 par value, authorized for issuance pursuant to the ASSAC Articles, and (b) the 250,000,000 ordinary shares of ASSAC, $0.0001 par value, to be authorized for issuance pursuant to the ASSAC Restated Articles.

"ASSAC Preferred Shares" means the collective reference to (a) the 1,000,000 preferred shares of ASSAC, $0.0001 par value, authorized for issuance pursuant to the ASSAC Articles, and (b) the 10,000,000 preferred shares of ASSAC, $0.0001 par value, to be authorized for issuance pursuant to the ASSAC Restated Articles.

"ASSAC Proxy Statement" means the proxy statement that is prepared by the Parties and mailed to the holders of ASSAC Ordinary Shares prior to the date of the ASSAC Shareholders Meeting.

"ASSAC Restated Articles" means the Amended and Restated Memorandum and Articles of Association of ASSAC in the form of **Exhibit A** annexed hereto and made a part hereof.

"ASSAC Series A Preferred Shares" means up to a maximum of 800,000 ASSAC Preferred Shares, to be designated as ASSAC Series A Preferred Shares pursuant to the ASSAC Series A Preferred Certificate of Designations and issued to the respective holders pursuant to this Agreement and the Additional Acquisition Agreements; which ASSAC Series A Preferred Shares shall, among other things:

    (a)    have a par value of $0.0001 per share;

    (b)    have a liquidation value and stated value of $1,000.00 per share;

3

Confidential Treatment Requested

(c)    commencing on the Conversion Date pay per share dividend, semi-annually at the rate of 5% per annum, accruing from the issuance date thereof, on the Adjusted Purchase Value, in the form of additional Conversion Shares;

(d)    vote on an "as converted" basis, together with the ASSAC Ordinary Shares, on all matters requiring the approval or ratification of shareholders of ASSAC; *provided that*, until converted into Conversion Shares, such ASSAC Series A Preferred Shares shall, at each ordinary and extraordinary meeting of shareholders of ASSAC held prior to such conversion of ASSAC Series A Preferred Shares, or with respect to any transaction requiring approval of ASSAC shareholders prior to such conversion of ASSAC Series A Preferred Shares, be deemed to vote in favor of or be deemed to have consented to, all proposals that are recommended for approval and adoption by shareholders of ASSAC by a majority of the members of the board of directors of ASSAC;

(e)    on the Conversion Date, *automatically* (and without any action on the part of the holder or ASSAC) commence to convert into Conversion Shares at the Conversion Price then in effect, at the rate (rounded off to the nearest full Conversion Shares) of one-sixth (or 16.66%) of the total number of ASSAC Series A Preferred Shares held by each holder on the last day of each month commencing July 31, 2010 so that all of the ASSAC Series A Preferred Shares issued pursuant to the terms of this Agreement and the Additional Acquisition Agreements will be fully converted into Conversion Shares on December 31, 2010;

(f)    provide that each ASSAC Preferred Share issuable to the Fund or Fund Shareholders shall be convertible at the Conversion Ratio applicable to the Fund; and

(g)    contain such other terms and conditions as shall be set forth in the ASSAC Series A Preferred Certificate of Designations.

"ASSAC Series A Preferred Certificate of Designations" means the certificate of designation for the issuance of the ASSAC Series A Preferred Shares, in the form of **Exhibit B** annexed hereto and made a part hereof, or, if not permitted under applicable law, the terms of which shall be included in the ASSAC Restated Articles used for the same purpose.

"ASSAC Shareholder Approval" means the required affirmative consent, vote and ratification at the ASSAC Shareholders Meeting by the holders of ASSAC Ordinary Shares (the "ASSAC Shareholders") of (i) this Agreement, the Ancillary Agreements and the transactions contemplated hereby and thereby, (ii) the increase in the authorized share capital of ASSAC, (iii) adoption of the ASSAC Restated Articles (iv) the consummation of ASSAC's acquisition of Amalphis Exchange Shares and the Stillwater Funds, all pursuant to terms and conditions of the Additional Acquisition Agreements, (v) if applicable, the consummation of ASSAC's acquisition of Northstar, (vi) the change of the corporate name of ASSAC to **Gerova Financial Group, Ltd.,** or such other name as shall be acceptable to ASSAC and the Wimbledon Parties, and (viii) the other proposals set forth in the ASSAC Proxy Statement.

"ASSAC Shareholders Meeting" means the meeting of the ASSAC Shareholders held on or before January 19, 2010 in accordance with the ASSAC Proxy Statement.

"Buyer" shall mean **WFM Fund Ltd.,** a Cayman Island exempted company.

"Consent" means any authorization, consent, approval, filing, waiver, exemption or other action by or notice to any Person.

84422196_18

Confidential Treatment Requested                                                                    WMAC0020461

"Contract" means a contract, agreement, lease, commitment or binding understanding, whether oral or written, that is in effect as of the date of this Agreement or any time after the date of this Agreement.

"Consideration" means the aggregate of **106,000** Amalphis Exchange Shares that are to be issued to the Fund pursuant to this Agreement, and exchanged on the Closing Date for 106,000 ASSAC Series A Preferred Shares pursuant to the Amalphis Exchange Agreement.

