# PELUSO & TOUGER, LLP
## 70 LAFAYETTE STREET
## NEW YORK, NEW YORK 10013
### *PelusoandTouger.com*

*Ph. No. (212) 608-1234*
*Fax No. (212) 513-1989*

May 21, 2025

BY ECF and EMAIL
Honorable P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re: *United States v. Jason Galanis*, 15 Cr. 643 (PKC)

Dear Judge Castel,

The Court directed the government to clarify whether the phrase "no further restitution," as used in the Presidential Commutation, applies to the funds at issue. The government's answer that "further" means only prospective obligations is correct. However, their argument that the funds already forfeited for the limited and designated reason of restitution, though never so applied—are outside the reach of clemency is not merely incorrect; it is indefensible. As shown below, "no further restitution" as precisely stated in the Presidential Commutation must include restitution that has not been executed—regardless of when forfeiture occurred or what internal process DOJ commenced because there is no more restitution order to follow. The government's attempt to limit the President's clemency power through semantics finds no support in law, and the structure of the Constitution itself forecloses it.

Under the Constitution's unitary executive framework, all federal law enforcement authority is exercised under the President's control and by officers subject to his supervision and removal. As the Supreme Court recently reaffirmed in *Trump v. United States*, "all federal law enforcement power is ultimately exercised under [the President's] authority." See *Trump v. United States*, 602 U.S. ___, slip op. at 13–15 (2024); see also *Schick v. Reed*, 419 U.S. 256, 266 (1974) and *Myers v. United States*, 272 U.S. 52, 135 (1926). The clemency power is not open to reinterpretation by subordinate components of the Executive Branch. It is exclusive and final. The United States Attorney's Office for the Southern District of New York—no less than Main Justice—remains constitutionally bound by that command. "And the courts have "no power to control [the President's] discretion" when he acts pursuant to the powers invested exclusively in him by the Constitution." *Trump at slip op at 7*.

1

The government's May 15, 2025, submission does not simply misapply the law—it distorts it. At every turn, the government substitutes doctrinal sleight-of-hand for actual authority and ignores both the controlling force of the Presidential Commutation and the factual record in this case. Its opposition reads more like a bureaucratic justification than a legal argument. Forfeiture is not a blank check to use as you wish especially in this instance when the funds were clearly forfeited for the specific use of restitution, and executive clemency is not advisory. No amount of wordplay can erase the fact that the government is holding money it has no more lawful right to retain.

The government argues, incredibly, that once it has seized property—even for a specific purpose that has now been nullified—it may keep it permanently, regardless of the President's constitutional command or any lack of legal justification. That position is not supported by precedent, not grounded in the Constitution, and not consistent with the Department of Justice's own forfeiture policy. It is, in short, unlawful.

## I. THE COMMUTATION ORDER BARS ANY FURTHER RESTITUTION

### A. The Government's Interpretation Is Textually Untenable And Legally Indefensible

"Further" in this context plainly refers to obligations not yet completed—not solely prospective installments. The funds at issue were not disbursed to victims, not applied to restitution, and not credited in any way. They are held by the Clerk, frozen in place, awaiting direction. In every functional and legal sense, the funds continue to remain subject to future restitution—and therefore fall squarely within the ambit of "no further… restitution." Simply the funds were seized for a restitutional purpose, they were not disbursed and now that restitutional purpose has been eradicated, thus the funds must be returned to Mr. Galanis because there is no recognized reason to give the funds to anyone else.

The government asserts that the Commutation Order does not apply because "…the Commutation Order does not include any language concerning any payments that Galanis already made..." (Gov't Opp. at 3). That would be true if any restitution payments had been made but if there is one thing all the parties agree upon is that no such payments have been made. The fact that the government took some steps towards effectuating restitution payments does not belie the issue that no such payments have been made. And now there is no legal order to make restitution payments present.