"Conversion Date" shall mean July 31, 2010.

"Conversion Price" shall mean $7.50, as the same may from time to time be adjusted prior to the Conversion Date pursuant to the ASSAC Series A Preferred Certificate of Designations.

"Conversion Ratio" shall mean, as to the Fund, that ratio (expressed as "___:1") of that number of Conversion Shares into which one (1) full Series A ASSAC Preferred Share issued to the Fund or the Fund Shareholders shall be converted; all as determined in accordance with Section 2.7 of this Agreement.

"Conversion Shares" shall mean that number of Ordinary Shares of ASSAC issuable upon conversion of the Series A Preferred Shares, as shall be calculated by dividing (i) the Adjusted Purchase Value of the Fund, by (ii) the Conversion Price then in effect.

"Estimated NAV" means the unaudited $106.0 million Net Asset Value of the Fund as at December 31, 2009, as estimated in good faith by the Portfolio Manager, all in accordance with this Agreement.

"Encumbrance" means any charge, claim, community property interest, easement, covenant, condition, equitable interest, lien, option, pledge, security interest, right of first refusal or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"Fund Shareholders" shall mean each of the holders of record of the share capital of the Fund.

"Governmental Authorization" means any approval, consent, license, permit, waiver, registration or other authorization issued, granted, given, made available or otherwise required by any Governmental Entity or pursuant to Law.

"Governmental Entity" means any federal, state, local, foreign, international or multinational entity or authority exercising executive, legislative, judicial, regulatory, administrative or taxing functions of or pertaining to government.

"Governmental Order" means any judgment, injunction, writ, order, ruling, award or decree by any Governmental Entity or arbitrator.

"Insolvency Event" shall mean as to any of the Party or Parties, (a) such Party or Parties shall make an assignment for the benefit of creditors; (b) if a receiver, liquidator or trustee shall be appointed for such Party or Parties, (c) such Party or Parties shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, such Party or Parties, or (d) if any proceeding for the dissolution or liquidation of such Party or Parties shall be instituted; provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not

5

Confidential Treatment Requested

WMAC0020462

consented to by such Party or Parties, upon the same not being discharged, stayed or dismissed within sixty (60) days.

"Knowledge" means, (i) with respect to the Wimbledon Parties, any fact or circumstance actually known to any of Albert Hallac or Keith Wellner, (ii), with respect to the Amalphis Parties, any fact or circumstance actually known to any member of the Board of Directors of Amalphis or the executive officers or management of Amalphis or which any of such Persons should have known after reasonable inquiry and (iii) with respect to ASSAC, any fact or circumstance actually known to Gary T. Hirst, the President or Michael Hlavsa, the Chief Financial Officer, respectively, of ASSAC.

"Law" means any constitution, law, ordinance, principle of common law, regulation, statute or treaty of any Governmental Entity.

"Liabilities" shall mean and include all accounts payable, notes payable, Redemption Claims, accrued expenses and other liabilities and obligations of the Fund and of the feeder funds that invest in the Fund that in each case would be required to be set forth on a balance sheet of a Person prepared in accordance with generally accepted accounting principles ("GAAP") or International Financial Reporting Standards ("IFRS"), as applicable, including any causes of action and contingencies, whether know or unknown, as the same shall exist as at the Closing Date; a general description of which Liabilities are set forth on **Exhibit C-2** annexed hereto and made a part hereof (the "**Liabilities Schedule**").

"Litigation" means any claim, action, arbitration, mediation, audit, hearing, investigation, proceeding, litigation or suit (whether civil, criminal, administrative, investigative or informal) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Entity or arbitrator or mediator.

"Management Agreement" shall mean the management agreement between Weston, as Portfolio Manager, and the Buyer, in the form of **Exhibit D** annexed hereto and made a part hereof.

"Material Adverse Effect" shall mean (a) with respect to any of the Wimbledon Parties, any event or condition that could reasonably be expected to have a material adverse effect on the business, assets, results of operations, financial condition or prospects of any of such Wimbledon Parties, and (b) with respect to any of the Amalphis Parties or ASSAC, any event or condition that could reasonably be expected to prevent or cause any of the Amalphis Parties or ASSAC to be unable to consummate the transactions contemplated hereby or by the Amalphis Exchange Agreement , pay the Consideration or otherwise perform its obligations under this Agreement or the Amalphis Exchange Agreement.

"NAV Appraisal" shall mean the appraisal of the Net Asset Value of the Fund, to be prepared by Houlihan Smith Inc. or other business appraisal firm (the "Asset Appraiser") as shall be reasonably acceptable to the Portfolio Manager and ASSAC in accordance with recognized methods of valuing such assets and liabilities that are reasonably acceptable to such Parties.

"NAV Valuation Methods" means the methods used in valuing the net asset value of the Fund that are set forth on **Schedule A** annexed hereto and made a part hereof, or such other valuation methods as shall be reasonably satisfactory to ASSAC and the Fund.