What the government describes as "already paid" and "past payments" is nothing more than undelivered funds transferred between government accounts. To accept the government's framing would be to collapse the distinction between process and outcome—to treat the intent to pay as though payment had occurred. But asset seizure is not satisfaction. Custody is not compliance. And possession is not legal execution. The government's position is not just mistaken—it asks this Court to retroactively bless an administrative act that was never legally completed. There are indistbutable facts at bar here as admitted by the Government. First, is that money was acquired from Mr. Galanis for the sole purpose of restitution. Second, that restitution was never made. Third, is the President of the United States acting within his powers granted to him by the Constitution and supported by all judicial decisions exercised his power to commute Mr. Galanis' sentence and included in that Order is the clear language that no further restitution payments are required. Thus, it is Mr. Galanis' position that since the money taken from Mr. Galanis was for

the sole purpose of restitution and now that purpose has been extinguished, the money should be returned to him under Rule 41 (g). The government's unsupportable position is that they should be able to just keep it even though there is no legal reason to do so and they should just get a financial windfall. If the funds are not returned to Mr. Galanis where will they go. The only rightful place is back to Mr. Galanis because they cannot be used for restitution as there is no restitution order to follow.

Even more revealing than the government's legal arguments are its own factual admissions. The government concedes that "the Forfeiture Proceeds were transferred to the Clerk of Court for the purpose of applying the funds toward the Galanis restitution obligation." (Gov't Opp. at 3). It also admits, crucially, that "the most updated version" of the Clerk's victim payment records would need to be obtained by a direct request from the Court—because no such disbursement has yet occurred. (Gov't Opp. at 6). **These are not throwaway lines.** They amount to an admission that restitution has not been executed. In the same breath, however, the government insists that the Presidential Commutation—stating that Galanis shall have "no further…restitution"—does not apply to these unallocated and undisbursed funds. That is illogical. A pending restitution—especially one lacking legal predicate steps and issued without proper authorizations—is, by definition, future in character and therefore falls squarely within the plain terms of the Presidential Order.

### B. The Government's Reliance On Knowingly Distinguishable Cases Misleads The Court

The government cites *Knote v. United States*, 95 U.S. 149 (1877), for the proposition that clemency cannot reach forfeited funds already vested in the Treasury. But *Knote* involved post-Civil War confiscations where the funds had long been absorbed into the general fund of the Treasury. In essence the funds had reached their ultimate designated destination. That is entirely different then the facts herein. Here the funds have not reached their final designated destination and there is at this time no final designation to reach. Thus, the government's reliance on this case is misplaced. The money in this case has not been already paid forward for its designated purpose it remains segregated in the Clerk's control—earmarked for restitution (an obligation that no longer exists). No act of Congress has appropriated these funds for another use. The government does not cite a single modern case holding that segregated forfeiture funds, undisbursed and in limbo, are immune from judicial order once their stated purpose has been extinguished.

Moreover, *Knote* predates the development of the modern restitution and forfeiture framework by more than a century. It is no answer to the plain command of *Schick v. Reed*, 419 U.S. 256 (1974), which confirms that the President may commute "any part" of a sentence, including financial penalties. If a forfeiture judgment is part of the sentence—as DOJ itself argues when it wants to enforce one—then it is equally and necessarily subject to the clemency power.

The government's invocation of *Fordham v. Georgia Department of Administrative Services*, No. 23-11214, 2023 WL 5747709 (11th Cir. Sept. 6, 2023), borders on misdirection. In *Fordham*, the restitution funds had already been paid to victims. The case turned on the simple, uncontested fact that "the district court transferred all restitution monies to the victims," and those funds were no longer in the hands of the government. Here, not a single dollar has been distributed. The funds remain under federal control, undisbursed, and held solely for a restitution order that was

3

extinguished by Presidential Commutation. To equate *Fordham*—where restitution was a fait accompli—with this case, where restitution never occurred and now not required, is not just inapposite—it's legally incoherent. The government conflates completed relief with undone intention. That distinction makes all the difference.

### C. The Government Misrepresents the Defense Position

The SDNY asserts that "Galanis's suggestion that the Commutation Order means that he is no longer guilty of any crime is meritless." (Gov't Opp. at 4). That characterization is not only inaccurate—it is a deliberate distortion of the argument actually advanced.