"Net Asset Value" or "NAV" means, as at December 31, 2009 (a) the value of all of the assets and investments of the Fund as determined in accordance with the NAV Valuation Methods, *less* (b) all liabilities and obligations of the Fund applicable to such assets and investments, including without limitation, all accounts payable, accrued expenses, notes payable and the aggregate amount of all outstanding Redemption Claims.

84422196_18

Confidential Treatment Requested                                        WMAC0020463

"Northstar" means Northstar Group Holdings, Inc., a Bermuda corporation.

"Northstar Merger Agreement" means one of the Additional Acquisition Agreements pursuant to which, inter alia, ASSAC shall acquire 100% of the share capital and capital stock of Northstar.

"Organizational Documents" means (i) the memorandum and articles of association of a company, (ii) the partnership agreement and any statement of partnership of a general partnership, (iii) the limited partnership agreement and the certificate of limited partnership of a limited partnership, (iv) the limited liability company agreement and articles or certificate of formation of a limited liability company, (v) any charter or similar document adopted or filed in connection with the creation, formation or organization of a Person and (vi) any amendment to any of the foregoing.

"Person" means any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Entity or other entity.

"Process Agent" has the meaning set forth in Section 9.8.

"Purchase Value" means the 100% of the Estimated NAV of the Fund.

"Redemption Claims" means the outstanding amounts (whether payable in cash or in other property) owed to the Fund Shareholders who have notified Wimbledon in writing, or may prior to the Conversion Date notify Wimbledon in writing, in each case during a period when redemptions from the Fund have not been suspended by the board of directors of the Fund, that such Persons either (a) seek to withdraw their capital from the Fund, or (b) are owed money in connection with the redemption of their shares from the Fund.

"Registration Rights Agreement" means the agreement of ASSAC to register all of the Conversion Shares issuable under the Amalphis Exchange Agreement and the Additional Acquisition Agreements for resale under the Securities Act of 1933, as amended (the "Securities Act"), all in accordance with the terms and conditions set forth in **Exhibit E** annexed hereto and made a part hereof.

"Remedies Exception," when used with respect to any Person, means except to the extent enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting the enforcement of creditors' rights generally and by general equitable principles.

"Required Consents" means all Consents required to consummate the transactions contemplated by this Agreement, including without limitation, the ASSAC Shareholder Approval.

"Stillwater" means Stillwater Capital Partners, Inc., a Delaware corporation.

"Stillwater Acquisition Agreements" means the two separate asset purchase agreements and four separate agreements and plans of merger all dated as of December 31, 2009, among the various Stillwater Funds, ASSAC, acquisition subsidiaries of ASSAC and Stillwater or its Affiliate, pursuant to which, inter alia, it is contemplated that on or before January 23, 2010, ASSAC or its Subsidiaries will acquire all of the net assets, subject to all of the liabilities of such Stillwater Funds; in each case in exchange for ASSAC Series A Preferred Shares, valued at the Estimated NAV of each of the Stillwater Funds and subject to post-closing adjustments based on the Adjusted NAV set forth in each such agreement.

"Stillwater Agreement" means the letter agreement, dated December 14, 2009, between Stillwater, ASSAC and certain other Persons and the attached Memorandum, in the form of **Exhibit F**

84422196_18

Confidential Treatment Requested

WMAC0020464

annexed hereto and made a part hereof.

"Stillwater Funds" shall mean those Delaware and Cayman Island limited partnerships and Cayman Island companies, consisting of asset backed lending funds, real estate funds, hedge funds and fund of funds that are managed by Stillwater or an Affiliate thereof and listed in paragraphs (b), (c), (d) and (e) of Section 1.1 of the Stillwater Agreement.

"Subsidiary" means any Person in which any ownership interest is owned, directly or indirectly, by another Person.

"Taxes" means all taxes, charges, fees, levies or other assessments, including all net income, gross income, gross receipts, sales, use, ad valorem, transfer, franchise, profits, license, withholding, payroll, employment, social security, unemployment, excise, estimated, severance, stamp, occupation, property or other taxes, customs duties, fees, assessments or charges of any kind whatsoever, including all interest and penalties thereon, and additions to tax or additional amounts imposed by any Governmental Entity.

"Wimbledon" or the "Fund" shall mean **Wimbledon Financing Master Fund Ltd.**, a Cayman Islands exempted company.

"Wimbledon Real Estate Fund" shall mean **Wimbledon Real Estate Financing Master Fund Ltd.**, a Cayman Islands exempted company.

"Wimbledon Real Estate Fund Acquisition Agreement" shall mean the agreement, dated as of the date hereof, by and among ASSAC, Amalphis, Allied Provident, the Buyer, Weston and the Wimbledon Real Estate Fund.

"Wimbledon Funds" shall mean the collective reference to the Fund and the Wimbledon Real Estate Fund.

Certain terms not defined above are defined in the sections below.

## ARTICLE II.

### PURCHASE AND SALE OF THE ASSETS; ASSUMPTION OF LIABILITIES

SECTION 2.1.      The Acquired Assets.