At no point does Mr. Galanis contend that his conviction is invalid or that the Presidential Commutation erases guilt. The defense accepts the finality of the conviction and takes no issue with its continued effect. The argument here is far narrower: that the government cannot lawfully retain funds when both the punitive and compensatory purposes for doing so have been extinguished by Presidential clemency.

This is not a novel theory. It is grounded in well-settled constitutional law. See *Schick*, 419 U.S. at 256. ("A pardon is an act of grace… which exempts the individual, whom it is granted, from the punishment the law inflicts for a crime he has committed."). Clemency does not erase the conviction—it terminates the punishment. That is precisely what occurred here.

The SDNY's attempt to reframe this motion as a collateral attack on guilt is telling. It suggests a lack of confidence in the merits of its own position on the narrow issue actually presented: whether the government may indefinitely retain seized property when the legal basis for doing so no longer exists. Rather than confront that question, the government invokes a false narrative—one that has no support in the defense's actual motion or any filing before this Court.

## II. THE GOVERNMENT'S PROCEDURAL NARRATIVE BREAKS DOWN UNDER LAW AND RECORD

### A. The Government's Reliance On "Vesting" Misrepresents Forfeiture Law

The government places undue weight on the idea that title "vested" in the United States under the Final Order of Forfeiture (especially considering that the United States has no rightful claim to the money), as if that legal formality insulates its continued possession from all subsequent developments. This is both doctrinally flawed and practically absurd. The mere fact of vesting does not confer indefinite dominion over funds when the lawful purpose for which they were obtained—here, restitution—has been nullified by executive clemency. The government's reliance on "vesting" is a misstatement of current forfeiture law and fundamentally misrepresents how forfeiture operates within our legal system.

Vesting, in this context, is not a final destination—it is a procedural waypoint on the path toward lawful disposition. Title may have passed to the government, but that title came with strings attached: compliance with applicable law, DOJ policy, and judicial oversight. The forfeiture order itself states that the funds **"shall be disposed of according to law** (emphasis added)." That law

now includes the operative effect of the Presidential Commutation, which extinguished any remaining financial obligations. The government may not invoke "vesting" as a one-way ratchet—seizing assets indefinitely while disclaiming all continuing obligations to either dispose of them properly or return them once their justification collapses.

Courts have repeatedly recognized that the government's right to retain forfeited property is not absolute. In *United States v. Trotter*, 912 F.2d 964, 966 (8th Cir. 1990), the Eighth Circuit emphasized that forfeiture is a punitive tool—it must serve a valid penal or remedial purpose, not become a permanent windfall. Similarly, in *United States v. Bajakajian*, 524 U.S. 321, 329 (1998), the Supreme Court held that even completed forfeitures are subject to constitutional scrutiny and may be invalidated if they are grossly disproportionate or lack a legitimate basis. Once the penalty has been commuted and restitution eliminated, no punitive or remedial function remains. Continued possession becomes not merely unauthorized—it becomes an unconstitutional taking and a due process violation.

Indeed, the logic of the government's position—that once "vested," the funds are beyond judicial scrutiny or executive clemency—would immunize all forfeited assets from review, even in cases where the conviction is later vacated, the law changes, or clemency is granted. That is not the law. Vesting does not override the Constitution. Nor does it permit the government to transform restitution-oriented forfeiture into an unaccountable revenue mechanism.

### B. The Treasury-Vesting Argument Misrepresents Boultbee And Knote

The government cites *United States v. Boultbee*, 2024 WL 3220261 (Fed. Cl. July 1, 2024), and *Knote v. United States*, 95 U.S. 149 (1877), for the proposition that once forfeited funds are transferred to the United States Treasury, they become irrevocably vested in the United States and are no longer recoverable absent an act of Congress. This misstates both the holdings and the context of those decisions.