(a)      Upon the terms and subject to the conditions set forth in this Agreement, on the Closing Date, the Fund shall sell, transfer, convey and assign (collectively, "Transfer") to the Buyer good and marketable title in and to all, and not less than all, of the Acquired Assets of the Fund, as the same shall exist as at the Closing Date.

(b)      On the Closing Date, the Fund shall execute and deliver to the Buyer one or more bills of sale, assignments, stock powers and other documents and instruments as shall be legally required, necessary or advisable to effect the Transfer of all of the Acquired Assets (collectively, the "Acquired Assets Transfer Instruments").

SECTION 2.2.      Registration of Acquired Assets.Subject to the provisions of this Agreement, as soon as practicable on or after the Closing Date, the Parties shall cause to be filed with any Governmental Authority in any jurisdiction, all necessary Transfer instruments and other documents as

8

Confidential Treatment Requested                                                                                    WMAC0020465

shall be legally required, necessary or advisable to register good and marketable title in and to the Acquired Assets to and in the name of the Buyer.

SECTION 2.3.       Assumption of Liabilities.

(a)       Upon the terms and subject to the conditions set forth in this Agreement, on the Closing Date, the Buyer shall assume all, and not less than all, of the Liabilities, as the same shall exist as at the Closing Date.

(b)       On the Closing Date, the Buyer shall, and Allied Provident shall cause the Buyer to, execute and deliver to the Fund one or more assumption agreements or other undertakings, documents and instruments as shall be legally required, necessary or advisable to effect the Transfer of all of the Liabilities to, and the assumption of all of the Liabilities by, the Buyer (collectively, the "Liability Assumption Instruments").

SECTION 2.4.       Management Agreement.

On the Closing Date, the Buyer shall execute and deliver the Management Agreement to the Portfolio Manager.

SECTION 2.5.       Consideration; Escrow of Closing Documents

(a)       In consideration for the Transfer of the Acquired Assets, and in addition to the assumption of the Liabilities by the Buyer, on the Closing Date, Amalphis shall deliver to the Fund, an aggregate of 106,000 Amalphis Exchange Shares, representing 100% of $106,000,000  Purchase Value attributable to the Fund as at December 31, 2009.

(b)       The Asset Transfer Instruments, the Liability Assumption Instruments, the Consideration set forth in Section 2.5(a) above, and all of the other documents and instruments to be delivered by the Wimbledon Parties, the Amalphis Parties and ASSAC hereunder (collectively, the "Closing Documents"), shall all be held in escrow by legal counsel to the Portfolio Manager and the Fund (the "Escrow Agent") pending the Closing of the transactions contemplated by the Amalphis Exchange Agreement (the "Exchange Agreement Closing Date"), pursuant to which, *inter alia*, in exchange for the aforesaid **106,000** Amalphis Exchange Shares, the Fund shall receive, in exchange for such Amalphis Exchange Shares, an aggregate of **106,000** ASSAC Series A Preferred Shares.  In the event and to the extent that, for any reason or no reason, the transactions contemplated by the Amalphis Exchange Agreement are not consummated by 5:00 p.m. (Eastern Standard Time) on January 23, 2010 (the "Outside Closing Date"), then and in such event, this Agreement and all of the transactions contemplated hereby shall be rescinded and rendered null and void, *ab initio*, and all of the Closing Documents shall be returned to the respective Party or Parties who delivered the same to such Escrow Agent.  The escrow agreement among the Parties and the Escrow Agent shall be prepared by and in form and content reasonably satisfactory to the Escrow Agent.

(c)       On the Exchange Agreement Closing Date, in exchange for the delivery to the Buyer and the Amalphis Parties of the Asset Transfer Instruments and other Closing Documents deliverable to the Buyer and the Amalphis Parties, ASSAC shall deliver to the Fund all, and not less than all, of the 106,000 ASSAC Series A Preferred Shares.

SECTION 2.6.       Adjusted Purchase Value; NAV Appraisals.

9

Confidential Treatment Requested                                                                    WMAC0020466

(a)    The Wimbledon Parties hereby covenant and agree to use their commercially reasonable efforts to cause the Asset Appraiser to deliver the NAV Appraisal on or before June 30, 2010. The calculations of the NAV Appraisal by the Asset Appraiser shall be final and binding upon all Parties hereto.

(b)    Upon delivery of the NAV Appraisal, the Adjusted Purchase Value of the Fund shall be determined.  As provided in the ASSAC Series A Preferred Certificate of Designations, there shall be a post-Closing adjustment to the Conversion Shares and the Conversion Ratio, as provided in Section 2.7 below.

SECTION 2.7.    Conversion of ASSAC Series A Preferred Shares.