First, the funds in this case were **never** deposited into the general Treasury of the United States. They were initially transferred to the Department of Justice's Asset Forfeiture Fund (AFF)—a special-purpose Treasury account designated by statute for law enforcement and victim restitution—not general congressional appropriation.[1] Following internal DOJ procedures, the U.S. Marshals Service then transferred the funds to the Clerk of Court for the Southern District of New York, where they remain undisbursed. This trajectory places the funds in a fundamentally different legal posture than the assets addressed in *Knote* or *Boultbee*. Those cases involved funds irrevocably absorbed into the Treasury's general fund and removed from judicial control. Here, the funds are segregated, unapplied, and remain within the reach of this Court. See 28 U.S.C. § 524(c)(1). Funds in the AFF remain subject to DOJ control and judicial oversight for the specific purposes enumerated in the statute, not as general revenue. The court in *United States v. Blackwell*,

---

[1] *See* 28 U.S.C. § 524(c), which establishes the DOJ Assets Forfeiture Fund as a special account "in the Treasury of the United States" to receive forfeited assets and permit their use for law enforcement and victim compensation—not general congressional spending. Although administered within the Treasury, the AFF is distinct from the general fund referenced in *Knote*. *See also* DOJ Asset Forfeiture Policy Manual (2016 ed.), Ch. 14, pp. 250–53 (explaining the AFF's restricted uses, the restoration process, **and the continuing jurisdiction of courts over undisbursed funds**).

459 F.3d 739, 772 (6th Cir. 2006) recognized this distinction, noting that forfeited assets destined for specific statutory purposes remain subject to judicial scrutiny in ways that general Treasury funds do not.

The distinction is legally dispositive. As *Boultbee* itself recognizes, "a property interest is considered vested once the property has 'passed out of the jurisdiction of the officer or tribunal.'" 2024 WL 3220261, at *3 (quoting *Knote*, 95 U.S. at 154). Here, the funds have not passed out of jurisdiction. They remain under the custody of the Court and may be directed by this Court pursuant to its equitable authority under Rule 41(g), which applies specifically when criminal proceedings have concluded and the government lacks a continuing lawful basis to retain property. See *United States v. Chambers*, 192 F.3d 374, 377 (3d Cir. 1999).

Second, the government's invocation of the Appropriations Clause is equally misplaced. Article I, § 9, cl. 7 of the Constitution ensures that public funds cannot be spent absent statutory authority—but it does not bar the return of property that the government has no legal right to retain. When the constitutional foundation for holding those funds has been nullified, due process and equity demand their return. Rule 41(g) provides the precise mechanism for that return, and no appropriation is needed when the government's claim has been extinguished by a superior constitutional authority—here, a valid and binding Presidential Commutation under Article II.

### C. The Government's Own Conduct Confirms the Intended Purpose of the Forfeited Funds

The government now suggests that it may retain funds that were forfeited for the expressed purpose of restitution even after the restitution obligation has been constitutionally cancelled. That position is inconsistent with the mutual understanding at the time of plea and sentencing, and with the government's own conduct over the following years.

Not once, but twice, the government demonstrated that understanding. In 2021, it submitted a formal restoration request to the Department of Justice's Money Laundering and Asset Recovery Section (MLARS), seeking permission to apply the forfeited funds toward restitution. When that effort proved incomplete, the government attempted again in December 2024. These efforts are not procedural curiosities—they are admissions of intent. At no point did the government argue that the funds were simply government property untethered to restitution. Instead, it consistently treated them as conditionally held for restitution payment.

That framing is confirmed in the government's current brief. It states that **"the Forfeiture Proceeds were transferred to the Clerk of Court for the purpose of applying the funds toward [Galanis's] restitution obligation."** (Gov't Opp. at 3). That sentence encapsulates the shared premise: the funds had a designated end-use. That end-use—restitution—has now been nullified by a Presidential Commutation. With that purpose extinguished, the continued retention of funds violates the intent that underpinned their surrender.

The mutual understanding at the time of the plea herein was not that the government would receive a windfall if restitution became impossible. And if asked in 2017 whether, in the event of a future legal development voiding restitution, the government would nonetheless keep the funds, no reasonable party would have answered yes. That scenario was not contemplated. As courts have

consistently held, plea agreements must be construed to avoid inequitable or absurd results. See *United States v. Ready*, 82 F.3d 551, 559 (2d Cir. 1996); *United States v. Vaval*, 404 F.3d 144, 152 (2d Cir. 2005).