Upon delivery of the NAV Appraisal, the number of Conversion Shares and the Conversion Ratio shall be recalculated, as follows:

(a)    the *aggregate* number of Conversion Shares that are issuable to the Fund or the Fund Shareholders, as the case may be, upon automatic conversion of all ASSAC Series A Preferred Shares previously issued to the Fund or the Fund Shareholders, respectively, shall be automatically and without any further action adjusted and determined by dividing (i) the Adjusted Purchase Value of the Fund, by (ii) the Conversion Price then in effect;

(b)    the Conversion Ratio applicable to the Fund or the Fund Shareholders shall, automatically and without any further action, be adjusted and determined by dividing the (i) aggregate number of Conversion Shares applicable to the Fund, as determined in accordance with Section 2.7(a) above, by (ii) the number of ASSAC Series A Preferred Shares issued at Closing to the Fund or Fund Shareholders; and

(c)    the number of Conversion Shares issuable to the Fund and if applicable, to each individual Shareholder of the Fund, respectively, upon automatic conversion of all ASSAC Series A Preferred Shares issued to the Fund or Fund Shareholder, shall be shall be automatically and without any further action determined by multiplying (i) the aggregate number of Series A Preferred Shares issued to the Fund or Fund Shareholder, by (ii) the Conversion Ratio, as determined pursuant to Section 2.7(b) above.

For the avoidance of doubt, if for example:

(A)    The Estimated NAV of the Fund at December 31, 2009 is $106.0 million, then 100% the Purchase Value of the Fund payable to the Fund is $106.0 million.

(B)    The Fund shall receive at Closing 106,000 ASSAC Series A Preferred Shares, having a total stated or liquidation value of $1,000 per share.

(C)    Based on the initial $7.50 per shares Conversion Price, the assumed number of Conversion Shares at the Closing Date would be 14,133,333 ASSAC Ordinary Shares ($106.0 million divided by $7.50) and the assumed Conversion Ratio would be 133.333 ASSAC Ordinary Shares for each of the 106,000 ASSAC Preferred Shares, or 133.333:1.

(D)    If the Appraised NAV based on the NAV Appraisal of the Fund reflects that the Adjusted Purchase Value of the Fund as at December 31, 2009 was, in fact, only $80.0 Million,

84422196_18

Confidential Treatment Requested                                                                    WMAC0020467

then the Consideration that should have been payable to the Fund or the Fund Shareholders at the Closing is only $85,000,000 and not $106,000,000.

(E)    The actual number of Conversion Shares issuable to the Fund or the Fund Shareholders is then automatically adjusted downwards to 11,333,333 ASSAC Ordinary Shares ($85.0 million divided by $7.50), and the adjusted Conversion Ratio applicable to each full ASSAC Series A Preferred Share would be 106.918 ASSAC Ordinary Shares for each of the 106,000 ASSAC Preferred Shares, or 106.918:1 (11,333,333 Conversion Shares divided by 106,000 ASSAC Series A Preferred Shares).

The number of ASSAC Series A Preferred Shares always remains fixed but the Conversion Shares and Conversion Ratio change based upon the Adjusted Purchase Value of the Fund.  In addition, the 5% dividend on the ASSAC Series A Preferred Shares will also be payable in additional ASSAC Ordinary Shares at the Conversion Date and will reflect the Adjusted Purchase Values based upon the NAV Appraisals. To avoid the issuance of fractional Ordinary Shares, all Conversion Shares issuable pursuant to this Agreement shall be rounded up or down to the nearest whole Ordinary Share.

SECTION 2.8.    Delivery of Consideration Certificates.

(a)    On the Closing Date, ASSAC shall deliver to the Fund, one (1) or more share certificates evidencing the aggregate number of ASSAC Series A Preferred Shares issuable to the Fund, registered in the name of "Wimbledon Financing Master Fund Ltd.". The Fund may, following the Closing, at its option, either cause ASSAC to issue and thereafter distribute Series A Preferred Share certificates to the individual Fund Shareholders, or hold such share certificates for the benefit of the Fund Shareholders pending the automatic conversion of such ASSAC Series A Preferred Shares into Conversion Shares as contemplated pursuant to this Article II.

(b)    Following the Conversion Date, ASSAC shall either deliver physical stock certificates evidencing the Conversion Shares registered in the name of the Fund or at the request of the Fund, registered in the names of the Fund Shareholders or other Persons or deliver such certificates in electronic format by DTC or other method, all as requested by the Fund.

## ARTICLE III.  CLOSING AND CLOSING DATE

SECTION 3.1.    Closing Date.    The transactions contemplated by this Agreement shall be consummated in escrow on or before January 19, 2010, following the satisfaction or waiver of the conditions set forth in Article VII hereof.  The closing of the transactions contemplated by this Agreement (the "Closing") will take place at the offices of Hodgson Russ LLP, 1540 Broadway, 24th floor, New York, New York, at 9:00 a.m. on January 23, 2010 (the "Closing Date") or at such other place and on such other date as may be mutually agreed by the parties hereto, in which case Closing Date means the date so agreed.  The Closing will be effective as of the close of business on the Closing Date.  **The Parties hereto acknowledge and agree that time is of the essence.**

SECTION 3.2.    Deliveries.    Subject to the conditions set forth in this Agreement, on the Closing Date:

(a)    The Amalphis Parties and ASSAC will deliver to the Wimbledon Parties:

(i)    evidence of payment of the Consideration, consisting of the Amalphis Series A Preferred Shares issued to the Fund;