### *D. This Court Has Already Ruled That Restoration Must Be Completed Before Any Victim Entitlement Attaches*

In a July 16, 2021, letter to this Court, the government described the restoration process as incomplete and legally non-self-executing. The SDNY wrote: "Restoration is not automatic." We agree. The office went on to emphasize that "[t]he final determination of whether to grant such restoration rests with MLARS," the DOJ's Money Laundering and Asset Recovery Section. (ECF No. 571 at 3). The government further stated that "courts do not have authority to order restoration absent a motion from the Government and approval by MLARS." (Id.).

This Court adopted that exact framework in its August 12, 2021, ruling. The Court acknowledged that while the government had submitted a restoration request to MLARS, no approval had issued and "no restoration has occurred." (ECF No. 575 at 2). It held accordingly that the forfeited funds were not subject to restitution.

That ruling resolved the legal question now before the Court: whether forfeited funds can be deemed "vested" in victims before the DOJ completes restoration and seeks court authorization. The answer in 2021 was no—and the relevant facts have not changed. Although the government now cites a December 2024 MLARS approval, it has taken no further steps. No motion has been filed under Rule 32.2(e), no court order has issued, and no distribution has occurred. The funds remain unallocated and undistributed and their reason for forfeiture nullified. It is clear from the facts that no restitution Order has been executed let alone that any restitution made thus, the government's "vested" arguments are inapplicable.

The SDNY's current theory—that the victims somehow acquired enforceable rights without court action—is not merely inconsistent with its 2021 position. It is a full reversal. Then, the government insisted that MLARS approval was necessary but insufficient standing alone. Today, it invites the Court to treat an alleged MLARS approval as functionally dispositive—despite the lack of any judicial follow-through.

### *E. MLARS Authority Is Foreclosed After Presidential Commutation*

Notwithstanding all of the above, MLARS is not authorized to act once the criminal sentence has been commuted. The government's reliance on prior MLARS restoration approval reflects a misunderstanding of both the scope of that authority and the legal consequence of a Presidential Commutation. MLARS operates exclusively within the DOJ's criminal enforcement infrastructure. Its authority to approve restoration of forfeited property to victims exists only where a valid restitution order remains in effect. That authority does not survive the termination of the underlying sentence. Once the President exercised his constitutional power to eliminate "all further restitution," MLARS became legally disabled from authorizing any further action. The agency's role was foreclosed.

DOJ policy is explicit. The Asset Forfeiture Policy Manual states that "Restoration requires a court order of restitution and a final order of forfeiture," and that "[r]estoration requests must be approved by the Chief of MLARS" only while a valid restitution obligation remains enforceable. See AFPM (2016 ed.), Ch. 14 at 253. That condition is jurisdictional. Without a restitution order, MLARS lacks authority to approve any disbursement. Even internal DOJ regulations confirm that MLARS is empowered to act only "in connection with the return of forfeited property to victims pursuant to court-ordered restitution." 28 C.F.R. § 9.8. There is no provision—statutory or regulatory—that permits MLARS to operate independently of a criminal judgment. Its authority is derivative, not plenary.

Nor may MLARS approval serve to revive a restitution obligation that has been constitutionally extinguished. The restoration process is not self-executing. It requires a live judgment, court authorization, and an operative legal purpose. None of those conditions are met here. The funds at issue remain undisbursed, no motion under Rule 32.2(e) has been filed, and the restitution obligation itself has been eliminated. Whatever MLARS may have approved in December 2024, that approval was nullified as a matter of law the moment clemency entered into effect.

The government's invocation of MLARS in this context is not supported by law—it is an effort to preserve the appearance of enforcement authority after its legal foundation has collapsed. The DOJ cannot act through MLARS once the criminal framework is gone. It cannot use MLARS to effect restitution that has been barred by the President's clemency, nor can it invoke restoration procedures to bypass the judicial oversight required under Rule 41(g).