11

Confidential Treatment Requested    WMAC0020468

(ii)    a duly executed copy of the Amalphis Exchange Agreement;

(iii)    a certificate of each of ASSAC and the Amalphis Parties dated the Closing Date stating that the conditions set forth in SECTION 7.1 have been satisfied;

(iv)    the text of the resolutions adopted by the boards of directors of the Amalphis Parties and ASSAC authorizing the execution, delivery and performance of this Agreement and the Ancillary Agreements, certified by an appropriate officer of the Amalphis Parties and ASSAC;

(v)    each Ancillary Agreement to which the Amalphis Parties and/or ASSAC is a party, duly executed by the Amalphis Parties or ASSAC, as applicable;

(vi)    except for the ASSAC Shareholder Approvals, all Required Consents, duly executed by all appropriate parties;

(vii)    all Liability Assumption Instruments under and pursuant to Section 2.2(b) of this Agreement;

(viii)    confirmation from legal counsel that the Restated ASSAC Articles has been filed with the Registrar of Companies in the Cayman Islands; and

(ix)    such other certificates, documents and instruments that the Wimbledon Parties reasonably request for the purpose of (A) evidencing the accuracy of the Amalphis Parties' and ASSAC's representations and warranties, (B) evidencing the performance and compliance by the Amalphis Parties and ASSAC with the agreements contained in this Agreement, (C) evidencing the satisfaction of any condition referred to in SECTION 7.1 or (D) otherwise facilitating the consummation of the transactions contemplated by this Agreement.

All actions to be taken by the Amalphis Parties and ASSAC in connection with consummation of the transactions contemplated by this Agreement and all certificates, opinions, instruments and other documents required to effect the transactions contemplated by this Agreement will be in form and substance reasonably satisfactory to the Wimbledon Parties and their counsel.

(b)    The Wimbledon Parties will deliver to ASSAC:

(i)    a certificate of the Wimbledon Parties dated the Closing Date stating that the conditions set forth in SECTION 7.2 have been satisfied;

(ii)    the text of the resolutions adopted by the board of directors of the Fund and by the Portfolio Manager authorizing the execution, delivery and performance of this Agreement and the Ancillary Agreements to which the Fund or the Portfolio Manager is a party, as applicable, certified by an appropriate officer of the Fund and the Investment Manger;

(iii)    each Ancillary Agreement to which any Wimbledon Party is a party, duly executed by such Wimbledon Party;

(iv)    all Required Consents, duly executed by all appropriate parties;

(v)    all Asset Transfer Instruments under and pursuant to Section 2.1(b) of this Agreement; and

12

84422196_18

Confidential Treatment Requested

WMAC0020469

(vi)    such other certificates, documents and instruments that the Amalphis Parties reasonably request for the purpose of (1) evidencing the accuracy of the Wimbledon Parties' representations and warranties, (2) evidencing the performance and compliance by the Wimbledon Parties with the agreements contained in this Agreement, (3) evidencing the satisfaction of any condition referred to in SECTION 7.2 or (4) otherwise facilitating the consummation of the transactions contemplated by this Agreement.

All actions to be taken by each of the Wimbledon Parties in connection with consummation of the transactions contemplated by this Agreement and all certificates, opinions, instruments and other documents required to effect the transactions contemplated by this Agreement will be in form and substance reasonably satisfactory to the Amalphis Parties, ASSAC and their counsel.

(c)    <u>Simultaneous Deliveries</u>.    All items delivered by the Parties at the Closing will be deemed to have been delivered simultaneously, and no items will be deemed delivered or waived until all have been delivered.

## ARTICLE IV.

## REPRESENTATIONS AND WARRANTIES OF THE AMALPHIS PARTIES AND ASSAC

Each of the Amalphis Parties, jointly and severally, represent and warrant to the Wimbledon Parties on behalf of themselves and **Rineon Group, Inc.,** a Nevada corporation ("<u>Rineon</u>"); and ASSAC severally (not jointly and severally) represents to the Wimbledon Parties, that as of the date of this Agreement and as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement).  For purposes of this Article IV, the term "Amalphis Parties" shall include each of Rineon, Amalphis, Allied Provident and the Buyer:

SECTION 4.1.    <u>Incorporation; Power and Authority</u>.  Each of the Amalphis Parties and ASSAC is duly incorporated, validly existing and in good standing under the laws of their respective jurisdictions.  Each of the Amalphis Parties and ASSAC has all necessary power and authority to execute, deliver and perform this Agreement and the Ancillary Agreements to which it will become a party.

SECTION 4.2.    <u>Valid and Binding Agreements; Corporate Structure</u>.

(a)    The execution, delivery and performance by each of the Amalphis Parties and ASSAC of this Agreement and the Ancillary Agreements to which it will become a party have been duly and validly authorized by all necessary corporate or equivalent action.  This Agreement has been duly executed and delivered by each of the Amalphis Parties and ASSAC and constitutes the valid and binding obligation of the Amalphis Parties and ASSAC, enforceable against it in accordance with its terms, subject to the Remedies Exception.  Each Ancillary Agreement to which an Amalphis Party or ASSAC will become a party, when executed and delivered by or on behalf of such Party, will constitute the valid and binding obligation of such Amalphis Parties or ASSAC, as applicable, enforceable against such Party in accordance with its terms, subject to the Remedies Exception.