In its reply the SDNY now urges the Court to act in its stead: "The Government understands that the most expedient way for the Court to obtain the most updated version of those records would be for the Court to request them directly from the Clerk of Court." (Gov't Opp. at 6). The government is conceding that they have no power to act, thus they are asking this Court to step in and retrieve from the Clerk of the Court the list of restitution parties and then Order restitution to those parties even though there is no longer any restitution order to act on. This audacious request is a hail Mary attempt by the government to bypass the procedural safeguards that govern restitution and forfeiture administration because it no longer has the power to submit its own motion seeking disbursement or allocation. But like most hail Mary pass attempts, it must fall incomplete, because the Court has no restitution order to act upon, as it has been extinguished by the Presidential Commutation.

In effect, the government asks the Court to initiate the evidentiary inquiry itself—to stand in for the prosecution's own unmet burden. The SDNY's refusal to file a motion now is because **it lacks the authority or documentation to do so.[2]** This Court should not be conscripted to act where the SDNY will not—and cannot.

---

[2] Even if MLARS continued to be available, it would not be complete as of the Commutation date. Under Department of Justice regulations and policy, MLARS approval is not a one-time authorization. It is a continuing supervisory requirement that extends through each phase of the restoration process. Specifically, the Asset Forfeiture Policy Manual makes clear that MLARS must review and approve *both* the initial restoration request *and* the specific motion or stipulation filed with the court to effectuate disbursement. See DOJ Asset Forfeiture Policy Manual (2016) at 166 ("[A]ll motions or stipulations must be sent to

### III. THE CLERK-HELD FUNDS ARE NOT BEYOND THIS COURT'S REACH

*A. The Government's Position Subverts The Authority Of The President And The Unitary Executive*

Even assuming arguendo that a prior MLARS Chief approved restoration on December 23, 2024, that authorization was discretionary, incomplete, and never executed. It has no force under the current administration. As Justice Rehnquist observed, "[a] change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of… its programs." *State Farm*, 463 U.S. 29 at 59 (1983) (Rehnquist, J., concurring). The SDNY cannot now revive a discretionary process initiated by unelected officials in a prior administration to override a binding act of constitutional clemency. The President—not a U.S. Attorney's Office—sets national policy. And the President has the power to oversee the faithfulness of the officers who execute them. *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 496-97 (2010). The SDNY's position is not just wrong—it is structurally incompatible with the democratic and constitutional order.

At bottom, the government's position rests on the dangerous premise that an executive agency—here, the SDNY of the Department of Justice—can neutralize or override a binding act of Presidential clemency. That is not merely doctrinally incorrect—it is structurally offensive to the constitutional design.

The Constitution vests "[t]he executive Power" in a single official: the President. U.S. Const. art. II, § 1, cl. 1. That power includes the absolute authority to "grant Reprieves and Pardons for Offences against the United States." U.S. Const. art. II, § 2, cl. 1. As the Supreme Court held in *Schick*, 419 U.S. at 256, this power includes the authority to alter, eliminate, or modify any part of a sentence. No subordinate within the Executive Branch—not DOJ, not MLARS, not the Marshals Service—may lawfully frustrate or circumvent that order.

The SDNY now seeks to preserve its control over the funds by invoking forfeiture formalities and Treasury theories in defiance of the plain language of the President's command. That is not how a unitary Executive operates. Under *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2197 (2020), and *Myers v. United States*, 272 U.S. 52 (1926), executive branch officials act only through the President's constitutional authority—not in defiance of it. When the President cancels further restitution, no one in the Department of Justice may revive it by sleight of hand. A President—not a prosecutor—controls the fate of a federal sentence.

*B. Rule 41(g) Now Governs As A Civil Proceeding—And That Shift Carries Consequences*

---

MLARS for approval before being filed with the court."). MLARS approval is therefore iterative and contingent—not self-executing. The absence of a subsequent motion, supported by a renewed MLARS conference and approval, is fatal to the government's present position.

The government's opposition continues to frame this matter as though it remains part of an active criminal case. It is not. The criminal sentence has been commuted in full. There is no outstanding judgment to enforce, no pending criminal proceeding, and no further restitution obligation. The only question before this Court is whether the government may continue to hold property where the asserted basis for retention—restitution—has been extinguished. That question falls squarely within the scope of Rule 41(g), which governs civil motions for return of property when criminal proceedings have ended and no other lawful basis remains.