(b)    The Buyer is a wholly-owned Subsidiary of Allied Provident that has been formed solely for the purpose of entering into this Agreement and consummating the transactions contemplated by this Agreement.  Except for the foregoing, the Buyer has no assets or liabilities and has conducted no business and will conduct no business prior to the Closing Date.

(c)    Allied Provident is a wholly-owned Subsidiary of Amalphis.

13

Confidential Treatment Requested                                                      WMAC0020470

(d)      Amalphis is a holding company formed solely for the purpose of owning 100% of the share capital of Allied Provident.  Except for the foregoing, Amalphis has no assets or liabilities and has conducted no business and will conduct no business prior to the Closing Date.

(e)      Amalphis is classified as a special purpose entity and is consolidated with Rineon for financial reporting purposes.  Rineon currently owns 36,000 Amalphis Series A Preferred Shares, constituting 100% of the issued and outstanding Amalphis Preferred Shares. 100% of the Amalphis Ordinary Shares are owned of record by **NatProv Holdings, Inc.** ("NatProv").

SECTION 4.3.      SEC Filings.

(a)      ASSAC is a "foreign private issuer" (as such term is defined in Rule 3b-4 promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act")).  Rineon also files periodic reports under the Exchange Act.   Each of ASSAC and Rineon and has timely filed and is current in its filing of all periodic and other reports, schedules, statements and other documents (collectively, the "SEC Reports") it is required to file with the Exchange Commission ("SEC") under the Securities Act and the Exchange Act.   None of the SEC Reports filed by ASSAC or Rineon are currently being reviewed by the SEC and neither ASSAC nor Rineon has received any letter of comments from the SEC that it has not, as yet, fully responded to.

(b)      Each of the SEC Reports was prepared and complied in all material respects with the applicable requirements of the Securities Act, the Exchange Act, the Sarbanes-Oxley Act of 2002, as amended, and any other Law applicable to the SEC Reports as in effect at the time it was filed or furnished (or, in the case of any registration statement or proxy statement, on the date of effectiveness or the date of mailing, respectively, and in the case of any SEC Report amended or superseded by a filing prior to the date of this Agreement, then on the date of such amending or superseding filings).  As of their respective dated of filing, effectiveness or mailing, as applicable (or, if amended or supplemented, as of the dates of such amendments or supplements) the SEC Reports did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading.

(c)      Each of ASSAC and Rineon has been and is in compliance with the applicable listing, corporate governance and other applicable rules and regulations of the American Stock Exchange, Inc.

(d)      Each of ASSAC and Rineon has established and maintains disclosure controls and procedures required by Exchange Act Rules 13a-14 and 15d-14.   Such disclosure controls and procedures are adequate and effective to ensure that information required to be disclosed by ASSAC and Rineon is recorded and reported on a timely basis to its chief executive officer and chief financial officer by others within those entities.

(e)      Each of the consolidated financial statements of ASSAC and Rineon contained in the SEC Reports (the "Financial Statements"), together with the related schedules and notes thereto, complied as to form in all material respects, as of the date of filing with the SEC, with applicable accounting requirements and the published rules and regulations of the SEC with respect thereto, and fairly presents, in all material respects, the financial position of ASSAC or Rineon, as applicable, as of the dates indicated and the statement of operations and stockholders' equity and cash flows of ASSAC or Rineon for the periods then ended.  The Financial Statements have been prepared in accordance with GAAP, applied on a consistent basis throughout the periods involved (except, in the case of unaudited quarterly financial statements, subject to normal year-end adjustments consistent with GAAP).

14

Confidential Treatment Requested                                                                    WMAC0020471

(f)    The ASSAC Ordinary Shares are registered pursuant to Section 12(g) of the Exchange Act and no action has been taken or, to the Knowledge of the ASSAC Parties, is contemplated, and no proceeding is pending or has been threatened that would result in the suspension, cancellation or termination of such registration.

SECTION 4.4.    No Breach; Consents.  The execution, delivery and performance by the Amalphis Parties and ASSAC of this Agreement and the Ancillary Agreements to which either or both of the Amalphis Parties will become a party will not (a) contravene any provision of the Organizational Documents, if any, of ASSAC or the Amalphis Parties or the ASSAC Registration Statement on Form S-1 (Registration No. 333-145163) declared effective by the SEC on January 16, 2008 (the "Registration Statement") or the definitive prospectus included therein; (b) violate or conflict with any Law, Governmental Order, Governmental Authorization or the rules and regulations of the American Stock Exchange; (c) conflict with, result in any breach of any of the provisions of, constitute a default (or any event that would, with the passage of time or the giving of notice or both, constitute a default) under, result in a violation of, increase the burdens under, result in the termination, amendment, suspension, modification, abandonment or acceleration of payment (or any right to terminate) under any agreement etc. [language dropped] require a Consent, including any Consent under any Contract or Governmental Authorization that is either binding upon or enforceable against the Amalphis Parties or ASSAC or any Governmental Authorization that is held by the Amalphis Parties or ASSAC; (d) require any Governmental Authorization; (e) give any Governmental Entity or other Person the right to challenge any of the contemplated transactions or to exercise any remedy or obtain any relief under any Law, Governmental Order or Governmental Authorization; (f) cause the Wimbledon Parties to become subject to, or to become liable for the payment of, any Tax; or (g) result on the creation or imposition of any Encumbrance.