The government cannot selectively invoke the criminal posture to justify its continued retention while refusing to accept the procedural consequences that civil treatment entails. Once Rule 41(g) attaches in its civil form, the government inherits the burdens and responsibilities of a civil litigant. That includes the obligation to justify its retention of property under equitable standards—not mere possession. The burden of proof shifts to the government to demonstrate a lawful basis for continued custody. See *Chambers*, 192 F.3d at 377 ("The burden shifts to the government"). The presumption is no longer in the government's favor. The Court is no longer required to defer to prosecutorial representations. The matter is to be resolved under principles of fairness, finality, and constitutional fidelity.

The government's failure to acknowledge that procedural pivot is telling. It continues to file through the Criminal Division. It continues to rely on forfeiture formalities. And it continues to assert a punitive framework that no longer exists. Clemency extinguished the sentence. There is no longer a criminal structure through which these funds may be retained. The government is attempting to enforce a judgment that has been voided—through a division that no longer has standing to pursue it—and by a process that no longer applies.

That is not how Rule 41(g) operates. And it is not how the Constitution functions. The government must now defend its position as a civil custodian—not a criminal enforcer. And it must do so under standards that demand more than historical seizure or bureaucratic inertia. The burden rests with the government to show—affirmatively and with precision—why it continues to hold the funds in question in the absence of any sentence to satisfy and no restitution order to enforce. It has not done so. And under Rule 41(g), that failure compels return.

The government cannot have it both ways. If the criminal sentence has ended, then Rule 41(g) governs and the government bears the civil burden of justifying retention under equitable standards. If the criminal sentence remains operative, then it falls under the President's clemency power and has been extinguished. Either way, the government has no lawful basis to keep the funds.

## CONCLUSION

The material facts are not in dispute. The government concedes that the funds in question were never disbursed to victims. It acknowledges that any allocation would require further judicial action, and that no such motion has been filed under Rule 32.2(e) or 18 U.S.C. § 3664. It further admits that the most current records of the Clerk's Office must be obtained directly by the Court, not from any completed administrative process. Indeed, the most reasonable inference for the government missing the court ordered deadline and requested two additional extensions is that the

administrative process can no longer legally be completed in compliance with MLARS requirements.

At the same time, the government asks this Court to conclude that these funds—undistributed, unallocated, and not subject to any operative restitution order—are beyond the reach of a valid Presidential Commutation. That position cannot be squared with the structure of the Commutation, the undisputed procedural history, or the framework of Rule 41(g), which applies precisely where criminal proceedings have concluded and no lawful basis remains for continued retention of property.

The question now is not whether restitution was warranted when first ordered—it is whether restitution was ever lawfully completed. The record confirms it was not. No funds were disbursed. No court order directed payment. No victim allocation has been authorized. And the Commutation eliminated any further restitution obligation.

In these circumstances, continued possession of the funds lacks a statutory or constitutional foundation. The government has asserted no remaining legal mechanism for disbursement, nor offered any evidence that the requirements of MLARS restoration were completed. The funds remain in custodial suspension—without judicial directive, without executive authority, and without lawful purpose.

The Court need not reach beyond these facts. Very simply and logically under Rule 41(g), when the government's legal claim to property lapses, the remedy is return. That rule does not carve out exceptions for cases involving commutations, nor does it permit indefinite retention of property based on incomplete processes. To rule otherwise would create a deeply problematic precedent: that unexecuted restitution—left untouched for nearly a decade—can be revived at the eleventh hour to defeat a Presidential Commutation, without court order or statutory authority. The equities now urged by the government cannot cure its years of procedural inaction, nor transform an incomplete process into a lawful basis for indefinite retention. Put very simply the funds were taken for a particular purpose it is indisputable that that purpose no longer exists and thus under Rule 41(g) the funds must be returned.

We respectfully submit that the motion should be granted and the funds in question be returned to undersigned counsel's IOLA account.

Respectfully submitted,

David Touger, Esq.
Counsel for Jason Galanis