SECTION 4.5.    ASSAC Shareholder Approvals. The Amalphis Parties and ASSAC shall use commercially reasonable efforts to obtain all Required Consents and the ASSAC Shareholder Approval required pursuant to this Agreement.

SECTION 4.6.    Brokerage.  Except as set forth on Schedule 4.6 hereto, none of the Amalphis Parties or ASSAC is required to pay any finders fee or other brokerage commissions in connection with the transactions contemplated by this Agreement and the Ancillary Agreements.

SECTION 4.7    Capitalization.  ASSAC is duly authorized to issue the ASSAC Ordinary Shares and the ASSAC Preferred Shares pursuant to its Organizational Documents. As at September 30, 2009, (a) an aggregate of 14,000,000 Ordinary Shares were issued and outstanding, (b) no Preferred Shares were issued and outstanding, and (c) warrants to issue an aggregate of 18,000,000 Ordinary Shares, at exercise prices of $7.50 per share (of which warrants to issue 5,725,000 Ordinary Shares have "cashless exercise" provisions) were issued and outstanding.   Since September 30, 2009, ASSAC sold and issued the ASSAC Executive Shares.

SECTION 4.8    Boards of Directors Authorization.

(a)    The board of directors of ASSAC has duly authorized the issuance of the **106,000** ASSAC Series A Preferred Shares and Conversion Shares pursuant to the Amalphis Exchange Agreement, subject at all times to ASSAC obtaining the ASSAC Shareholder Approval required thereby.

(b)    The board of directors of Amalphis has duly authorized the issuance of the **106,000** Amalphis Series A Preferred Shares constituting the **106,000** Amalphis Exchange Shares to be issued to the Fund pursuant to this Agreement

15

Confidential Treatment Requested                                                                                 WMAC0020472

SECTION 4.7.    <u>No Material Adverse Changes</u>.  Since September 30, 2009 there has not been:

(a)    any material adverse change in the financial position of ASSAC or the Amalphis Parties, except changes arising in the ordinary course of business, which changes will in no event materially and adversely affect the financial position of ASSAC or the Amalphis Parties;

(b)    any damage, destruction or loss materially affecting the assets, prospective business, operations or condition (financial or otherwise) of ASSAC or the Amalphis Parties whether or not covered by insurance;

(c)    any declaration, setting aside or payment of any dividend or distribution with respect to any redemption or repurchase of the capital stock of ASSAC or the Amalphis Parties;

(d)    any sale of an asset (other than in the ordinary course of business) or any mortgage or pledge by ASSAC or the Amalphis Parties of any of its properties or assets; or

(e)    any adoption by ASSAC or the Amalphis Parties of a pension, profit sharing, retirement, stock bonus, stock option or similar plan or arrangement.

SECTION 4.8.    <u>Taxes</u>.  Each of the Amalphis Parties and ASSAC timely filed, or has caused to be timely filed on its behalf, all applicable tax returns required to be filed by it, and all such tax returns are true, complete and accurate, except to the extent any failure to file or any inaccuracies in any filed tax returns, individually or in the aggregate, have not had and would not reasonably be expected to have a Material Adverse Effect on the Amalphis Parties or ASSAC.  All Taxes shown to be due on such tax returns, or otherwise owed, has been timely paid, except to the extent that any failure to pay, individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect on  the Amalphis Parties or ASSAC.

SECTION 4.9.    <u>Compliance with Laws</u>.  Each of the Amalphis Parties and ASSAC has complied with all requirements of Law applicable to it or its business which, if not complied with, would have a Material Adverse Effect on it or them.

SECTION 4.10.    <u>No Breach</u>.  The execution, delivery and performance of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby will not:

(a)    violate any provision of the Organizational Documents of the Amalphis Parties or ASSAC;

(b)    violate, conflict with or result in the breach of any of the terms of, result in a material modification of, otherwise give any other contracting party the right to terminate, or constitute (or with notice or lapse of time, or both constitute) a default under any Contract to which the Amalphis Parties or ASSAC is a party or by or to which it or any of its assets or properties may be bound or subject or result in the creation of any Encumbrance (other than Permitted Encumbrances [Not Defined]) on the assets or properties of the Amalphis Parties or ASSAC; or

(c)    violate any requirements of Law against, or binding upon, the Amalphis Parties or ASSAC or upon the properties or business of  the Amalphis Parties or ASSAC or applicable to the transactions contemplated herein.

16

Confidential Treatment Requested                    WMAC0020473